# Exhibit A


Westlaw.

S.D.N.Y. 2004.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
In Re: MEDCO HEALTH SOLUTIONS, INC.,
PHARMACY BENEFITS MANAGEMENT
LITIGATION.
**No. 03 MDL 1508 (CLB)**

May 25, 2004.

MEMORANDUM AND ORDER

[Brieant], J.
  **\*1** This Court held a hearing on December 11,
2003, continued on May 6, 2004, with respect to Class
Plaintiffs' motion for final approval of their
settlement. The Plaintiffs request an Order from this
Court certifying them as a class for settlement
purposes pursuant to [Fed. R. Civ. P. 23(a) & (b)], and
approving a proposed settlement of this litigation. This
was all preliminarily approved by this Court on July
31, 2003. Also before this Court is a fee application on
behalf of Abbey Gardy, LLP, and Boies, Schiller &
Flexner, the firms which represent Plaintiffs Genia
Gruer, Walter Green, Mildred Bello, Marissa Janazzo
and Elizabeth O'Hare ("Settling Plaintiffs"), a fee
application on behalf of by Lowey Dannenberg
Bemporad & Selinger[FN1] and Rawlings &
Associates[FN2] (Docket # 69) and a fee application of
Attorney Linda J. Cahn (Docket # 59), discussed
below. Familiarity of the reader is assumed to all prior
papers and proceedings in this litigation.

> [FN1]. Lowey Dannenberg Bemporad &
> Selinger represents class members Verizon
> Communications,         Inc.,        Qwest
> Communications, International, Inc., and
> SBC Communications, Inc.

> [FN2]. Lowey Dannenberg Bemporad &
> Selinger togther with Rawlings and
> Associates have represented Oxford Health
> Plans, Inc., Louisiana Blue Cross Blue
> Shield, Guardian Life Insurance Company of
> America, Group Health Incorporated,
> Great-West Life & Annuity Insurance

Company, Medical Mutual of Ohio,
California Physicians' Service d/b/a Blue
Shield of California, Blue Cross and Blue
Shield of North Carolina, Premera Blue
Cross, CIGNA Healthcare, Inc., and Horizon
Blue Cross Blue Shield of New Jersey.

  On December 17, 1997, a complaint was filed in
the Southern District of New York against Defendants
Merck-Medco Managed Care, L.L.C., Merck & Co.,
Inc. and Medco Health Solutions (collectively
"Medco"). The complaint alleges breaches of Medco's
fiduciary duties to its pharmaceutical benefit plans
under the Employee Retirement Income Security Act
("ERISA"),     [29 U.S.C. Section 1001]*et seq.*
Subsequently, four additional actions were filed with
this Court, which were consolidated into the present
action. In 2001, the Judicial Panel on Multidistrict
Litigation accepted jurisdiction of these and other
cases. To date, 12 additional actions have been
transferred to this Court, all containing the same or
similar allegations of breaches of fiduciary duties
owed to employee benefit plans under ERISA.

  The law firm of Abbey Gardy ("Abbey Gardy")
represented Plaintiffs in each of the five cases at the
outset. In late 2000 and early 2001, several of the
Plaintiffs retained the law firm of Boies, Schiller &
Flexner ("Boies Firm"). The two firms coordinated
their efforts from that point on.

  **\*2** Plaintiffs claim that Medco held itself out as an
independent pharmacy benefits management company
("PBM") that could control the quickly rising costs of
prescription drugs by aggregating the purchasing
power of employee benefit plans and thereby
negotiating favorable purchasing terms with drug
manufacturers. In reliance on Medco's promises of
cost containment, Plan sponsors entrusted Medco with
discretionary authority over certain aspects of the
management of their pharmacy benefit plans ("Plans")
for the primary purpose of cost containment. Plaintiffs
claim that Medco "systematically misused its
fiduciary authority, and its management of
formularies and drug-switching programs, among
other purposes (i) to increase the market share in
specific drugs of its parent company Merck, and (ii) to
divert rebates from drug manufacturers to itself, both

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at the expense of the Plans".*See* Pl. Mem. Plaintiffs contend that Medco did not disclose the nature of its plan management practices or the extent to which the Plans failed to obtain benefits, or incurred costs, because of such practices. Plaintiffs allege that Medco and its parent company Merck engaged in transactions prohibited under ERISA.

Defendants filed for summary judgment on September 21, 1999, which motion was deferred pending discovery and later withdrawn because of settlement discussions. In December 1999, the first four actions, consolidated under 97-Civ-9167, were referred on consent to Special Master Charles G. Moerdler, to aid in, among other things, discovery issues and disputes. The Parties began intensive settlement negotiations in summer 2001, under the direct supervision of the Special Master and with some participation of this Court, which resulted ultimately in the Proposed Settlement Agreement presently before this Court.

The Class, as defined by the Proposed Settlement Agreement, consists of all employee welfare benefit Plans that have and have had contracts with Medco, whether directly or indirectly (including through third party administrators, HMOs, insurance companies, Blue Cross Blue Shield entities, or other intermediaries (collectively, "TPAs")), where the contracts between such plans and Medco were both (a) in force at any time between December 17, 1994, to the date of the final approval of the Settlement contemplated by this Settlement Agreement, and (b) subject to ERISA.

As terms of the Settlement, Medco will modify its business practices significantly, provide significant disclosures as to the basis of changes in the formularies and drug interchange programs managed by Medco, and pay $42.5 million into a settlement fund to be paid to class members, which includes attorneys' fees, not to exceed 30%, and expenses. In exchange, Plaintiffs will release all claims of the Class to the extent that the claims arise under ERISA or arise from or relate in any way to the transactions or occurrences that are the subject of the actions asserted against Merck or Medco, and Plaintiffs will release claims against third-party administrators ("TPAs") and plan sponsors that have contracted with such TPAs that are based upon, arising from or related to the conduct of Medco or Merck that are being released

with this Settlement. *See* Amended Settlement Agreement, ¶ 16. However, the Proposed Settlement does not release anti-trust claims or contract claims not affected by ERISA. *See* Amended Settlement Agreement, ¶ 17.

**\*3** The Notice of Pendency of Class Action, Proposed Class Settlement and Hearing (the "Initial Notice") was sent on September 16, 2003, to over 815,000 potential class members, informing them of the Proposed Settlement and hearing to be held on December 11, 2003 to determine the fairness, reasonableness and adequacy of the Settlement. Any class member choosing to opt out of the Proposed Settlement was to mail such requests by November 14, 2003. At the initial fairness hearing on December 11, 2003, the Court received and heard a number of objections to the Proposed Settlement Agreement, which are either discussed in further detail below, or have since been withdrawn. At the initial fairness hearing, it was also discovered that numerous TPAs and other intermediaries did not forward the Initial Notice to the Plans on whose behalf they contracted with Medco. The Court ordered a supplemental notice be sent to the class members that had not received the Initial Notice, which Order was filed on March 15, 2004. The fairness hearing, for class members that had not received adequate notice, resumed on May 6, 2004, at which time the applications were fully submitted for decision.

During the May 6, 2004 hearing, Class Counsel informed this Court that no additional objections had been filed in response to the supplemental notice sent, and only three of the objections heard at the initial hearing remained. Currently there are approximately 200 individual plans opting out of the settlement. Upon the approval of the settlement, 13 out of the 17 cases involved in this litigation currently before the Court will be closed.

**Objections to the Proposed Settlement Agreement**

Sweetheart Cup Company ("Sweetheart") is a plan sponsor of an employee welfare benefit plan located in Owings Mills, Maryland. Sweetheart entered into a contract with Systemed, L.L.C., an affiliate of Medco Health Prescription Solutions, Inc., titled "Integrated Prescription Drug Program Agreement". In the agreement, Medco agreed to provide Sweetheart with a prescription drug benefit

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

program and be its pharmaceutical benefit manager.

Sweetheart is a member of the class. It is a sponsor for the plan through an affiliate of Medco. The contracts were subject to ERISA. Sweetheart is a self-funded plan that believes its interests were not protected by the settling plaintiffs who represented insured members and plans.

Iron Workers Tri-State Welfare Fund ("Iron Workers") is an employee benefit fund located in Lansing, Illinois. Iron Workers also contracted with Systemed. Iron Workers is a member of the class in the same way Sweetheart is and objects for the same reasons as Sweetheart, as discussed below.

Central States Southeast and Southwest Areas Health & Welfare Fun ("Central States") is an employee welfare benefit fund in Rosemont, Illinois. Central States is also a member of the class in the same way Sweetheart and Iron Workers are members. Central States contracted with Medco to provide Central States with managed prescription-drug program services and to act as its pharmaceutical manager. Central States objects to the settlement on the same grounds as both Sweetheart and Iron Workers.

**\*4** Sweetheart, Iron Workers and Central States Ironworkers contest the settlement claiming that the allocation between the self-funded drug plans and the insured or capitated drug plans is unfair, inadequate and unreasonable. All three plans contend that the Proposed Settlement unfairly favors the insured and capitated, as opposed to the self-funded plans. According to the Notice, Plans that paid for insurance to avoid risk of paying claims, share in the Settlement Fund, at a reduced rate, notwithstanding that they suffered no damage because of their insurance coverage. The Notice is silent as to how the proponents of the settlement derived the insured plans' claim reduction of 55% relative to the claims of the self-funded plans. The three plans contend that no Plaintiff adequately represents the separate interests of self-funded plans. They also claim there is a conflict of interest in the representation of the class, arguing that only a self-insured plan or sponsor, can adequately represent the interests of the self-insured plans.

At the hearing, and in Class Counsels'

memorandum of law in support of Class Plaintiffs' motion for final approval of settlement, it became clear that in practical reality no such conflict of interest exists. The same legal theory underlies all Class Members' claims, that Medco violated ERISA in exercising its discretionary authority to negotiate with drug manufacturers on behalf of its plan sponsors, and in its control over the formularies and therapeutic drug interchange program. Although the negative drug interchange claim directly affected the self-funded plans as opposed to the insured plans, this is insufficient to find a conflict of interest exists. Class Counsel determined that Medco's failure to pass through rebates may have increased or failed to reduce the drug-acquisition costs of the members of the insured plans in addition to those of the self-funded plans. Accordingly, the 55% reduction applying to the insured plans was determined to be a reasonable discount of their claims. "Even where there are some individualized damages issues", common issues may predominate "when liability can be determined on a class-wide basis." *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001).

Sweetheart, Iron Workers and Central States also argue that the Proposed Settlement inadequately describes how the settlement funds are to be distributed. They contend that class members cannot calculate their proportionate share based on the information in the Proposed Settlement or the Notice. The Proposed Settlement and Notice state that allocation of the funds "shall be made primarily on the basis of each settling Plan's proportionate share of the total drug spend of all settling Plans[.]" They claim that this wording does not explain the meaning of "primarily", disclose the non-primary bases for determining allocation and methodology, or indicate the total drug spend of the proposed class during the class period. The three objecting plans also contend that there is no basis to determine whether the $42.5 million cash component is reasonable. As discussed in detail below, the Court finds the Proposed Settlement and the Plan of Allocation reasonable and fair.

**\*5** Finally, Sweetheart, Iron Workers and Central States contend that the Notice and Proposed Settlement are unfairly misleading as to which claims are retained by the class members in Paragraph 17. This objection was discussed during the December 11, 2003 court conference. The Court finds no merit in this objection. Paragraph 17 states:

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Nothing in paragraph 16 is intended to release or to be construed to release Medco from contract claims asserted by parties with which Medco has contracted to provide services, including (where permitted by applicable state law) contract claims for breach of implied covenant of good faith and fair dealing, provided, however, that claims not based on contract are released to the extent provided for in paragraph 16. Nothing in paragraph 16 is intended to release or to be construed to release TPAs from contract claims asserted by parties with which any TPA has contracted to provide services, including (where permitted by applicable state law) contact claims for breach of the implied covenant of good faith and fair dealing, provided, however, that claims not based on contract are released as provided for in paragraph 16.

The Amended Settlement Agreement is clear and it speaks for itself. Further, it was admitted by Medco during the December 11, 2003, conference that "the contract claims are carved out and not released...Medco agrees with settling counsel that none of the contract claims will be released for any of Medco's client and no contract claims are preempted by ERISA."Dec. 11, 2003 Hearing Tr. at 16. Accordingly, the objections made by Sweetheart, Iron Workers and Central States are without merit and they are overruled.

On November 14, 2003, the following Plaintiffs submitted a Statement of Intent to Opt Out with Conditional Objection to the Proposed Settlement and Incorporated Memorandum in Support with Motion to Intervene: (i) Betty Jo Jones on behalf of Daimler Chrysler Prescription Drug Plan; (ii) Rosemary DeLong on behalf of the Verizon Prescription Drug Plan; (iii) David J. Gibson on behalf of the DuPont Prescription Drug Plan; (iv) Carl J. Goodman on behalf of the DuPont Dow Elastomers Prescription Drug Plan; (v) Pamela Stolz on behalf of the Northwest Airlines Prescription Drug Plan ("Northwest"); (vi) Margaret Weesner on behalf of the American Standard/TRANE Prescription Drug Program; and, (vii) Mattie Garcie on behalf of the Lucent Technologies Prescription Drug Plan. These Plaintiffs wanted to be excluded from the Settlement and in the event that any "opt out" exclusion is not recognized by the Court, they wished to intervene, and object to the Proposed Settlement.

At the Court Conference on December 11, 2003,

this Court was informed and now finds that the seven individuals listed above did not have authority to act on behalf of the plans that they were attempting to opt-out of the settlement. The class consists solely of Plans. A plan participant or beneficiary does not have the authority to decide whether to opt-out its plan. The Court has received letters from counsel writing on behalf of each Plan's fiduciary indicating the Plans' intent to participate in the settlement agreement. In a letter dated December 5, 2003, Northwest Airlines wrote a letter to this Court stating that Pamela Stolz does not represent Northwest Airlines, and thus, cannot bind it. Northwest seeks to have itself stricken from the pleading. This Court grants Northwest's request, and denies the Objection of Pamela Stolz, since the right to object and opt out belongs to the Plan Fiduciary. In a letter dated December 8, 2003, Daimler Chrysler wrote a letter to this Court stating that Betty Jo Jones did not have the authority to act on behalf of Daimler Chrysler, and thus could not bind it. In a letter dated December 10, 2003, attorneys for DuPont stated that the named Plaintiffs did not have the authority to opt out both of DuPont's plans from the settlement and that DuPont's intention is not to opt out. By letter dated December 1, 2003, the fiduciary for American Standard, Inc. notified this Court that Ms. Weesner was not authorized to represent the American Standard plan, and that the Plan did not wish to opt out of the settlement. By letter dated November 18, 2003, Verizon indicated that Ms. DeLong was not authorized to act on behalf of the plans sponsored by Verizon Communications, Inc. and that Verizon did not wish to opt out of the settlement. Lucent Technologies, Inc., the named fiduciary of the Lucent medical plans, wrote to the Court on December 3, 2003, informing the Court that it was not opting out of the settlement and that Ms. Garcie did not have authorization to represent Lucent or any one of its plans. Accordingly, Plaintiffs' motions and objections on behalf of the six plans are denied for want of standing and overruled.

**\*6** On November 14, 2003, Group Hospitalization and Medical Services, D/B/A Carefirst Blue Cross Blue Shield ("Carefirst"), a TPA, filed objections to the Amended Proposed Settlement, as well as a motion to intervene on February 13, 2004. The Court denied Carefirst's motion to intervene on March 25, 2003, concluding that the right to accept or reject the proposed settlement belongs to the Plan Fiduciaries and not to the TPAs. Because Carefirst is not a member of the Class, and its rights will not be

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

affected by the approval of the Settlement, Carefirst lacks standing to object on its own behalf and has failed to demonstrate that it has authority to act for a plan in opting out.

### Discussion

### *Class Action Certification*

In order to qualify for class certification under Fed.R.Civ.P. 23(b)(3), plaintiffs in the proposed class must first demonstrate that they satisfy the four requirements of Fed. R. Civ. P. 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. If these criteria are met, the court must decide whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and whether a class action "is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).*Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

Rule 23(a)(1) requires that the "class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The rule does not require that joinder of all parties is impossible, only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate. "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (*per curiam*). Typicality "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001).

The class is comprised of self-funded and insured or capitated plans. The number of potential class members exceeds 815,000. The Plans claim that Medco breached its fiduciary duties owed to the Plans under ERISA. It is clear that the requested declaration of a class fits within the requirements of Rule 23(a) F. R. Civ. P. in that the class is so numerous that joinder of all members is impracticable, questions of law and fact are common to the class, and the claims or

defenses of the representative parties are typical of the claims or defenses of the class.

**\*7** "Rule 23(a)(4) provides that, in order to certify a class, its proponents must show that 'the representative parties will fairly and adequately protect the interests of the class.'" Fed. R. Civ. P. 23(a)(4). This rule requires courts to ask whether "plaintiff's interests are antagonistic to the interest of other members of the class." *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 142 (2d Cir. 2001) (internal citations omitted). As previously mentioned, three members object to class certification on the theory that their interests as self-insured plans were not represented adequately because their attorneys were kept out of the negotiations. Our Court of Appeals has held that the threshold for meeting "adequacy of representation" is "[first,] class counsel must be 'qualified, experienced and generally able' to conduct the litigation. Second, the class members must not have interests that are 'antagonistic' to one another." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992) (internal citations omitted); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

Opponents of the Settlement do not dispute that the first prong has been met. They focus their attack on the second prong, arguing that their interests substantially conflict with the rest of the class, the insured plans. This Court disagrees. Aside from the general allegation that the Settling Plaintiffs did not submit proof as to how, during their negotiations, they calculated the 55% reduction in recovery for self-insured plans, the Opposing Plaintiffs have not offered any proof that the Settling Plaintiffs' interests are antagonistic to the self-insured plans. The class members must "possess the same interest and suffer the same injury" to meet the adequacy of representation requirement. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26, 117 S. Ct. 2231, 2251 (1997). The record shows that all members of the class share a common interest in establishing that Medco violated ERISA. All members similarly wish to obtain the highest possible recovery.

The question is whether the insured or capitated plans suffered the same injury or any injury at all. As insured funds, they paid the same premiums regardless of which type of drug Medco purchased for the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

account of their plan. It is highly unlikely that the Plans incurred any monetary damages as a result of Medco's activities as alleged by the drug interchange claim, which principally affects the self-funded plans. However, to the extent that Medco was keeping rebates and breaching its fiduciary duties under ERISA as claimed by the Plaintiffs, those claims are equally meritorious and equally viable for the self-funded plans and the insured plans. For all these reasons, the Settlement Agreement balances the equities. It provides for the insured plans' claims to be reduced to 55% as compared to the claims of the self-funded plans. That the two different types of plans might recover different amounts had they brought suit on their own, is insufficient to establish antagonistic interests among class members. This Court rejects the argument that Rule 23(a)(4) has not been satisfied.

*8 Rule 23(b)(3) certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *see also Parker*, 331 F.3d at 21. The rule requires the Court to consider "the interest of members of the class in individually controlling the prosecution or defense of separate actions," Fed. R. Civ. P. 23(b)(3)(A), as well as "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). *Parker*, 331 F.3d at 21.

This Court finds that the Plaintiffs satisfy the prerequisites for status as a class action pursuant to Rule 23(b)(3). The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members of the Class. The class action is superior to other available methods for fair and efficient adjudication of the claims.

### Approval of Settlement and Judgment

Under Fed. R. Civ. P. 23(e)(1)(C), "the court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate."

The settlement amount of $42.5 million is fair,

reasonable and adequate. It represents a significant amount, bargained at arms length, by distinguished and experienced attorneys who have been involved in the case for an extended period of time. The parties engaged in protracted, often difficult and lengthy negotiations, supervised and aided by the Special Master and this Court. The negotiations were undertaken in good faith and after substantial factual investigation and legal analysis of the claims and defenses of the parties. Legal issues of first impression in this Circuit are presented by this litigation.

The absence of a substantial number of objections, and the relatively few opt-outs may be considered by the Court in approving the Proposed Settlement. Class counsel sent out more than 815,000 notices of which only 200 Class members have opted out, and only three objections remained, which this Court has now dismissed.

This litigation involved complex factual and legal issues. The case presented a question of first impression, whether pharmacy benefit managers (PBMs), like Medco, are fiduciaries as defined under ERISA. If Medco is a fiduciary according to ERISA, then Plaintiffs would have had to prove that Medco breached its fiduciary duty by making decisions during the Class Period that benefitted it or its parent Merck at the expense of the Plans. Defendants deny that Medco owed fiduciary duties to the plans. Defendants assert that Medco administers its prescription drug plans according to plan design choices made in arm's length negotiations and well known to the industry prior to 1997 when this litigation began and, even so, the plans did not suffer any damages from any alleged misconduct. Discovery on these claims and defenses was substantial.

*9 The significant amount of time and discovery that has been conducted in the course of this litigation has allowed the participants to reach a clear understanding of the value of the claims being asserted. This Court can and should balance the benefits afforded the Class including the immediacy and certainty of recovery against the continuing risks and delay of litigation. The claims present unique questions of the applicability of ERISA to PBMs. Their viability is unknown, and securing an award for damages and injunctive relief for Class Plaintiffs is a reasonable strategy in the course of litigation.

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

The law favors and encourages settlements in complex class actions such as this one, and it is reasonable for the Court to rely upon the exercise of judgment by the negotiating parties, where, as in this case, it is clear that this settlement has been entered into after considerable arms length negotiation, and there is no suggestion of collusion or misconduct.

It is unlikely in this Court's view that a significantly larger judgment could be recovered after a jury trial. Class Counsel concluded that there was a good chance that Plaintiffs were unlikely to prevail on their ERISA claims. If Plaintiffs did prevail at trial, appellate review could prevent the Class from receiving any benefit for many months or even years. The passage of time alone diminishes the value of a future recovery. This Settlement, in the Court's view, represents a substantial tangible and prompt recovery without further risk, expense and delay. The Settlement provides significant equitable relief, requiring Medco to change its challenged business practices, a beneficial result which cannot be guaranteed had the parties continued to trial. The significant modifications to Medco's business practices allows Plan Sponsors to monitor Medco's business activities, and limit its ability to engage in the types of self-dealing criticized by Class Plaintiffs.

Also considered by this Court is the Settlement between Medco and 20 states' Attorneys General and with the U.S. Department of Justice on April 26, 2004. That Settlement provides for a payment of $29.3 million, as well as changes in Medco's business practices, many of which are similar, if not identical to those earlier negotiated in this litigation and now required by the Proposed Settlement Agreement before this Court.

The Court also has considered and finds fair and reasonable the Allocation Plan proposed by Settling Plaintiffs and their attorneys. Although there were objections regarding the allocation of the settlement, as previously discussed above, the allocation is reasonable. The Settlement Fund, less any fees and expenses awarded to counsel will be distributed on a *pro rata* basis, to members of the Class who submit a short form that will enable Medco to identify the participating plan. The Plan of Allocation provides for a 55% payment of the drug spend of the insured or capitated plans as compared to that of the self-funded plans to provide those plans that suffered direct

damages from negative interchanges with a proportionately greater share of the Settlement Fund. The insured or capitated fund were not directly financially damaged by the actions of Medco on the negative interchange claim because the Plans paid a flat capitation for every person regardless of the type of drug prescribed. Through the negotiation process, relying on advice from experts of their own choosing and assistance by the Special Master, and in light of the important non-monetary benefits of the Settlement, Class Counsel determined to discount the allocation of the Settlement Fund to insured plans relative to the self-funded plans as provided in the Settlement Agreement.

### *Attorneys' Fees and Disbursements of Class Counsel*

**\*10** Paragraph 12 of the Amended Settlement Agreement provides that attorneys' fees and expenses, not to exceed 30% shall be paid out of the Settlement Fund. Settling Plaintiffs' Counsel, Abbey Gardy, LLP and Boies, Schiller & Flexner LLP, are requesting that this Court approve their application for attorneys' fees in the amount of $12.75 million, 30% of the Settlement Fund, a 1.79 multiple of their lodestar, and for disbursements in the amount of $893,294.50. From their fee award they will absorb by agreement among counsel payment of a reasonable fee to Lowey Dannenberg Bemporad & Selinger and Rawlings & Associates (collectively the "Lowey Firm") which have requested a fee award in the amount of $637,500, a 1.317 multiplier of their lodestar of $483,947.50, and disbursements in the amount of $19,576.96. In the absence of agreement, this Court will retain jurisdiction to adjudicate a fair allocation. There is also an application before this Court made by Linda J. Cahn, Esq. for fees and expenses in the amount of 10% of the total attorneys' fees awarded to Plaintiffs' Counsel, discussed separately below.

The Supreme Court has long recognized that, when a plaintiff-representative successfully establishes or protects a fund in which the other class members have a beneficial interest, the costs of litigation may be spread among the fund's beneficiaries. *Trustees v. Greenough, 105 U.S. 527 (1882)*; *Mills v. Electric Auto-Lite Co., 396 U.S. 375 (1970)*; *Alyeska Pipeline Service Co. v. The Wilderness Society, 421 U.S. 240 (1975)*. Under the "equitable fund" doctrine, attorneys for the successful party may petition for a portion of the fund as

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

compensation for their efforts. "[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

Two methods are used by courts to calculate reasonable attorneys' fees in common fund cases, the lodestar method and the percentage method. *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999). The lodestar method multiplies "the numbers of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area and, once this base or 'lodestar' rate is established, to determine the final fee by then deciding whether to take into account other less objective factors, such as the 'risk of litigation', the complexity of the issues, and the skill of the attorneys."*Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (citations omitted). The percentage method calculates the fee award as some percentage of the settlement fund created for the benefit of the class. *Savoie*, 166 F.3d at 460. This method "also relieves the court of the 'cumbersome, enervating, and often surrealistic process' of evaluating fee petitions."*Savoie*, 166 F.3d at 460 (citing *Third Circuit Task Force*, 108 F.R.D. 237 (1985)). If a court chooses to use the percentage method in awarding attorneys' fees, "requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage" is appropriate. *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

**\*11** Our Court of Appeals elucidated, in *City of Detroit v. Grinnell Corporation*, 560 F.2d 1093, 1099 (2d Cir. 1977), that the fee awarded must reflect "the actual effort made by the attorney to benefit the class" and that a court is "to act as a fiduciary who must serve as a guardian of the rights of absent class members.""District courts should be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'"*Goldberger*, 209 F.3d at 51 (quoting *In re Union Carbide Corporation Consumer Products Business Securities Litigation*, 724 F.Supp. 160, 163 (S.D.N.Y. 1989)).

Applying the above factors, the present fee application for 30% of the Settlement Fund made by Abbey Gardy and Boies, Schiller & Flexner and including the services of the Lowey firm is reasonable. It is clear by Settling Plaintiffs' submissions that Counsel expended a substantial amount of time and effort in this litigation. The total combined lodestar for Settling Plaintiffs' Counsel and the Lowey firm is $7,138,047.25, representing almost 16,000 hours spent litigating this case. Settlement negotiations began almost three years ago, and were completed only by the tremendous effort of counsel.

The litigation occurred over a period of six years, and was performed on a purely contingent basis, with Class Counsel advancing the many thousands of dollars of necessary disbursements. If, after trial, Class Plaintiffs were unsuccessful, due to the contingent nature of the lawsuit, Settling Plaintiffs' Counsel would have received no compensation. "[C]ontingency risk and quality of representation must be considered in setting a reasonable fee."*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 54 (2d Cir. 2000).

Settling Plaintiffs' Counsels' request of 30% of the Settlement Fund, applies a multiplier of 1.786 to the submitted lodestar. This multiplier is reasonable and fair, taking into consideration the factors listed above.

The Court awards Settling Plaintiffs' Counsel (including the Lowey firm) a fee award of 30% of the Settlement Fund, calculated as $12.75 million, less the award of legal fees to Linda J. Cahn, set forth below, and disbursements in the amount of $893,294.50 for Settling Plaintiffs' Counsel and disbursements for the Lowey firm in the amount of $19,576.96. Under the class notice, total fees may not exceed 30%.

**Fee Application of Linda J. Cahn, Esq.**

**\*12** By motion filed December 10, 2003 and supplemented on March 9, 2004 (Docs. 59 and 81), attorney Linda J. Cahn, although never the attorney for the plaintiff class, and not the attorney of record for any settling Plaintiff who belongs to the class, has applied for a legal fee and disbursements to be paid out of the common fund produced by the settlement

agreement. She seeks to be reimbursed for a lodestar of 2,182 hours together with $4,698 in expenses and also for an award of 10% of the total attorneys fees awarded to Class Counsel of record.

While the lodestar claimed appears to this Court to be grossly excessive, as is the claim for a contingent fee, this Court concludes that the efforts of Ms. Cahn did effectuate certain improvements in the Settlement Agreement which were ultimately of benefit to the class members, and that she is therefore entitled to a reasonable fee in the nature of *quantum meruit*, limited to the efforts actually directed towards achieving the benefits obtained. Equity requires fair treatment of one who confers a benefit, even where the actor has no standing and participates as an interloper or volunteer.

Ms. Cahn graduated from Princeton University in 1976 and from Hofstra Law School in 1979. She clerked for a year in the Eastern District of New York, and beginning in 1988, was associated with the New York City law firm of Schulte Roth and Zabel. It is undisputed that Ms. Cahn originated the theory of ERISA liability upon which the complaints in these cases was founded. She tells us that she proposed the idea of bringing the cases for the first time during employment interviews at the firm of Abbey Gardy & Squitieri LLP (the "Abbey" firm) and she joined the Abbey firm as a salaried associate lawyer sometime prior to November 1997, bringing this work product, whatever it was, with her to her new employer. Until the end of 2000, she was primarily responsible for litigating the cases for the Abbey firm It is not disputed that she was fully compensated by the Abbey firm for all her work while affiliated with that office.

At the end of 2000, she left the Abbey firm and entered the employ of the law firm of Boies Schiller & Flexner LLP (the "Boies firm") where she also became a salaried lawyer and took primary responsibility for the litigation of these cases in that office. Ms. Cahn took with her to Boies some but not all of the cases, with the result that beginning in January 2001 and thereafter, responsibility for this class action litigation against Medco was shared by the two law firms. In January 2002, Ms. Cahn resigned from the Boies firm. It is undisputed that she was fully compensated by the Boies firm for all of her work while affiliated with that office. She became an individual practitioner effective upon her resignation

from Boies, and is practicing law from her home apparently without associates or partners.

On leaving the Boies firm, Ms. Cahn took with her the *Blumenthal* case (99 Civ. 4970). The ERISA Plan maintained by *Blumenthal* has opted out of the class action settlement, and it is clear that Ms. Cahn plans to continue to litigate the claims against Defendants in that case.

**\*13** Because there was uncertainty as to whether *Blumenthal* would opt out of the Settlement as the plan ultimately did, or remain within the Class and file objections to the Settlement, it was the specific direction of this Court that the Settlement terms and the documentation implementing the Settlement be made available to Ms. Cahn for her consideration and response on behalf of her remaining client, prior to being finalized and prior to being submitted to this Court. Starting on September 18, 2002 and thereafter, Ms. Cahn participated in meetings, telephone conference calls, and appearances at Court with respect to implementation of the settlement. Although the Settlement had been agreed upon in principle by Class Counsel, without any input whatever from Ms. Cahn, her subsequent participation did play an important part in the finalization and fine tuning of the terms and provisions of the relevant documents. This was of benefit to the Class. Although the significance of changes advocated by Ms. Cahn and ultimately accepted may be the subject for reasonable disagreement among the respective attorneys, this Court agrees that her services, although not rendered as Class Counsel, were of sufficient benefit to the plan as to support a reasonable legal fee out of the fund in the nature of *quantum meruit*. The Court finds no basis to award a percentage fee of the recovery to Ms. Cahn. She neither created the class action settlement nor did she induce acceptance of it by the Defendants. Her assistance was limited to fine tuning of provisions and documents after the Settlement had been agreed to in principle.

Contingent fees are a phenomenon peculiar to Courts in the United States, and are allowed on the theory that, without contingent fees, some unpopular or risky cases could not achieve representation, and because the availability of a contingent fee enables clients who are without funds or lack the confidence in their claims which would induce them to invest money in advance of an uncertain recovery, to gain access to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

justice by hiring a lawyer who is promised a piece of the action. Although contingent fees are inconsistent in principle with our traditional opposition to champerty and maintenance, long forbidden to lawyers in the common law tradition, contingent fees are necessary to attract lawyers to such clients and cases which would otherwise lack representation. Compensating for the additional risk of no recovery is an additional reason why the Courts tolerate the concept of a contingent fee. Those reasons which support a contingent fee are inapplicable to the participation of Attorney Cahn. The Settlement was already cooked up and served when Ms. Cahn got into the act. It was clear to her from the beginning that if she improved the terms of the settlement or the conditions and language of the agreements, she would be entitled to a *quantum meruit* fee, even if, as it turned out, her clients opted out of the settlement and that if the *Blumenthal* Plaintiffs became settling plaintiffs, as they might have done, she would have participated in the overall fee.

**\*14** The basic premise for a *quantum meruit* fee, absent a retainer agreement or even an attorney-client relationship, has always been considered to be the reasonable lodestar, that is to say, the amount of hours reasonably and necessarily expended in connection with the work multiplied by a reasonable dollar value, and not a percentage of the recovery. While Plaintiffs' Class Counsel are receiving a contingency fee which exceeds their lodestar in the case, it must be remembered that these law firms accepted the risk that all of their work would go for naught if Defendants won the case. Such a risk was minimal or absent in connection with Ms. Cahn's services for which compensation is being awarded.

We then turn to the issue of the reasonable time necessarily devoted by Ms. Cahn to the Settlement. The benefit conferred on the Class by Ms. Cahn begins on September 18, 2002 when the Settlement Agreement currently before the Court was made available to her for her comments. There is no reasonable basis, in fact or in law, to compensate Attorney Cahn for writing opinion articles in the Wall Street Journal, drafting testimony before the Senate Committee, conferring with potential plaintiffs and State Attorneys General who wish to litigate with Medco, and similar activities. The same is true with respect to her efforts to bring an antitrust case, which this Court determined could be brought, but not as a

part of this litigation. Such a case, as drafted by Ms. Cahn, would contemplate about a dozen additional defendants who are competitors of Merck. Similarly, review of the S-1 filings and other documents filed by Merck and Medco, did nothing to improve the Settlement.

This Court has examined the schedule attached to Exhibit A of the opposing papers which breaks down Ms. Cahn's lodestar purporting to show those entries directly related to the Settlement Agreement. As noted earlier, services rendered prior to September 18th are not within the scope of professional efforts for which compensation is appropriate. This eliminates 127.5 hours from the total of that exhibit, which is 1,117.9 hours. Certain inappropriate, unnecessary or inapplicable services are also included in the schedule. These are consideration of the anti-trust issues, telephone calls to the media, and assistance rendered to counsel for other litigants not participating in the Settlement, as well as conferences with State Attorneys General and other third parties. Research on the issue of preemption on May 27-29 and June 11 (27.9 hours) was not of benefit to the Settlement Fund. The same is true of efforts to discuss opt out and objection issues with third parties including the Herman-Mathis Group. While these are not broken down clearly in the hourly account, these items amount to at least 40 hours through June 2003. There are numerous hourly charges for telephone calls thereafter with class members seeking information. By this time, the Settlement documents were frozen and all of the benefit which Ms. Cahn could have or did give to the Settlement were past and concluded. Discussing opting out with persons wishing to do so, and considering whether they should do so, did not improve the position of or benefit the fund or the persons interested in the fund. These services after August 1, 2003 amount to 118.1 hours. This leave a total net lodestar attributable to the efforts on the part of Ms. Cahn which benefitted the Settlement Class amounting to approximately 804.4 hours.

**\*15** There is also a dispute raised by counsel for the class as to the hourly rates to be attributable to Ms. Cahn. As this Court has previously observed, a lawyer practicing with a full service law firm must include within his or her hourly charges, staffing costs and overhead not applicable to a single practitioner. It is generally understood that in the greater New York suburban area, medium sized firms which do their

billing on an hourly basis generally estimate that office overhead, rent, equipment, publications, management expenses and the salaries of support persons whose time cannot be charged directly to the client, will consume between 40% and 50% of the total hourly charges. Ms. Cahn, practicing from her home, avoids most of those expenses.

While this Court holds in high esteem the surviving individual practitioners, and admires the courage of those who practice law alone or with one or two clerks in the tradition of the great Nineteenth Century lawyers, such lawyers today cannot bring to a major case the supervision, judgment, institutional responsibility and team approach to litigation which is the product of the modern law firm, and which supports the increased economic value which the market attributes to its services. *See generally In Re: Texaco, Inc. Shareholder Derivative Litigation, 123 F.2d 169, 174 (S.D.N.Y. 2000).* Similarly, to the extent that an individual practitioner must do alone the supportive work in litigation commonly done by paralegals or secretarial staff, that also affects the appropriate hourly rate. These issues do not lend themselves to mathematical precision. Fees, if awarded, must be reasonable, and the time reasonably expended and the reasonable hourly rate for that time are the best criteria.

This Court finds that the reasonable time expended by Ms. Cahn doing legal work for the benefit of the settlement class and fund, is 804.4 hours; that a reasonable hourly rate for the services performed under the working conditions, in which they were rendered with little or no overhead, is $200 and that an appropriate fee award is $160,880. There seems to be no objection to the disbursements charged in the amount of $4,698 which is also awarded. The legal fee of Linda J. Cahn, Esq., payable out of the fund, is awarded in the amount of $160,880 together with disbursements in the amount $4,698 making a total of $165,578, which shall be deducted from the 30% award to Class Counsel in light of the cap on total fees, set forth in the class notice. The foregoing findings of fact and conclusions of law concerning attorney compensation are without prejudice to any claim Ms. Cahn may make in the future in the event that she recovers a damage award in the *Blumenthal* case. All issues including the reasonable hourly rate for *Blumenthal*, where an actual attorney client relationship exists, as well as a contingency risk, will be considered anew in the event of a successful result in that continuing litigation.

**Conclusion**

***16** This Action is certified as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3). After holding a hearing pursuant to Fed. R. Civ. P. 23(e), the Court finds the Amended Proposed Settlement is within the range of fair, reasonable, and adequate settlement of the claims of the Class. The legal fees and disbursements as set forth herein are allowed. The application for approval of the Proposed Amended Settlement Agreement, dated July 31, 2003, is granted. Those consolidated cases in which the Plans have opted out of the settlement are hereby severed.

Settle a final judgment on five (5) days notice or on waiver of notice, consistent with the foregoing, which Judgment shall reserve jurisdiction to administer and enforce the Settlement and provide that payments thereunder are stayed pending appellate finality. No finding under Rule 54(b) F.R. Civ.P. is necessary.

SO ORDERED.

Dated: White Plains, New York, May 25, 2004
Charles L. Brieant, U.S.D.J.

S.D.N.Y. 2004.
In Re: MEDCO HEALTH SOLUTIONS, INC., PHARMACY BENEFITS MANAGEMENT LITIGATION.
Not Reported in F.Supp.2d, 2004 WL 1243873 (S.D.N.Y.)

END OF DOCUMENT