# Exhibit 6

SEC Admin. Proc. No. 3-12808

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**INVESTMENT ADVISERS ACT OF 1940**
Release No. 2650 / September 19, 2007

**ADMINISTRATIVE PROCEEDING**
File No. 3-12808

| | |
|---|---|
| **In the Matter of**<br><br>Callan Associates,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Callan Associates ("Callan" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and a Cease-and-Desist Order Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that:

### Summary

This matter concerns the incomplete disclosure of a conflict of interest by Callan Associates, a registered investment adviser and one of the nation's largest pension consultants in its Form ADV Part II. Since 1999, Callan has referred clients to BNY Brokerage Inc. ("BNY") as Callan's preferred securities broker. Although Callan disclosed in its Form ADV Part II that it had a contractual relationship with BNY that required Callan to identify BNY as its preferred or exclusive broker, Callan failed to disclose that it was receiving annual payments that were contingent on Callan clients generating a certain level of commissions for BNY. The omission of this conflict caused Callan's public disclosures to be misleading.

### Respondent

1. Callan Associates is an employee-owned pension consulting firm that is registered as an investment adviser with the Commission. Callan provides consulting services and education services to over 270 institutional retirement plans, endowments, foundations and hospital plans with assets of over $900 billion ("retirement plan clients"). It also offers educational and consulting services to investment managers that provide investment advice to the retirement plan clients ("investment manager clients").

### Background

2. In October 1998, Callan sold Alpha Management Inc. ("Alpha"), its affiliated broker-dealer, to BNY ESI & Co., Inc. (the subsidiary is now known as BNY Brokerage Inc.), a subsidiary of the Bank of New York.

3. As a part of that transaction, Callan and BNY entered into a Services Agreement wherein BNY agreed to pay Callan a specified amount per year for eight years, 1998 through 2006. A portion of the annual payment, 8%, was contingent on BNY's generating gross brokerage commissions above a certain minimum threshold from Callan clients. The minimum threshold, which remained constant during the entire eight year period, was based on Alpha's brokerage commissions earned in 1998.

### Callan's Inadequate Disclosures

4. Pursuant to the provisions of the Services Agreement, Callan was required to inform its retirement plan clients that BNY was its preferred broker should the clients elect to pay for Callan's services through directed brokerage.[1] Callan sent annual letters to its retirement

---

[1] As used in this Order, the term "directed brokerage" refers to an arrangement through which the client requests its investment manager to direct brokerage business to a particular broker-dealer that has agreed to pay Callan's invoices for the client.

plan clients informing them of this option. Similarly, Callan agreed to inform its investment manager clients that BNY was its exclusive broker should the clients elect to pay for Callan's services with soft dollar credits.[2] Callan sent annual letters to its investment manager clients informing them of this option.

       5.     While the annual letters to the retirement plan and investment manager clients referenced the fact that Callan had sold Alpha to BNY, the letters failed to disclose that Callan was receiving compensation from BNY that depended on a certain level of commissions being generated by Callan clients.

       6.     As a registered investment adviser, Callan was required to file amendments to Commission registration statements known as Form ADV Part II at least annually. Under Rule 204-1(c) of the Advisers Act, an adviser is deemed to have filed Part II with the Commission by maintaining a copy of the document in its files. Between 1999 and 2005, Callan's Form ADV Part II stated that Callan was obligated by the terms of the Services Agreement to inform its plan sponsor clients that BNY was its preferred broker and investment manager clients that BNY was its exclusive broker if the client chose to pay Callan's fees through soft-dollar or directed brokerage arrangements. Callan further reported that, "[a]ccording to the terms of the transaction, BNY ESI makes periodic <u>fixed</u> payments to Callan each year." (Emphasis added.)

       7.     The characterization of BNY's payments to Callan as "fixed" was misleading in that a material portion of each annual payment was contingent upon BNY's receipt of a minimum threshold of Callan client brokerage business.

       8.     Callan's inaccurate public disclosures contributed to Callan employee confusion regarding the relationship between Callan and BNY. For instance, Callan incorrectly informed a potential client that Callan's compensation was not dependent on brokerage activity in any way. In February 2002, a potential plan sponsor client asked Callan whether payments from BNY to Callan were in any way dependent on future brokerage activity. A written response from a Callan employee stated, "[T]he terms of the 1998 sale to BNY ESI provided for semi-annual fixed payments to Callan each year. And simply put, the purchase price is being paid out over time. We once again must emphasize the semi-annual payments are not dependent whatsoever on current or future brokerage activity." Even though Callan had routinely satisfied the commission threshold since selling Alpha to BNY, this response was inaccurate and misleading because the language of the Services Agreement specifically provided that those payments were dependent upon the continuation of BNY receiving from Callan clients gross brokerage commissions exceeding the minimum threshold.

---

[2] As used in this Order, the term "soft dollars," also called client commission practices, refers to arrangements under Section 28(e) of the Exchange Act in which advisers direct brokerage to broker-dealers and request that they allocate a percentage of the brokerage commissions to pay for brokerage and research services. In some cases, the broker-dealer creates a client commission or soft dollar account and pays for services, including to third-party vendors. In addition to cash, Callan accepted client commissions or soft dollar credits as payment on its invoices for services rendered to its investment manager clients.

9. In September 2005, following an examination by the Commission staff, Callan revised its Form ADV Part II to include language that disclosed that 8% of its annual Services Agreement payment from BNY was contingent on BNY receiving from Callan clients gross brokerage commissions above the minimum commission threshold.

10. As a result of the conduct described above, Callan willfully violated Section 207 of the Advisers Act, which makes it "unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission . . . or willfully to omit to state in any such application or report any material fact which is required to be stated therein."[3]

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Callan's Offer. Accordingly, pursuant to Section 203(k) of the Advisers Act it is hereby ORDERED that Respondent Callan cease and desist from committing or causing any violations and any future violations of Section 207 of the Advisers Act.

By the Commission.

Nancy M. Morris
Secretary

---

[3] "Willfully" as used in this Offer means intentionally committing the act which constitutes the violation, Cf. Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965). There is no requirement that the actor also be aware that he is violating one of the Rules or Acts.