# Exhibit 8

# The Regulation of Investment Advisers

## by

# The Securities and Exchange Commission

**Robert E. Plaze**
**Associate Director**

**Division of Investment Management**
**United States Securities and Exchange Commission**

Updated to November 22, 2006

# Regulation of Investment Advisers by
# The U.S. Securities and Exchange Commission[*]

### I.    Introduction

Money managers, investment consultants, and financial planners are regulated in the United States as "investment advisers" under the federal Investment Advisers Act of 1940 ("Advisers Act" or "Act") or similar state statutes.  This outline describes the federal regulation of investment advisers.

The Advisers Act is the last in a series of federal statutes intended to eliminate abuses in the securities industry that Congress believed contributed to the stock market crash of 1929 and the depression of the 1930s.  The Act is based on a congressionally mandated study of investment companies, including consideration of investment counsel and investment advisory services, carried out by the Securities and Exchange Commission ("SEC") during the 1930s.[1] The SEC's report traced the history and growth of investment advisers and reflected the position that investment advisers could not properly perform their function unless all conflicts of interest between them and their clients were removed.  The report stressed that a significant problem in the industry was the existence, either consciously or, more likely, unconsciously, of a prejudice by advisers in favor of their own financial interests.

The SEC's report culminated in the introduction of a bill that, with some changes, became the Advisers Act.  The Act, as adopted, reflects congressional recognition of the delicate fiduciary nature of the advisory relationship, as well as Congress' desire to eliminate, or at least expose, all conflicts of interest that might cause advisers, either consciously or unconsciously, to render advice that is not disinterested.[2]

The outline that follows is divided into five sections, each of which addresses a different question:  *Who* is an "investment adviser?"  *Which* investment advisers must register with the SEC?  *Who* must register under the Act?  *How* does an investment adviser register under the Act?  *What* are the requirements applicable to an investment adviser registered under the Act?

---

[*]    The Securities and Exchange Commission, as a matter of policy, disclaims responsibility for any private publication of any of its employees.  The views expressed in this outline are those of the author, and do not necessarily reflect the views of the Securities and Exchange Commission or of the author's colleagues on the staff of the Securities and Exchange Commission.  Portions of this outline have been included in outlines used by members of the Division of Investment Management.  The author would like to thank Jennifer Sawin, Penelope Saltzman, and Vivien Liu of the SEC staff for their assistance.

1

**II.    Who is an Investment Adviser?**

    A.    <u>Definition of Investment Adviser</u>

Section 202(a)(11) of the Act defines an investment adviser as any person or firm that:

- For compensation;
- Is engaged in the business of;
- Providing advice to others or issuing reports or analyses regarding securities.

A person must satisfy all three elements to fall within the definition of "investment adviser," which the SEC staff has addressed in an extensive interpretive release explaining how the Act applies to financial planners, pension consultants and other persons who, as a part of some other financially related services, provide investment advice.[3] Published in 1987, Investment Advisers Act Release 1092 represents the views of the Division of Investment Management, which is primarily responsible for administering the Act.

    1.    *Compensation.* The term "compensation" has been broadly construed. Generally, the receipt of any economic benefit, whether in the form of an advisory fee, some other fee relating to the total services rendered, a commission, or some combination, satisfies this element.[4] The person receiving the advice or another person may pay the compensation.

    2.    *Engaged in the Business.* A person must be engaged in the business of providing advice. This does not have to be the sole or even the primary activity of the person. Factors used to evaluate whether a person is engaged are: (i) whether the person holds himself out as an investment adviser; (ii) whether the person receives compensation for providing investment advice; and (iii) the frequency and specificity of the advice provided.[5] Generally, a person providing advice about specific securities will be considered "engaged in the business" unless specific advice is rendered only on a rare or isolated occasion.[6]

    3.    *Advice about Securities.* A person clearly meets the third element of the statutory test if he provides advice about specific securities, such as stocks, bonds, mutual funds, limited partnerships, and commodity pools. Advice about real estate, coins, precious metals, or commodities is not advice about securities.[7] The more difficult questions arise with less specific

advice, or advice that is only indirectly about securities. The SEC staff has stated in this regard:

    a.    Advice about market trends is advice about securities;[8]

    b.    Advice about the selection and retention of other advisers is advice about securities;[9]

    c.    Advice about the advantages of investing in securities versus other types of investments (*e.g.*, coins or real estate) is advice about securities;[10]

    d.    Providing a selective list of securities is advice about securities even if no advice is provided as to any one security;[11] and

    e.    Asset allocation advice is advice about securities.[12]

The SEC staff does not believe, however, that the Act applies to persons whose activities are limited to advising issuers concerning the structuring of their securities offerings.[13]

B.    <u>Exclusions from Definition</u>

There are several exclusions from the investment adviser definition available to persons who presumably (or at least arguably) satisfy all three elements of the definition. A person eligible for one of the exclusions is not subject to any of the provisions of the Act.

1.    *Banks and Bank Holding Companies.* This exclusion is generally limited to U.S. banks and bank holding companies, and (as of 2006) federal savings association.[14] Non-U.S. banks,[15] credit unions, and investment adviser subsidiaries of banks or bank holding companies[16] cannot use the exception.

2.    *Lawyers, Accountants, Engineers, and Teachers.* The professional exclusion is available only to those professionals listed, and only if the advice given is incidental to the practice of their profession. Factors used to evaluate whether advice is incidental to a profession are: (i) whether the professional holds himself out as an investment adviser; (ii) whether the advice is reasonably related to the professional services provided; and (iii) whether the charge for advisory services is based on the same factors that determine the professional's usual charge.[17]

3.    *Brokers and Dealers.*  Brokers and dealers that are registered
with the SEC under the Securities and Exchange Act of 1934
("Exchange Act") are excluded from the Act if the advice
given is (i) solely incidental to the conduct of their business as
brokers or dealers, and (ii) they do not receive any "special
compensation."

a.    *Special Compensation.* Generally, to avoid receiving
"special compensation," a broker relying on this
exclusion must receive only commissions, markups,
and markdowns.[18]

*Wrap Fee Programs.*  The SEC staff has stated a
broker-dealer that receives a "wrap fee," *i.e.,* a fee
based on a percentage of assets that compensates the
broker-dealer for both advisory and brokerage services,
will receive "special compensation."[19]

*Fee-Based Brokerage Accounts.*  The SEC has recently
issued a rule under which broker-dealers charging
asset-based brokerage fees (rather than commissions,
mark-ups, or mark-downs) are not deemed to be
investment advisers based solely on receipt of special
compensation, so long as:  (i) the broker-dealers do not
exercise investment discretion over the accounts; (ii)
any advice provided by the broker-dealers with respect
to the accounts is incidental to the brokerage services
provided to those accounts; (iii) and prominent
disclosure is made regarding the fact that the account is
a brokerage account and not an advisory account.[20]

b.    *Solely Incidental.*  The SEC believes that investment
advice is "solely incidental to" brokerage services when
the advisory services rendered are "in connection with
and reasonably related to the brokerage services
provided."[21]  If advice is not "solely incidental" a
broker-dealer is subject to the Advisers Act regardless
of the form of compensation it receives.  The SEC has
adopted a rule identifying three (non-exclusive)
circumstances in which advice is not solely incidental
to brokerage services.

*Separate Contract or Fee.*  A broker-dealer that
separately contracts with a customer for investment
advice is not providing advice that is solely incidental
to brokerage services.

4

*Discretionary Accounts.* A broker-dealer that exercises discretionary authority over a client account must treat the account as an advisory account.[22]

*Financial Planning.* A broker-dealer does not provide advice solely incidental to brokerage services if it provides advice as part of a "financial plan" and (i) holds itself out as a financial planner, (ii) delivers to a customer a financial plan, or (iii) represents to the customer that he is receiving financial planning.[23]

*Broker-Dealer Agents.* The SEC staff has stated that a registered representative of a broker-dealer can rely on the exception if she is: (i) giving advice within the scope of her employment with the broker-dealer; (ii) the advice is incidental to her employer's brokerage activities; and (iii) she receives no special compensation for her advice.[24]

4.   *Publishers.* Publishers are excluded from the Act, but only if a publication: (i) provides only impersonal advice, *i.e.,* advice not tailored to the individual needs of a specific client; (ii) is "bona fide," containing disinterested commentary and analysis rather than promotional material disseminated by someone touting particular securities; and (iii) is of general or regular circulation rather than issued from time to time in response to episodic market activity.[25]

5.   *Government Securities Advisers.* This exclusion is available to persons and firms whose advice is limited to certain securities issued by or guaranteed by the U.S. government.[26]

6.   *Credit Rating Agencies.* This exclusion is available to any rating agency regulated under Section 15E of the Exchange Act as a "nationally recognized statistical rating organization."[27]

7.   *Governments and Political Subdivisions.* The Act does not apply to the U.S. government, state governments and their political subdivisions, and their agencies or instrumentalities, including their officers, agents, or employees acting in their official capacities.[28]

In addition, the SEC has authority to designate, by rule or order, other persons who are not within the intent of the definition of investment adviser.[29]

### III.    Which Investment Advisers Must Register Under the Advisers Act?

A firm that falls within the definition of "investment adviser" (but is not eligible for one of the exclusions) must register under the Advisers Act, unless it (i) qualifies for an exception from the Act's registration requirement[30] or (ii) is prohibited from registering under the Act because it is a smaller firm regulated by one or more of the states. An unregistered investment adviser is not subject to the Act's recordkeeping rules or SEC examination, but is subject to the Act's anti-fraud provisions.

A.    Exemptions from Registration

Section 203(b) of the Act provides several exemptions from registration. The exemptions are voluntary; advisers eligible for them can nonetheless register with the SEC.[31]

1.    *Intrastate Advisers*.  Available to an adviser (i) all of whose clients are residents of the state in which the adviser maintains its principal office and place of business, and (ii) that does not give advice about securities listed on any national exchange.[32]

2.    *Advisers to Insurance Companies*.  Available to an adviser whose only clients are insurance companies.[33]

3.    *Private Investment Advisers*.  Available to an adviser that during the previous twelve months (i) has had fewer than fifteen clients during the preceding twelve months, (ii) does not hold itself out generally to the public as an investment adviser, and (iii) is not an adviser to a registered investment company.[34]

a.    *Counting Clients*

(i)    *Integration*.  Advisers under common control that are not operated separately, each of which may have fewer than fifteen clients, cannot rely on the private investment adviser exemption.[35]

(ii)    *Rule 203(b)(3)-1*.  The SEC has adopted a rule that provides that the following can be considered a single client:[36]

(A)    A natural person; any minor child of the natural person; any relative, spouse, or relative of the natural person's spouse with the same principal residence; and

6

all accounts or trusts of which natural persons (and/or persons described above) are the only primary beneficiaries; or

(B)     A corporation, general or limited partnership, limited liability company, trust or other legal organization that receives investment advice based on its investment objectives (rather than the individual investment objectives of its owners),[37] and where two or more of these entities have identical owners, they are to be counted as a single client.

(iii)     *Additional rules.*

(A)     U.S. advisers must count both non-U.S. and U.S. clients for purposes of the private investment adviser exemption.[38]

(B)     Non-U.S. advisers must count only clients that are U.S. residents – and need not count foreign clients – for purposes of the exemption.[39]

(C)     Advisers need count only paying clients.[40]

(iv)     *Rule 203(b)(3)-2, Hedge Fund Advisers.*  In this 2004 rule the SEC attempted to identify circumstances in which an adviser must "look through" certain pooled investment vehicles and count the investors in the fund to determine its eligibility for the private investment adviser exemption.  In 2006, A Court of Appeals vacated the rule, opining that it was unreasonable to view the investors in a hedge fund as "clients" of the adviser.[41]

b.     *Holding Out.*  The SEC staff views a person as holding himself out as an adviser if he advertises as an investment adviser or financial planner, uses letterhead indicating activity as an investment adviser, or maintains a telephone listing or otherwise lets it be known that he will accept new advisory clients,[42] or hires a person to solicit clients on their behalf.[43]

7

*Non-U.S. Advisers and the Internet.*  An adviser using the Internet to provide information about itself ordinarily would be "holding itself out" as an adviser. However, the SEC has stated that it will not consider a non-U.S. adviser to be holding itself out as an adviser if:

(i)     *Prominent Disclaimer.*  The adviser's web site includes a prominent disclaimer making it clear that its web site materials are not directed to U.S. persons; and

(ii)    *Procedures.*  The adviser implements procedures reasonably designed to guard against directing information about its advisory services to U.S. persons (*e.g.*, obtaining residency information before sending further information).[44]

4.      *Charitable Organizations and Plans.*  Available to an adviser that is a charitable organization or a charitable organization's employee benefit plan, including a trustee, officer, employee, or volunteer of the organization or plan to the extent that the person is acting within the scope of his employment or duties.[45]

5.      *Commodity Trading Advisors.*  Available to any adviser that is registered with the U.S. Commodity Futures Trading Commission as a commodity trading advisor and whose business does not consist primarily of acting as an investment adviser and that does not advise a registered investment company or a business development company.[46]

B.      Prohibitions from Registration

Until 1996, the SEC and one or more state regulatory agencies regulated most advisers.  In 1996, the Act was amended to allocate regulatory responsibility between the SEC and the states.[47]  Today, most small advisers (generally those with less than $25M of assets under management) are subject to state regulation of advisers and are prohibited from registering with the SEC.[48]  Most large advisers (generally those with more than $25M of assets under management) are subject to federal regulation of advisers and must register with the SEC.  State investment adviser laws have been preempted for these advisers.[49]

1.    *Exceptions to Prohibition.*  Section 203A and SEC rules carve out several exceptions from the $25M of assets under management test:

   a.  *Advisers to Investment Companies.*  Advisers to investment companies registered under the Investment Company Act of 1940 must register with the SEC.[50]  The exception is not available to an adviser that simply gives advice about investing in investment companies.[51]

   b.  *Wyoming Advisers*.  Advisers that have a principal office and place of business in a state that does not regulate advisers must register with the SEC regardless of the amount of assets under management.[52]  Currently, Wyoming is the only state that does not regulate advisers.

   c.  *Non-U.S. Advisers.*  Advisers whose principal office and place of business is outside the United States are not prohibited from registering with the SEC.[53]  A non-U.S. adviser giving advice to residents of the U.S. must register with the SEC, unless an exemption from registration is available.

   d.  *Ratings Agencies*.  Ratings agencies, such as S&P and Moody's, may register with the SEC.[54]

   e.  *Pension Consultants.*  Advisers providing advisory services to employee benefit plans having at least $50M of assets may register with the SEC (even though the consultant does not itself have those assets under management).[55]

   f.  *Affiliated Advisers.*  Advisers that control, are controlled by, or are under common control of an SEC-registered adviser may register with the SEC, but only if they have the same principal office and place of business.[56]

   g.  *Newly-Formed Advisers.*  Advisers that are not registered, and have a reasonable expectation that they will be eligible for SEC registration within 120 days of registering, may register with the SEC.[57]

   h.  *Multi-State Advisers.*  Advisers that would otherwise be obligated to register with 30 or more states may register with the SEC.[58]

9

       i.   *Internet Advisers.*  Certain advisers who provide advice though an interactive web site may register with the SEC.[59]

    2.   *State Law Still Applicable to SEC-Registered Advisers.* Although state investment adviser statutes no longer apply to SEC-registered advisers, other state laws, including other state securities laws, still apply.  In addition, state laws may (and most state laws continue to) require an SEC-registered adviser to:

       a.     Comply with state anti-fraud prohibitions;

       b.     Provide the state regulator with a copy of its SEC registration;

       c.     Pay state licensing and renewal fees; and

       d.     License persons giving advice on behalf of the adviser, but only if the person has a place of business in the state.[60]

    3.   *Federal Anti-Fraud Law Still Applicable to State-Registered Advisers*.  The SEC continues to institute enforcement actions against state-registered advisers charging violations of Section 206 of the Act.[61]

## IV.    Who Must Register Under the Advisers Act?

A.    <u>The Advisory Firm</u>

Although many individuals who are employed by advisers fall within the definition of "investment adviser," the SEC generally does not require those individuals to register as advisers with the SEC.  Instead, the advisory firm must register with the SEC.  The adviser's registration covers its employees *and* other persons under its control, provided that their advisory activities are undertaken on the adviser's behalf.[62]

B.    <u>Affiliates</u>

    1.   *Integration.*  The SEC staff takes the view that advisers and their affiliates cannot circumvent the disclosure and other requirements of the Act by separately registering under the Act if they have the same personnel, capital structures, and investment decision-making functions.[63]

2.    *Participating Non-U.S. Affiliates*.  The SEC staff takes the view that, under certain conditions, a non-U.S. adviser (a "participating affiliate") does not have to register under the Act if it provides advice to U.S. persons through a registered affiliate.[64]  The conditions that must be satisfied include the following:

    a.    An unregistered adviser and its registered affiliate must be separately organized;

    b.    The registered affiliate must be staffed with personnel (located in the U.S. or abroad) who are capable of providing investment advice;

    c.    All personnel of the participating affiliate involved in U.S. advisory activities must be deemed "associated persons" of the registered affiliate; and

    d.    The SEC must have adequate access to trading and other records of the unregistered adviser and to its personnel to the extent necessary to enable the SEC to monitor and police conduct that may harm U.S. clients or markets.[65]

3.    *Special Purpose Vehicles.*  The SEC staff takes the position that a special purpose vehicle (SPV) set up by a registered investment adviser to serve as the general partner of a pooled investment vehicle (e.g., a hedge fund) does not have to separately register as an investment adviser if all of the activities of the SPV are subject to the registered adviser's supervision and control, its employees are treated as "supervised persons" of the registered adviser and reported as such on its Form ADV, and the SPV is subject to examination by the Commission.[66]

## V.    How Does an Investment Adviser Register Under the Advisers Act?

A.    <u>Procedure</u>

Applicants for registration under the Act must file Form ADV with the SEC.  Within 45 days the SEC must grant registration or institute an administrative proceeding to determine whether registration should be denied.  The SEC can deny registration if the adviser makes false or misleading statements in its application, has been convicted of a felony, or if it or any of its related persons has any securities-related convictions, injunctions, or similar disciplinary events.[67]

There are no qualification requirements for an applicant for investment
adviser registration, although certain employees of the adviser may
have to pass securities examinations in the states in which they have a
principal place of business.  Advisers are required to disclose to clients
the background and qualifications of certain of their personnel.[68]

B.     Form ADV

Form ADV sets forth the information that the SEC requires advisers to
provide in an application for registration.  Once registered, an adviser
must update the form at least once a year, and more frequently if
required by instructions to the form.[69]  Form ADV consists of two
parts:

1.     *Part 1*.  Part 1 is primarily for SEC use.  It requires information
about the adviser's business, ownership, clients, employees,
business practices (especially those involving potential
conflicts with clients), and any disciplinary events of the
adviser or its employees.  The SEC uses information from this
part of the form to make its registration determination and to
manage its regulatory and examination programs.  Part 1 is
organized in a check-the-box, fill-in-the blank format.

2.     *Part II*.  Part II, which can be given to clients to satisfy the
"brochure rule" (discussed below), is primarily for client use.
It contains information such as the types of advisory services
offered, the adviser's fee schedule, and the educational and
business background of management and key advisory
personnel of the adviser; it also contains information about
arrangements that the adviser has that involve conflicts, such as
when the adviser uses an affiliate to execute client
transactions.[70]

C.     Electronic Filing

All applications for registration as an adviser with the SEC must be
submitted electronically through an Internet-based filing system called
the Investment Adviser Registration Depository ("IARD").[71]  The
IARD is operated by NASD (the broker-dealer self-regulator).[72]

D.     Public Availability

All current information from advisers' Form ADVs submitted to the
SEC is publicly available through an SEC web-site:
www.adviserinfo.sec.gov.

E.    Withdrawal of Registration

Advisers withdraw from registration by filing Form ADV-W.[73]  An adviser may withdraw from registration because it:  (i) ceases to be an investment adviser; (ii) is entitled to an exception from the registration requirements; or (iii) no longer is eligible for SEC registration (*e.g.*, it no longer has $25M of assets under management).[74]

F.    Successor Registrations

An unregistered person that assumes and continues the business of a registered investment adviser (which then ceases to do business) may rely on the registration of the investment adviser by filing an application for registration within 30 days of the succession.[75]

**VI.    What Are the Requirements Applicable to a Registered Investment Adviser?**

The law governing SEC-registered advisers imposes five types of requirements on an adviser:  (i) a fiduciary duty to clients; (ii) substantive prohibitions and requirements; (iii) contractual requirements; (iv) recordkeeping requirements; and (v) administrative oversight by the SEC, primarily by inspection.

A.    Fiduciary Duty to Clients

Fundamental to the Act is the notion that an adviser is a fiduciary.  As a fiduciary, an adviser must avoid conflicts of interest with clients and is prohibited from overreaching or taking unfair advantage of a client's trust.  A fiduciary owes its clients more than mere honesty and good faith alone.  A fiduciary must be sensitive to the conscious and unconscious possibility of providing less than disinterested advice, and it may be faulted even when it does not intend to injure a client and even if the client does not suffer a monetary loss.  The landmark court decision defining the duties of a fiduciary is Justice Cardozo's opinion in *Meinhard v. Salmon,* in which he explains that:

many forms of conduct permissible in the workaday world for those acting at arm's length are forbidden by those bound by fiduciary ties.  A fiduciary is held to something stricter than the morals of the marketplace.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.[76]

These concepts are embodied in the anti-fraud provisions of the Advisers Act. As the Supreme Court stated in *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, its seminal decision on the fiduciary duty of an adviser under the Act:

> [t]he Investment Advisers Act of 1940 reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.[77]

The duty is not specifically set forth in the Act, established by SEC rules, or a result of a contract between the adviser and the client (and thus it cannot be negotiated away). Rather, a fiduciary duty is imposed on an adviser by operation of law because of the nature of the relationship between the two parties.[78] It is made enforceable by the anti-fraud provisions of the Act (Section 206),[79] and incorporated indirectly into the Act in various provisions and disclosure requirements discussed below.[80]

Several obligations flow from an adviser's fiduciary duty:

1.  *Full Disclosure of Conflicts of Interest*. An adviser must act solely for the benefit of its client and must not place itself in a position of conflict with its client. An exception is made, however, when the adviser makes full disclosure to its client and obtains the client's informed consent. Under the Act, an adviser has an affirmative obligation of utmost good faith and full and fair disclosure of all material facts to its clients, as well as a duty to avoid misleading them.[81]

2.  *Suitable Advice*. Advisers owe their clients a duty to provide only suitable investment advice. This duty generally requires an adviser to make a reasonable inquiry into the client's financial situation, investment experience and investment objectives, and to make a reasonable determination that the advice is suitable in light of the client's situation, experience and objectives.[82]

3.  *Reasonable Basis for Recommendations*. An adviser must have a reasonable, independent basis for its recommendations.[83]

4.  *Best Execution*. Where an adviser has responsibility to direct client brokerage, it has an obligation to seek best execution of

clients' transactions.[84]  In meeting this obligation, an adviser must seek to obtain the execution of securities transactions for clients in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances.  In assessing whether this standard is met, an adviser should consider the full range and quality of a broker's services when placing brokerage, including, among other things, execution capability, commission rate, financial responsibility, responsiveness to the adviser, and the value of any research provided.[85]

*Soft Dollars.*  Section 28(e) of the Exchange Act provides a safe harbor from liability for breach of fiduciary duty when advisers purchase brokerage and research products and services with client commission dollars under specified circumstances. In July 2006, the SEC issued a revised interpretation as to the scope of the safe harbor.[86]

Under Section 28(e), an adviser that exercises investment discretion may lawfully pay commissions to a broker at rates higher than those offered by other brokers, as long as the services provided to the adviser by the broker-dealer (i) are limited to "research" or "brokerage," (ii) constitute lawful and appropriate assistance to the adviser in the performance of its investment decision-making responsibilities, and (iii)  the adviser determines in good faith that the commission payments are reasonable in light of the value of the brokerage and research services received.

a.      *Research Services.* "Research" services generally include the furnishing of advice, analyses, or reports concerning securities, portfolio strategy and the performance of accounts, which means the research must reflect the expression of reasoning or knowledge relating to the statutory subject matter bearing on the investment decision-making of the adviser.  The SEC does not believe that products or services with "inherently tangible or physical attributes" meet this test.

(i)      Products or services generally falling within the safe harbor include traditional research reports, market data, discussions with research analysts, meetings with corporate executives; software that provides analysis of securities, and

publications (other than mass-marketed publications).

(ii)    Products or services not within the safe harbor include computer hardware, telephone lines, peripherals; salaries, rent, travel, entertainment, and meals; software used for accounting, recordkeeping, client reporting, or other administrative functions; and marketing seminars and other marketing costs.

(iii)    Where a product or service has uses both inside and outside the safe harbor, the SEC believes that an adviser should make a reasonable allocation of the cost of the product or service according to its use and keep adequate books and records concerning allocations so as to be able to make the required good faith showing.[87]

b.    *Brokerage Services.*  "Brokerage" generally includes activities related to effecting securities transactions and incidental functions.  According to the SEC, brokerage begins when the order is transmitted to the broker-dealer and ends when funds or securities are delivered to the client account.[88]

c.    *Commissions*.  The SEC interprets the safe harbor of section 28(e) as being available for research obtained in relation to commissions on agency transactions, and certain riskless principal transactions.[89]

d.    *Disclosure Obligations.*  Advisers are required to disclose to clients any soft dollar arrangements, regardless of whether the arrangements fall within the section 28(e) safe harbor.[90] Failure to disclose the receipt of products or services purchased with client commission dollars may constitute a breach of fiduciary duty and/or violation of specific provisions of the Advisers Act and other federal laws.[91]

5.    *Proxy Voting*.  The SEC has stated that an adviser delegated authority to vote client proxies has a fiduciary duty to clients to vote the proxies in the best interest of its clients and cannot subrogate the client's interests to its own.[92]

B.    <u>Substantive Requirements</u>

The Act contains other, more specific prohibitions designed to prevent fraud.  In addition, the SEC has adopted several anti-fraud rules, which apply to advisers registered with the SEC.

1.    *Client Transactions*

    a.    *Principal Transactions.*  The Act prohibits an adviser, acting as principal for its own account, from knowingly selling any security to or purchasing any security from a client for its own account, without disclosing to the client in writing the capacity in which it (or an affiliate[93]) is acting and obtaining the client's consent before the completion of the transaction.[94]  Notification and consent must be obtained separately for each transaction, *i.e.,* a blanket consent for transactions is not permitted.[95]

        *Exception.*  The restrictions on principal transactions do not apply to transactions by a client where the adviser (or an affiliate) is also a broker-dealer, but "is not acting as an investment adviser with respect to the trade," *e.g.*, it has not given the advice to buy or sell the security.[96]

        *Pooled Investment Vehicles.*  Section 206(3) may apply to client transactions with a pooled investment vehicle in which the adviser or its personnel may have interests in depending on the facts and circumstances, including the extent of the interests held by the adviser and its affiliates.[97]  The staff has, however, stated that it believes that Section 206(3) does not apply to a transaction between a client account and a pooled investment vehicle of which the investment adviser and/or its controlling persons, in the aggregate, own 25% or less.[98]

    b.    *Agency Cross Transactions*.  The Act also prohibits an adviser from knowingly acting as broker for both its advisory client and the party on the other side of the transaction without obtaining its client's consent before each transaction.[99]  The SEC has adopted a rule permitting these "agency cross-transactions" without transaction-by-transaction disclosure if the client has given blanket consent in writing and certain other conditions are met.[100]

17

c.    *Cross-Trades.*  Effecting cross-trades between clients (where a third-party broker is used) is not specifically addressed by the Act, but is subject to the anti-fraud provisions of the Act.[101]  Cross-trades involve potential conflicts of interest (because the adviser could favor one client over another), and thus many advisers follow the methodology required by a rule under the Investment Company Act of 1940 when one of the clients is an investment company.[102]

d.    *Aggregation of Client Orders.*  In directing orders for the purchase or sale of securities, an adviser may aggregate or "bunch" those orders on behalf of two or more of its accounts, so long as the bunching is done for the purpose of achieving best execution, and no client is systematically advantaged or disadvantaged by the bunching.[103]  Advisers should have procedures in place that are designed to ensure that the trades are allocated in such a manner that all clients are treated fairly and equitably.[104]

2.    *Advertising.*  The anti-fraud provisions of the Act apply with respect to both clients and *prospective* clients.  The SEC has adopted a rule that prohibits any adviser registered with the SEC from using any advertisement that contains any untrue statement of material fact or is otherwise misleading.[105]

*Specific Restrictions.*  An advertisement may not:

a.    Use or refer to testimonials, which include any statement of a client's experience with, or endorsement of, an adviser;[106]

b.    Refer to past specific recommendations made by the adviser, unless the advertisement sets out a list of all recommendations made by the adviser during the preceding year;

c.    Represents that any graph, chart, or formula can, in and of itself, be used to determine which securities to buy or sell; and

d.    Refer to any report, analysis, or service as free, unless it really is.

*Performance Advertising.*  Advertisements containing information about the performance of client accounts must not be misleading.  The SEC considers an advertisement containing performance information misleading if it implies, or if a reader would infer from it, something about an adviser's competence or possible future investment results that would be unwarranted if the reader knew all of the facts.[107]  Advisers registered with the SEC must maintain records substantiating any performance claimed in an advertisement.[108]

*Definition of Advertisement.*  While no communications to clients may be misleading, the specific restrictions discussed above apply only to "advertisements" by advisers, which the SEC defines generally as communications (in writing or electronic form) to more than one person that offer advisory services.[109]  The SEC staff does not believe that a written communication by an adviser that does no more than respond to an unsolicited request by a client is an advertisement even if it received multiple requests for the same information, *e.g.*, in multiple RFPs.[110]

3.    *Custody of Client Assets.*  A registered adviser with custody of client funds or securities is required to take a number of steps designed to safeguard those client assets:[111]

   a.    *Qualified Custodians.*  The adviser must maintain client funds and securities with "qualified custodians" either under the client's name or under the adviser's name as agent or trustee for its clients.  Qualified custodians are:

      (i)    Brokers, dealers, banks, savings associations, futures commission merchants, and

      (ii)    Non-U.S. financial institutions that customarily hold financial assets for their customers, if the institutions keep the advisory assets separate from their own.

   b.    *Notification.*  The adviser must notify the client as to where and how the funds or securities will be maintained, promptly when the account is opened and following any changes to this information.[112]

   c.    *Quarterly Account Statements.*  The adviser must either:

(i)     Have a reasonable basis for believing that the qualified custodian sends quarterly account statements directly to the client;[113] or

(ii)    Send its own quarterly account statements to the client, in which case the adviser must also undergo an annual surprise examination by an accountant to verify the client's funds and securities.[114]

d.      *Investment Vehicles.*  If the adviser is the general partner of a limited partnership (or holds a similar position with another form of pooled investment vehicle such as a hedge fund):

(i)     The quarterly account statements must be sent to each investor in the limited partnership; or

(ii)    The adviser can forego having quarterly statements sent if the pool is audited and the audited financial statements distributed to the pool's investors.[115]

e.      *Definition of Custody.*  An adviser has custody of client funds or securities if it "hold[s], directly or indirectly, client funds or securities, or [has] any authority to obtain possession of them."  Custody includes:

(i)     Possession of client funds or securities:

(ii)    Any arrangement under which an adviser is permitted or authorized to withdraw client funds or securities (such as check-writing authority or the ability to deduct fees from client assets), and

(iii)   Any capacity that gives an adviser or its supervised person legal ownership of or access to client funds or securities (such as acting as general partner or trustee).[116]

In some cases, an adviser will be considered to have custody of client assets held by an affiliate.[117]

4.      *Proxy Voting.*  A registered adviser that exercises voting authority over client securities is required to vote them in the best interest of the client and not in its own interest.[118]  The

SEC has adopted a rule that requires advisers with voting authority over client securities to:

    a.    Adopt and implement written policies and procedures that are reasonably designed to ensure that the adviser votes in the clients' best interests, and which must specifically address conflicts of interest that may arise between the adviser and its clients,

    b.    Describe their voting policies and procedures to clients, deliver a copy of the policies and procedures to clients upon request, and inform clients how they can obtain information on how the adviser voted their securities, and

    c.    Keep certain records relating to voting of client securities.

5.    *Use of Solicitors*.  An adviser registered under the Act generally is prohibited from paying a cash fee, directly or indirectly, to a third party (a "solicitor") unless the arrangement complies with a number of conditions, including the delivery by the solicitor of a statement describing its solicitation activities and the compensation it will receive.[119]  The adviser has an obligation to supervise the activities of solicitors.[120]

6.    *Supervision.*  An adviser has a continuing responsibility to supervise all persons acting on its behalf.[121]

Under the Act, a person (*e.g.*, an adviser or an officer of the adviser) will not be deemed to have failed to supervise a person if:  (i) the adviser had established procedures designed to prevent the conduct; and (ii) the person reasonably discharged his supervisory duties, and had no reason to believe that the procedures were not being followed.[122]

7.    *Compliance Program.*  Each registered adviser must establish an internal compliance program that addresses the adviser's performance of its fiduciary and substantive obligations under the Act.[123]

    a.    *Chief Compliance Officer*.  Each adviser must designate a chief compliance officer who is knowledgeable about the Act and who has authority to develop and enforce appropriate compliance policies and procedures for the

adviser.  The CCO need not be a new employee or an employee that does not have other duties.

    b.    *Policies and Procedures.*  Each adviser must also adopt and implement written policies and procedures reasonably designed to prevent the adviser or its personnel from violating the Act.[124]

    c.    *Annual Review.*  The adviser must review the effectiveness of the policies at least annually.

8.    *Code of Ethics.*  All advisers must adopt and enforce a written code of ethics reflecting the adviser's fiduciary duties to its clients.[125]  At a minimum, the adviser's code of ethics must:

    a.    *Standards of Conduct.*  Set forth a minimum standard of conduct for all supervised persons;

    b.    *Compliance with Federal Securities Laws.*  Require supervised persons to comply with federal securities laws;

    c.    *Personal Securities Transactions.*  Require each of an adviser's access persons[126] to report his securities holdings at the time that the person becomes an access person and at least once annually thereafter and to make a report at least once quarterly of all personal securities transactions in reportable securities to the adviser's chief compliance officer or other designated person;

    d.    *Pre-approval of Certain Securities Transactions.*  Require the chief compliance officer or other designated persons to pre-approve investments by the access persons in IPOs or limited offerings;

    e.    *Reporting Violations.*  Require all supervised persons to promptly report any violations of the code to the adviser's chief compliance officer or other designated person;

    f.    *Distribution and Acknowledgment.*  Require the adviser to provide each supervised person with a copy of the code, and any amendments, and to obtain a written acknowledgment from each supervised person of his receipt of a copy of the code; and

g.    *Recordkeeping.*  Require the adviser to keep copies of
the code, records of violations of the code and of any
actions taken against violators of the code, and copies
of each supervised person's acknowledgement of
receipt of the a copy of the code.

9.    *Insider Trading.*  Advisers are required to establish, maintain,
and enforce written policies and procedures reasonably
designed to prevent the misuse of material, nonpublic
information by the adviser or any of its associated persons,[127]
including the misuse of material nonpublic information about
the adviser's securities recommendations and client securities
holdings and transactions.[128]

10.    *Brochure Rule.*  Advisers must prepare and deliver to clients
before entering into an advisory contract, and must annually
offer to deliver, a copy of Part II of Form ADV or a brochure
containing at least the information required to be in Part II.[129]
Satisfaction of the brochure delivery requirement does not
necessarily satisfy an adviser's full disclosure obligation under
the anti-fraud rules.[130]

11.    *Privacy Rule.*  Title V of the Gramm-Leach-Bliley Act protects
the privacy interests of consumers of financial services,
including clients of SEC-registered investment advisers.[131]
SEC rules implementing the statute protect only individuals'
personal privacy interests, and not those of businesses or
individuals who seek to obtain the services of an adviser for
business purposes.[132]

a.    *Notices.*  An adviser must provide clients an *initial* and
an *annual* notice of the adviser's privacy policies.  The
initial notice must be provided no later than when the
client enters into an advisory contract.[133]

*Content of Notice.*  Notices must be clear and
conspicuous, *i.e.,* reasonably understandable and
designed to call attention to the nature and significance
of the notice.  They must include, among other things:
(i) categories of nonpublic personal information the
adviser collects; (ii) categories of information the
adviser shares; (iii) categories of affiliates and non-
affiliates with which the adviser shares the information;
and (iv) the adviser's policies and practices for
protecting the confidentiality and security of
information.

b.    *Opt-Out.*  An adviser must provide clients with an opportunity to "opt out" or block the adviser from sharing "nonpublic" personal financial information with nonaffiliated third parties.[134]

*Exceptions.*  An adviser does not have to provide an opt-out right in three circumstances:

(i)    The information is provided to an affiliate;

(ii)    The adviser shares the information in the course of providing advisory services to the client (*e.g.,* with a broker, transfer agent, lawyer) with the client's consent, or as required by law;[135] or

(iii)    The adviser shares the information with a nonaffiliate that performs services, including marketing, for the adviser, but the adviser must have entered into a contract with the nonaffiliate that prohibits the nonaffiliate from using the information except for the purpose for which it received it.[136]

c.    *Safeguarding and Properly Disposing of Client Information.*  An adviser must adopt written procedures reasonably designed to protect client records and information, and to dispose of consumer report information properly.[137]

d.    *"Nonpublic personal information"* includes "personally identifiable financial information" (a defined term) and any list, description, or other grouping of clients derived using "personally identifiable financial information" (*e.g.*, a client list):[138]

(i)    "Personally identifiable financial information" includes information a client provides an adviser, information that results from services the adviser provides to the client, and information an adviser otherwise obtains about the client in connection with providing advisory services.[139]

(ii)    "Nonpublic personal information" does not include "publicly available information"— *i.e.*,

24

information the adviser reasonably believes is lawfully made available to the general public from government records, widely distributed media, or disclosures to the general public required by law.[140]

12.  *Form 13F Disclosure*.  An SEC-registered investment adviser that exercises investment discretion over at least $100 million in "Section 13(f) securities" must periodically file Form 13F with the SEC.[141]  "Section 13(f) securities" generally include equity securities that trade on either the New York or American Stock Exchange, or that are quoted on the NASDAQ National Market System.[142]  Form 13F must be filed electronically, via the SEC's Electronic Data Gathering, Analysis and Retrieval ("EDGAR") system, within 45 days after the end of the March, June, September, and December calendar quarters.  Form 13F reports must identify, among other things: (i) the name of the issuer; (ii) the number of shares owned; and (iii) the fair market value, as of the end of the quarterly filing period, of the reported securities.[143]

*Non-U.S. Advisers.*  Non-US investment advisers must file Form 13F if they (i) use any means or instrumentality of United States interstate commerce in the course of their business; and (ii) exercise investment discretion over $100 million or more in Section 13(f) securities.[144]

C.  <u>Contractual Requirements</u>

The Act requires certain provisions to be included and prohibits others from being included in the advisory contract.

1.  *Performance Fees.*  Advisers are not permitted to enter into a contract with a client that varies with the adviser's success in managing the client's money, *i.e.,* a fee based on a share of the capital gains or appreciation of a client's funds.[145]  Congress included this provision in the Act because of its concern that a performance fee would encourage undue speculation with clients' investments.  There are several exceptions to the prohibition.

a.  *Assets Under Management.*  The commonly charged fee based on an amount of assets under management is specifically excepted.[146]

b.   *Fulcrum Fee.*   The Act excepts from the performance fee prohibition a type of fee known as a "fulcrum fee." This is a fee for "big players" where the investment advisory contract involves registered investment companies or clients with over $1 million of assets.[147] The fee must be based on the asset value of the funds under management over a "specified period" and must increase or decrease proportionately with the "investment performance" of funds under management in relation to an "appropriate index of securities prices."[148]

c.   *Non-U.S. Clients.*   The Act also excepts contracts with persons who are not residents of the U.S.[149]   Congress added this exception in 1996 in recognition that the common use of performance fee arrangements in other countries placed U.S. advisers at a competitive disadvantage.

d.   *Qualified Purchaser Funds.*   The Act also excepts contracts with certain funds not registered under the Investment Company Act of 1940 because they are offered only to certain wealthy or sophisticated investors.[150]

e.   *Qualified Clients.*   The SEC has adopted a rule that permits an adviser to enter into a performance fee contract with certain "qualified clients."[151]   A qualified client is defined as a:

(i)      Natural person or company that has at least $750,000 under management with the adviser immediately after entering into the contract;

(ii)     Natural person or company that the adviser reasonably believes has a net worth of more than $1.5 million at the time the contract is entered into, or is a "qualified investor;" or

(iii)    Natural person who is an officer, director, trustee, or general partner (or a person serving in a similar capacity) of the adviser, or an employee who participates in investment decisions of the adviser and has done so for at least 12 months.[152]

26

2.   *Assignments of Advisory Contracts.*  Advisory contracts must contain a provision prohibiting their assignment without consent of the client.[153]  An assignment generally includes any direct or indirect transfer of an advisory contract by an adviser or any transfer of a controlling block of an adviser's outstanding voting securities.[154]  A transaction that does not result in a change of actual control or management of the adviser (*e.g.*, a corporate reorganization) would not be deemed to be an assignment for these purposes.[155]

3.   *Notification of Partnership Changes.*  If the adviser is organized as a partnership, each of its advisory contracts must provide that the adviser will notify the client of a change in its membership.[156]

4.   *Hedge Clauses.*  The Act voids any provision of a contract that purports to waive compliance with any provision of the Act.[157]  The SEC staff takes the position that an adviser that includes any such provision in a contract misleads its clients in violation of the Act's anti-fraud provisions by creating in the mind of the client the belief that a legal right or remedy under the Act is not available.[158]

5.   *Termination Penalties.*  The SEC staff takes the position that certain fees that may have the effect of penalizing a client for ending the advisory relationship, or that may make the client reluctant to terminate an adviser, may be inconsistent with the adviser's fiduciary duty and may violate Section 206.[159]  Thus, the staff interprets the anti-fraud provisions of the Act to require an adviser receiving its fee in advance to give a client terminating a contract a pro rata refund of pre-paid fees (less reasonable expenses),[160] unless the adviser is to receive a pre-determined amount upon termination for services already performed, and the client is provided adequate disclosure.[161]

D.   Recordkeeping Requirements

The SEC generally requires a registered adviser to maintain two types of books and records:  (i) typical accounting records that any business would normally keep; and (ii) certain additional records the SEC believes necessary in light of the adviser's fiduciary duty.[162]

The requirement to keep records does not turn on the medium in which the document is created or maintained.  Thus, electronic documents, including e-mails, must be maintained if they meet the required record described below.

27

1.    *Typical Records*

     a.    All checkbooks, bank statements, canceled checks, and reconciliations;

     b.    All written agreements entered into by the adviser with any client or otherwise relating to the business of the adviser, *e.g.,* rental and service agreements, mortgages, employment contacts, advisory contracts;

     c.    All invoices or statements relating to the adviser's business; and

     d.    All cash receipts and disbursement journals, other journals, appropriate ledger accounts, all trial balances, financial statements, and internal audit working papers relating to the business of the adviser.

2.    *Additional Records*

     a.    A record of the personal securities transactions of the adviser and its employees;

     b.    Copies of each report of personal securities holdings made by an access person under the adviser's code of ethics;

     c.    Documents supporting an adviser's decision to approve an access person's personal securities transactions;

     d.    A list of all persons who currently are "access persons" and who have been access persons within the last five years;

     e.    A memorandum of each order given by the adviser for the purchase or sale of any security and any instruction from the client concerning such purchase and sale;

     f.    A cross reference of securities held by client and by issuer;

     g.    The originals of all written communications received and copies of all written communications sent by the adviser relating to:

       (i)     Any recommendation made or proposed to be made, and any advice given or proposed to be given;

       (ii)    Any receipt, disbursement or delivery of funds or securities; or

       (iii)   The placing or executing of any order to purchase or sell any security.

h.     Copies of all circulars, advertisements, newspaper articles, etc., sent to 10 or more persons;

i.     A list of all accounts that the adviser has discretionary authority over;

j.     Copies of any power of attorney;

k.     A copy of each written statement given to any client in compliance with the brochure rule;

l.     Clients' acknowledgement of receipt of a solicitation agreement;

m.    Documents substantiating any performance advertised;[163]

n.    Certain additional records if the adviser has custody or possession of clients' cash or securities;[164]

o.    Copies of the code of ethics and amendments thereto;

p.    Records of violations of the code by supervised persons and of any actions taken against violators of the code of ethics; and

q.    Copies of each supervised person's written acknowledgment of receipt of a copy of the code of ethics.[165]

3.     *Other Requirements Regarding Recordkeeping*

a.     All books and records required to be kept by the rule must be maintained and preserved in any easily accessible place for a period of no less than five years;[166]

      b.     Records required to be kept may be kept in micrographic media (*e.g.*, microfilm or microfiche) or in electronic storage media (*e.g.*, optical storage discs, CD ROMs),[167] and

      c.     There are special recordkeeping rules for non-resident investment advisers.[168]

E.     <u>Applicability to Non-US Advisers.</u>  The Commission interprets the Act such that most of the requirements (discussed above) do not apply with respect to the non-U.S. clients of a registered adviser whose principal place of business is not in the U.S.[169]  For example, a non-U.S. adviser is not required to maintain non-U.S. person client assets in accordance with the custody rule.

A non-U.S. adviser registered with the SEC is subject to examination by SEC staff and must maintain certain records with respect to all of its clients, including non-U.S. clients.[170]

F.     <u>Administrative Oversight</u>

All records of a registered adviser (and not only those required to be created or maintained by SEC rule) are subject to examination by SEC staff.[171]  Personnel in the SEC's various regional offices usually conduct inspections.  All examinations are confidential.[172]

1.     *Types of Inspections.*   There are three types of inspections:

      a.     *Routine Examinations*.  The SEC staff conducts on-site exams of SEC-registered advisers based on risk assessments.  If the staff has concerns about an adviser's internal controls, exams could be as frequent as every other year.  Advisers with better control environments may be examined once every four years.[173]

      b.     *Sweep Examinations*.  The SEC staff conducts on-site exams for the purpose of evaluating a perceived problem (*e.g.*, adviser performance advertising) or to educate itself on current industry practices in a particular area prior to developing a regulatory solution (*e.g.*, best execution practices) or a combination of both (*e.g.*, soft dollar practices).

      c.     *Cause Examinations.*  These may be based on receipt of a complaint from a client or a competitor, press reports of problems, rumors, or anonymous tips.

2.     *Focus of Inspections.*  During routine inspections, examiners look particularly for evidence of the following:

      a.     Whether the adviser or its personnel is front-running client trades;

      b.     Whether the adviser is engaging in brokerage practices that are not in clients' best interests (*e.g.*, failure to obtain best execution; undisclosed soft dollar arrangements, unfair order allocations, payments for client referrals);

      c.     Whether the advice given to clients is suitable;

      d.     Whether the disclosure given to clients conforms to the adviser's actual practices;

      e.     Whether the adviser engages in deceptive advertising (particularly performance advertising) or any other problematic marketing practices;

      f.     Whether the adviser is eligible for SEC registration (*e.g.,* whether the adviser really manages $25 million of client assets);

      g.     Whether the adviser's system of compliance policies and procedures is adequate;

      h.     Whether the adviser engages in appropriate custody practices for clients' cash and securities; and

      i.     Whether the adviser maintains proper recordkeeping.

3.     *Results of Inspection.*  Generally, there are three possible results from an examination:

      a.     The staff finds no problems and sends the adviser a letter stating that the inspection is finished (a rare event!);

      b.     The staff sends a "deficiency letter" informing the

adviser of any violations or possible violations found and requests the adviser promptly to take any necessary corrective steps and notify the staff of the corrective actions taken; or

c.  The staff refers the inspection to the SEC's Division of Enforcement for further consideration and possible commencement of an enforcement proceeding—not common as a first step.

---

[1]  See Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong., 2d Sess. (1939).

[2]  SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 189, 191-192 (1963).

[3]  Applicability of the Investment Advisers Act of 1940 to Financial Planners, Pension Consultants, and Other Persons Who Provide Others with Investment Advice as a Component of Other Financial Services, Investment Advisers Act Release No. 1092 (Oct. 8, 1987) ("Release 1092").

[4]  Release 1092; see also Kenisa Oil Company, SEC Staff No-Action Letter (May 6, 1982), a person provides advice "for compensation" if it understands that successful investment will yield it a commission; SEC v. Fife, 311 F. 3d 1(1st Cir. 2002), or if it fraudulently converts client funds to its own use. In the Matter of Alexander V. Stein, Investment Advisers Act Release. No. 1497 (June 8, 1995).

[5]  Zinn v. Parish, 644 F.2d 360 (7th Cir. 1981).

[6]  An employer providing advice to an employee in connection with an employer-sponsored employee benefit program would not be in the business of providing advice. Letter to Olena Berg, Assistant Secretary, Department of Labor, from Jack W. Murphy, Chief Counsel, Division of Investment Management, SEC (Feb. 22, 1996).

[7]  Robert M. Champion, SEC Staff No-Action letter (Oct. 17, 1995)

[8]  Dow Theory Forecasts, SEC Staff No-Action Letter (Feb. 2, 1978). Thus, market-timing advice is advice about securities. See Maratta Advisory, Inc., SEC Staff No-Action Letter (July 16, 1981).

[9]  Release 1092; FPC Securities Corp., SEC Staff No-Action Letter (Dec. 1, 1974).

[10]  See id.

[11]  RDM Infodustries, Inc., SEC Staff No-Action Letter (Mar. 25, 1996). The SEC staff takes the position that providing information about securities in a report does not constitute providing advice about the securities if: (i) the information is readily available to the public in its raw state; (ii) the categories of

information presented are not highly selective; and (iii) the information is not organized or presented in a manner that suggests the purchase, holding, or sale of any security.  *See id.*

[12]    Maratta Advisory, Inc., SEC Staff No-Action Letter (July 16, 1981).

[13]    The Applicability of the Investment Advisers Act of 1940 to Financial Advisors to Municipal Bond Issuers, Division of Investment Management, SEC Staff Legal Bulletin No. 11 (Sept. 19, 2000), available at http://www.sec.gov/interps/legal.shtml.

[14]    The term "bank" is defined in Section 202(a)(2).  This section was amended in 2006 to include Federal savings associations, as defined in section 2(5) of the Home Owners' Loan Act (The Financial Services Regulatory Relief Act of 2006, Pub. L. No. 109-351, 120 Stat. 1973 (Oct. 13, 2006)).  The section was amended in 2001 to exclude a bank (as defined therein) from the exception to the extent that the bank serves or acts as an investment adviser to a registered investment company, but if, in the case of a bank, such services or actions are performed through a separately identifiable department or division, the department or division, and not the bank itself, shall be deemed to be the investment adviser.  The term "separately identifiable department or division" is defined in Section 202(a)(26).

[15]    Letter to Rep. William J. Hughes from Stanley B. Judd, Deputy Chief Counsel, Division of Investment Management, SEC (June 4, 1980).

[16]    First Commerce Investors, Inc., SEC Staff No-Action Letter (Jan. 31, 1991).

[17]    Release 1092; Henry S. Miller Companies of Dallas, Texas, SEC Staff No-Action Letter (Feb. 21, 1975).

[18]    Section 202(a)(11)(C); *see also* Certain Broker-Dealers Deemed Not To Be Investment Advisers, Investment Advisers Act Release No. 2376 (Apr. 12, 2005) ("Release 2376"), available at http://www.sec.gov/rules/final.shtml.

[19]    National Regulatory Services, SEC Staff No-Action Letter (Dec 2, 1992) at n. 3.

[20]    *See* rule 202(a)(11)-1; *see also* Release 2376, *supra* note 18.

[21]    Release 2376, *supra* note 18.

[22]    The SEC staff does not believe a broker-dealer has discretionary authority if one of its associated persons exercises discretionary authority over an account where that authority stems from his service as an executor, conservator, trustee, attorney-in-fact, or other agent as a result of a family or personal relationship, and not from employment with the broker-dealer.  Morgan, Lewis & Bockius, SEC Staff No-Action Letter (Nov. 17, 2005).

[23]    Rule 202(a)(11)-1(b).   The SEC staff has issued a letter explaining the application of the "financial planning" element of the rule.  Securities Industry Association, SEC Staff Letter (Dec. 16, 2005).

[24]    Institute of Certified Financial Planners, SEC Staff No-Action Letter (Jan. 21, 1986).

[25]    Section 202(a)(11)(D).  *See Lowe v. SEC*, 472 U.S. 181 (1985); *SEC v. Gun Soo Oh Park, A/K/A Tokyo Joe, and Tokyo Joe's Societe Anonyme Corp.*, 99 F. Supp. 2d 889 (N.D. Ill. 2000).  If a publisher voluntarily registers under the Act, or is required to register as a result of some other advisory activity, the adviser is subject to all of the provisions of the Act and SEC rules with respect to the publication.  Vincent J. Cosentino, SEC Staff No-Action Letter (Feb. 13, 1986).

[26]  Section 202(a)(11)(E).  The scope of the exception includes persons whose advice is limited to: (i) direct obligations of the Federal government (*e.g.*, U.S. Treasury obligations); (ii) securities subject to guarantees from the Federal government; and (iii) securities issued by or guaranteed by corporations whose securities are designated by the Secretary of the Treasury as exempt from the Exchange Act. Advice about repurchase agreements collateralized by U.S. government securities does not fall within the exception.  J.Y. Barry Arbitrage Management, Inc., SEC Staff No-action Letter (Oct. 18, 1989). *See also*  In the Matter of Rauscher Pierce Refsnes, Inc., et al., Investment Advisers Act Release No. 1863 (Apr. 6, 2000) ("Because Rauscher's advice was not limited to Treasury securities or other government securities as described in Section 202(a)(11)(E), that provision did not operate to exclude Rauscher from the definition of investment adviser.").

[27]  A new Section 202(a)(11)(F) was added in the "Credit Rating Agency Reform Act of 2006."  Pub. L. No. 109-291, 120 Stat. 1327 (Sept. 29, 2006).  The original Section 202(a)(11)(F) is now designated as Section 202(a)(11)(G).

[28]  Section 202(b).

[29]  Section 202(a)(11)(G).  *See, e.g.,* International Bank for Reconstruction and Development and International Development, Investment Advisers Act Release Nos. 1971 (Sept. 4, 2001) (notice) and 1955 (July 27, 2001) (order) (declaring World Bank instrumentalities not to be investment advisers under the Act).  Section 202(a)(11)(G) was designated as Section 202(a)(11)(F) until 2006.  *See supra* note 27.

[30]  Section 203(a).

[31]  Persons who voluntarily register under the Advisers Act, in circumstances where their registration may not be required, are subject to all of the provisions and rules under the Advisers Act applicable to persons required to register.  Investment Advisers Act Release No. 870 (July 15, 1983).  State regulatory law is not preempted for an adviser taking advantage of one of the exceptions from registration and thus the adviser may be required to register with one or more state securities regulators.  *See* discussion of state preemption in Section III.B. of this outline.

[32]  Section 203(b)(1).  The SEC staff takes the position that advice regarding investment companies involves advice about "listed securities" if the investment company invests in listed securities.  Roy Heybrock, SEC Staff No-Action Letter (Apr. 5, 1992).

[33]  Section 203(b)(2).

[34]  Section 203(b)(3).

[35]  Murray Johnstone Holdings Ltd., SEC Staff No-Action Letter (Oct. 7, 1994).  "Otherwise, a person would be able to do indirectly, through several persons, what he could not do directly" in violation of Section 208(d) of the Act.  Prudential-Bache Special Situations Fund L.P., SEC Staff No-Action Letter (Oct. 8, 1984).

[36]  Rule 203(b)(3)-1.  The rule provides a non-exclusive safe harbor for counting clients for purposes of Section 203(b)(3).  *See* the preliminary note to the rule.

[37]  An adviser must count an owner (*e.g.*, a limited partner) as a client if it provides advice to that owner "separate and apart" from the advice provided to the entity.  Rule 203(b)(3)-1(b)(1).  *See* Latham & Watkins, SEC Staff No-Action Letter (Aug. 24, 1998); Burr, Egan, Deleage & Co., Inc., SEC No-Action Letter (Apr. 27, 1987).

[38]    Rule 203(b)(3)-1(b)(5).  The SEC staff believes that a U.S. adviser providing advice exclusively to non-U.S. persons would be subject to the Act.  Gim-Seong Seow, SEC Staff No-Action Letter (Oct. 30, 1987).

[39]    *Id.*

[40]    Rule 203(b)(3)-1(b)(4).  An adviser must count each client it has provided services to during the 12-month period even if it received compensation before the beginning of the period.  Investment Advisers Act Release No. 1000 (Dec. 3, 1985).

[41]    *Goldstein v. SEC*, 451 F. 3d 873 (D.C. Cir.  2006).  The SEC staff has issued a no-action letter addressing a number of implications of this decision on hedge fund advisers remaining registered with, and on those withdrawing their registrations from, the SEC.  American Bar Association Subcommittee on Private Investment Entities, SEC Staff No-Action Letter (Aug. 10, 2006) (ABA Letter 2006), available at http://www.sec.gov/divisions/investment/noaction/aba081006.pdf.

[42]    *See, e.g.*, William Bloor, SEC Staff No-Action Letter (Feb. 15, 1980); Richard J. Shaker, SEC Staff No-Action Letter (Aug. 1, 1977); Al O'Brien Associates, SEC Staff No-Action Letter (Oct. 6, 1973).

[43]    Investment Advisers Act Release No. 688 (July 15, 1979) n. 9.  *But see* Lamp Technologies, Inc., SEC Staff No-Action Letter (May 29, 1997) (investment adviser deemed not to be "holding itself out generally to the public as an investment adviser" solely by virtue of posting information about certain private funds (*e.g.*, hedge funds) on a password-protected web site that is accessible only by accredited investors).

[44]    Statement of the Commission Regarding Use of Internet Web Sites to Offer Securities, Solicit Securities Transactions or Advertise Investment Services Offshore, Investment Advisers Act Release No. 1710  (Mar. 23, 1998) section VI, available at http://www.sec.gov/rules/interp/interparchive/ interparch1998.shtml.

[45]    Sections 203(b)(4) and (5) were added by the Philanthropy Protection Act of 1995, Pub. L. No. 104-62, 109 Stat. 682 (1995).

[46]    Section 203(b)(6) was added by the Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000), which also amended the Act's definition of  "security" in Section 202(a)(18) of the Act to include certain "securities futures."  The Act repealed the ban on single stock or narrow-based stock index futures and established a framework for shared jurisdiction over the trading of these instruments and market participants.  *See* Exchange Act Release No. 44288 (May 9, 2001), available at http://www.sec.gov/rules/proposed/34-44288.htm.

[47]    National Securities Markets Improvements Act of 1996 ("NSMIA"), Pub. L. No. 104-290, 110 Stat. 3416 (1996).  Most of the provisions amending the Advisers Act were codified in Section 203A.

[48]    Section 203A(a)(1)(A).  Section 203A creates a *prohibition*, not an exemption.  *See* Credit Agricole Asset Management Alternative Investments, Inc., SEC Staff No-Action Letter (Aug. 7, 2006); In the Matter of Matthew P. Brady, Investment Advisers Act of 1940 Release No. 2178 (Sept. 30, 2003).

The SEC has authority to set a higher threshold, which it has used to provide a state-registered adviser the option of waiting until it has $30M of assets under management to register with the SEC.  Rule 203A-1(1)-(2).  An adviser is not required to withdraw its registration with the SEC, however, until it has less than $25M of assets under management.  Rule 203A-1(b)(2).  The $5M "window" is designed to prevent an adviser from having to switch registrations frequently as the value of its assets under management changes.  Investment Advisers Act Release No. 1633 (May 15, 1997) section C.2.a.,

available at http://www.sec.gov/rules/final/finalarchive/finalarchive1997.shtml.  An adviser must report the value of its assets under management (and ascertain its continued eligibility for SEC registration) once each year when it submits its annual updating amendment to the SEC.  Rule 203A-1(b)(2).

[49]   For a comprehensive discussion of NSMIA as well as the SEC's rules implementing the statutory provisions, *see* Rules Implementing Amendments to the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1601 (Dec. 20, 1996) (proposing release), available at http://www.sec.gov /rules/proposed/proposedarchive/proposed1996.shtml; Rules Implementing Amendments to the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1633 (May 15, 1997) (adopting release), available at http://www.sec.gov/rules/final/finalarchive/finalarchive1997.shtml.

[50]   Section 203A(a)(1)(B).

[51]   *See* Instructions for Item 2 of Part 1A of Form ADV.

[52]   Section 203A(a)(1) prohibits any adviser from registering with the SEC that is *regulated or is required to be regulated* in a state in which it maintains its principal office and place of business.  The SEC interprets this provision to mean the prohibition applies only to an adviser that maintains its principal office and place of business in a state that has enacted an investment adviser statute.  Investment Advisers Act Release No. 1633 (May 15, 1997) n. 83 and accompanying text.

[53]   An adviser with a principal office and place of business in another country does not have a principal office and place of business in a U.S. state that regulates investment advisers.

[54]   Rule 203A-2(a)(f).  This exemption may be unnecessary in light of the enactment of the Credit Rating Agency Reform Act of 2006, which excepts ratings agencies from the definition of "investment adviser" and thus the Advisers Act, *see supra* note 27.

[55]   Rule 203(A)-2(b)(3).  In May 2005, the SEC staff published a report detailing concerns with conflicts of pension fund consultants.  *See* Staff Report Concerning Staff Examinations of Certain Select Pension Fund Consultants at www.sec.gov/news/studies/pensionexamstudy.pdf.

[56]   Rule 203A-2(c).

[57]   Rule 203A-2(d).   An adviser relying on this exception must file an amendment to its Form ADV at the end of the 120 days indicating whether it has become eligible for SEC registration, or must withdraw its SEC registration.

[58]   Rule 203A-2(e).  Under the rule, an adviser need not withdraw its SEC registration until the number of states with which it would otherwise have to register drops to fewer than 25.  Rule 203A-2(e)(1).

[59]   Rule 203A-2(f).  Investment Advisers Act Release No. 2091 (Dec. 12, 2002), available at http://www.sec.gov/rules/final/finalarchive/finalarchive2002.shtml.

[60]   SEC-registered advisers can comply with state requirements that they provide states with a copy of their registration (so-called "notice filings"), pay state registration fees, and license advisory personnel (in most states) through the electronic filing system (IARD) discussed below.

[61]   *See*, e.g., In the Matter of James William Fuller, Investment Advisers Act Release No. 1842 (Oct. 4, 1999).  But the anti-fraud rules adopted by the SEC pursuant to its authority under Section 206(4) of the Act (and discussed below) are not applicable to state-registered advisers.  States have, however, adopted similar rules in many cases.

36

62      Kevin J. Hughes, SEC Staff No-Action Letter (Dec. 7, 1983).  *See also* Investment Advisers
        Act Release No. 688 (July 12, 1979) (persons associated with a registered adviser need not
        separately register as investment advisers solely as a result of their activities as associated
        persons).

63      *See* Richard Ellis, SEC Staff No-Action Letter (Sept. 17, 1981); Kenneth Levanthal, SEC Staff No-
        Action Letter (Feb. 7, 1983).  *See also* Price Waterhouse, SEC Staff No-Action Letter (Nov. 22, 1988).

64      *See* Uniao de Bancos de Brasilerios, S.A., SEC Staff No-Action Letter (July 28, 1992); Mercury Asset
        Management, SEC Staff No-Action Letter (Apr. 16, 1993); Kleinwort Benson Investment Management
        Ltd., SEC Staff No-Action Letter (Dec. 15, 1993); Murray Johnston Holdings Ltd., SEC Staff No-
        Action Letter (Oct. 7, 1994).

65      *See id.*

66      American Bar Association Subcommittee on Private Entities (Dec 8, 2005) (ABA Letter 2005),
        Question G1, available at http://www.sec.gov/divisions/investment/noaction/aba120805.htm.

67      Sections 203(c)(2) and (e).  Section 203(e) was amended in 1990 to permit the SEC to deny an adviser
        registration under the Act (and to revoke an existing registration) based upon convictions in non-U.S.
        courts (Section 203(e)(2)) or actions of foreign financial regulators (Section 203(e)(8)).  The
        International Securities Enforcement Cooperation Act of 1990, Pub. L. No. 101-550, 104 Stat. 2713
        (Nov. 15, 1990).

68      Item 6 of Part II of Form ADV.

69      Rule 204-1(a).

70      The SEC has proposed substantial revisions to Part II of Form ADV.  Electronic Filing by Investment
        Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5,
        2000), available at http://www.sec.gov/rules/proposed/proposedarchive/proposed2000.shtml.  Part II is
        currently not filed with the SEC but must be kept by advisers in their files and made available to the
        SEC upon request.  Rule 204-1(c).

71      Rule 203-1(b).  NASD charges advisers filing fees to defray the cost of maintaining and operating the
        IARD.  To pay the fees, advisers must establish and fund an account with NASD before making a
        filing.  A fee schedule is available at www.sec.gov/divisions/investment/iard/iardfee.shtml.  The SEC
        approved NASD's request to waive all fees for a two-year period beginning Nov. 1, 2006.  Approval of
        Investment Adviser Registration Depository Filing Fees, SEC order (Oct 26, 2006), available at
        http://www.sec.gov/rules/other.shtml.

72      Rule 204-1(b).  For information about electronic filing by advisers, *see* www.sec.gov/iard.  The NASD
        does not act as a self-regulatory organization with respect to investment advisers.

73      Rule 203-2.  Form ADV-W filings are made electronically through the IARD, and are effective
        immediately.  There are no filing fees for Form ADV-W

74      Before withdrawing from registration, an adviser must arrange for the preservation of records it is
        required to keep under the Act.  Rule 204-2(f).

75      Section 203(g).  *See* Instruction 4 to Part 1A of Form ADV; Registration of Successors to Broker-
        Dealers and Investment Advisers, Investment Advisers Act Release No. 1357 (Dec. 28, 1992) (the

provision in Rule 203-1 referred to in Release 1357 that addressed successions was moved by the SEC to Instruction 4 to Form ADV in 2000.  A succession resulting from a change in the place or form of organization, or composition of a partnership, *i.e.*, a succession that does not involve a change of control, may be completed by amending the predecessor's Form ADV promptly after the succession. *Id.*

[76]    164 N.E. 545, 546 (N.Y. 1928).

[77]    375 U.S. 180, 190-192 (1963).

[78]    *See* In the Matter of Arleen W. Hughes, Exchange Act Release No. 4048 (Feb 18, 1948).

[79]    *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11 (1979) ("[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations.").

[80]    *See Morris v. Wachovia Securities, Inc.,* 277 F.Supp. 2d 622 (E.D. Va. 2003) ("§206(2) is more than an anti-fraud provision because it establishes fiduciary duties for investment advisers.").  The scope of the fiduciary duty is determined by reference to federal court and administrative decisions rather than state common law analogies.  *Laird v. Integrated Resources, Inc.,* 897 F.2d 826 (5th Cir. 1990) ("[B]ecause state law is not considered, uniformity is promoted.").

[81]    *See* In the Matter of Arleen W. Hughes*, supra* note 78.

[82]    *See* Suitability of Investment Advice Provided by Investment Advisers, Investment Advisers Act Release No. 1406 (Mar. 16, 1994).  In Release No. 1406, the SEC proposed a rule under the Act's anti-fraud provisions requiring advisers give clients only suitable advice.  Although the rule was never adopted, the SEC staff takes the position that the rule would have codified existing suitability obligations of advisers and, as a result, the proposed rule reflects the current obligation of advisers under the Act.   Suitability obligations do not apply to impersonal investment advice, and compliance with the obligation is evaluated in the context of a client's overall portfolio. "Thus, inclusion of some risky securities in the portfolio of a risk-averse client may not necessarily be unsuitable."  *Id.*  The SEC has instituted enforcement actions against advisers that provided unsuitable investment advice.  *See* In the Matter of Westmark Financial Services, Investment Advisers Act Release No. 1117 (May 16, 1968) (financial planner recommended speculative equipment leasing partnerships to unsophisticated investors with modest incomes); In the matter of George Sein Lin, Investment Advisers Act Release No. 1391(Nov. 9, 1993) (adviser with discretionary authority invested funds of clients desiring low-risk investment in uncovered option contracts and used margin accounts).

[83]    In the Matter of Alfred C. Rizzo, Investment Advisers Act Release No. 897 (Jan 11, 1984) (investment adviser lacked a reasonable basis for advice and could not rely on "incredible claims" of issuer); In the Matter of Baskin Planning Consultants, Ltd.; Investment Advisers Act Release 1297 (Dec. 19, 1991) (adviser failed adequately to investigate recommendations to clients).

[84]    In the Matter of Kidder Peabody & Co., Inc., Investment Advisers Act Release No. 232 (Oct. 16, 1968); In the Matter of Delaware Management Company,, Inc. Investment Advisers Act Release No. 8128 (July 19, 1968).  An adviser is relieved of this obligation when a client directs that the adviser use a particular broker (directed trade).  An adviser may, however, be required to make additional disclosure to clients.  *See* In the Matter of Mark Bailey & Co., Investment Advisers Act Release No. 1105 (Feb. 24, 1988) (adviser that failed to disclose that it did not negotiate commissions on directed trades, and failed to disclose that the adviser would be in a better position to negotiate commissions in bunched transactions for non-directed trades violated anti-fraud provisions of Advisers Act); and In the Matter of Jamison, Eaton and Wood, Inc., Investment Advisers Act Release No. 2129 (May 15, 2003).

85    *See* Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 23, 1986) ("1986 Soft Dollar Release").  To fulfill this duty, an investment adviser should "periodically and systematically" evaluate the execution it is receiving for clients.  *Id.*

86    Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 34-54165 (July 18, 2006) ("2006 Soft Dollar Release"), *available at* http://www.sec.gov/rules/interp/2006/34-54165.pdf.  The release superseded parts (but not all) of the 1986 Soft Dollar Release.  In particular, the 2006 Soft Dollar Release does not replace Section IV of the 1986 Release, which discusses an investment adviser's disclosure obligations.

87    *See supra*, 2006 Soft Dollar Release at Section F, note 148.

88    *Id.*

89    Exchange Act Release No. 45194 (Dec. 27, 2001) ("Release No. 45194"), available at http://www.sec.gov/rules/interp/interparchive/interparch2001.shtml. The SEC had interpreted the safe harbor as being available only to agency transactions.  Letter to Charles Lerner, Esq., Director of Enforcement, Pension and Welfare Benefit Administration, U.S. Department of Labor, from Richard Ketchum, Director, Division of Market Regulation, SEC (July 25, 1990).  In Release No. 45194, the SEC revised its interpretation and concluded that "[t]he term 'commission' in Section 28(e) . . . include[s] a markup, markdown, commission equivalent or other fee paid by a managed account to a dealer for executing a transaction where the fee and transaction price are fully and separately disclosed on the confirmation and the transaction is reported under conditions that provide independent and objective verification of the transaction prices subject to self-regulatory oversight."

90    Form ADV, the registration form for advisers, requires that advisers disclose soft dollar arrangements. *See* Form ADV, Part II, Item 12B.  *See also* SEC, Inspection Report on the Soft Dollar Practices of Broker-Dealers, Investment Advisers and Mutual Funds (Sept. 22, 1998), available at http://www.sec.gov/ news/studies/studiesarchive/1998archive.shtml.

91    *See*, *e.g*., In the Matter of S Squared Technology Corporation, Investment Advisers Act Release No. 1575 (Aug. 7, 1996)(adviser's failure to disclose its receipt of benefits in exchange for benefits received in exchange for direction of client brokerage violated Section 206 of the Act).

92    Investment Advisers Act Release No. 2106 (Jan. 31, 2003), available at http://www.sec.gov/rules/final/ finalarchive/finalarchive2003.shtml.  In this release, the SEC adopted rule 206(4)-6, which requires, among other things, each registered investment adviser that has voting authority over client securities to adopt and implement policies and procedures reasonably designed to ensure that client securities are voted in the best interest of clients.   The Commission has instituted enforcement action against an adviser that failed to disclose to clients its conflicts before voting their shares in a hotly contested proxy fight.  In the Matter of Deutche Asset Management, Inc., Investment Advisers Act Release No. 2160 (Aug. 19, 2003).

93    The SEC has applied Section 206(3) not only to principal transactions engaged in or effected by any adviser, but also when an adviser causes a client to enter into a principal transaction that is effected by a broker-dealer that controls, is controlled by, or is under common control with, the adviser. Interpretation of Section 206(3) of the Advisers Act of 1940, Investment Advisers Act Release No. 1732, at n.3 (July 17, 1998).  The Commission has instituted enforcement actions when advisers have effected principal transactions through affiliates without complying with section 206(3), s*ee, e.g.,* In the Matter of Calamos Asset Management, Investment Advisers Act Release No. 1589 (Sept. 30, 1996), including "riskless principal" transactions;  In the Matter of Rothschild Investment Corporation,

Investment Advisers Act Release No. 1714 (Apr. 13, 1998); in the Matter of Concord Investment Co., Investment Advisers Act Release No. 1585 (Sept. 27, 1996).

[94]    Section 206(3).  The SEC interprets completion of the transaction" to mean by settlement of the transaction.  Investment Advisers Act Release No. 1732 (July 17, 1998), available at http://www.sec.gov/rules/interp/ia-1732.htm.  But the SEC believes that, in order for post-execution, pre-settlement consent to comply with Section 206(3), the adviser must provide both sufficient disclosure for a client to make an informed decision, and the opportunity for the client to withhold consent.  *Id.*  While the notice must be in writing, oral consent is sufficient under the Act.  Dillon, Reed & Co., SEC Staff No-Action Letter (Aug. 6, 1975). The notice and consent provisions of Section 206(3) do not apply if the adviser is giving only impersonal advisory services.  Rule 206(3)-1.

[95]    Opinion of Director of Trading and Exchange Division, Investment Advisers Act Release No. 40 (Jan. 5, 1945).  The SEC has instituted enforcement actions against investment advisers for violating section 206(3) when they entered into principal transactions with their clients using only prior blanket disclosures and consents.  *See* In the Matter of Stephens, Inc., Investment Advisers Act Release No. 1666 (Sept. 16, 1997); In the Matter of Clariden Asset Management (New York) Inc., Investment Advisers Act Release No. 1504 (July 10, 1995).

[96]    Section 206(3) provides "prohibitions…shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction."  A broker-dealer that provides generalized, non-specific investment advice to a customer, (*e.g.*, "invest a portion of your account in equity securities,") and the same broker-dealer subsequently effects transactions in specific equity securities at the direction of the customer would not, in the SEC staff's view, act in an advisory capacity with respect to the subsequent transactions.  Securities Industry Association, SEC Staff No-Action Letter (Dec. 16, 2005), available at http://www.sec.gov/divisions/investment/noaction/sia121605.htm

[97]    ABA Letter 2005, *supra*, note 66 at II.A.1.  The SEC has instituted enforcement actions based on claims of violations of section 206(3) against advisers and their principals when the advisers effected transactions between their advisory clients and accounts in which the principals of the advisers held significant ownership interests.  *See* In the Matter of SEC v. Beacon Hill Asset Management, LLC, *et al.*, Litigation Release No. 18950 (Oct. 28, 2004); In the Matter of Gintel Asset Management, *et al.*, Investment Advisers Act Release No. 2079 (Nov. 8, 2002).

[98]    Gardner Russo & Gardner, SEC Staff No-Action Letter (June 7, 2006).

[99]    Section 206(3).  The SEC staff has stated that the provisions of Section 206(3) do not apply when the adviser/broker effects the trade without charging a commission or other fee.  Investment Advisers Act Release No. 1732 (July 17, 1998), available at http://www.sec.gov/rules/interp/interparchive/interparch1998.shtml.

[100]   Rule 206(3)-2.  The rule does not apply to a transaction when the adviser has discretionary authority to act for the purchaser and seller. Paragraph (c) of the rule admonishes advisers that the rule does not relieve them of the duty to act in the best interests of their clients, including the duty to obtain best price and execution for any transaction.

[101]   *See* In the Matter of Renberg Capital Management, Inc. and Daniel H. Renberg, Investment Advisers Act Release No. 2064 (Oct. 1, 2002).

[102]   Rule 17a-7.

[103]   Pretzel & Stouffer, SEC Staff No-Action Letter (Dec. 1, 1995).

104    The Commission has instituted numerous enforcement cases against advisers that unfairly allocated client trades without making adequate disclosure. *See* In the Matter of McKenzie Walker Investment Management, Inc, et al., Investment Advisers Act Release No. 1571 (1996) (adviser allocated profitable trades to accounts charged a performance-based fee); In the Matter of: Nicholas-Applegate Capital Management, Investment Advisers Act Release No. 1741 (Aug. 12, 1998) (adviser failed to supervise trader who allocated profitable trades to own personal account).

105    Rule 206(4)-1. *See SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1104 (9th Cir. 1977) (an adviser's advertising "must be measured from the viewpoint of a person unskilled and unsophisticated in investment matters"); In the Matter of Jesse Rosenblum, Investment Advisers Act Release No. 913 (May 17, 1984) (an investment adviser's advertisement that contained materially misleading statements was "not cured by the disclaimers buried in the [smaller print] text [of the advertisement]").

106    DALBAR, Inc., SEC Staff Letter (Mar. 24, 1997).

107    Edward F. O'Keefe, SEC Staff No-Action Letter (Apr. 13, 1978); Anametrics Investment Management, SEC Staff No-Action Letter (May 5, 1977). *See also* Clover Capital Management, Inc., SEC Staff No-Action Letter (Oct. 28, 1986).

108    Rule 204-2(a)(16).

109    Rule 206(4)-1(b) defines advertisement for purposes of the rule as "[a]ny notice circular, letter or other written communication addressed to more than one person, or any notice or other announcement in any publication or by radio or television, which offers (1) any analysis, report or publication concerning securities, or (2) any graph, chart, formula or other device to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (3) any other investment advisory service with regard to securities."  A communication covered by the rule may be made to new clients or to existing clients where the purpose is to induce them to renew their advisory contract or subscription. Spear & Staff, 42 S.E.C. 549 (1965).

110    Investment Counsel Association of America, SEC Staff Letter (Mar. 1, 2004).

111    Rule 206(4)-2. *See* Custody of Funds or Securities of Clients by Investment Advisers, Investment Advisers Act Release No. 2176 (Sept. 25, 2003) ("Release 2176"), available at http://www.sec.gov/rules/final/finalarchive/finalarchive2003.shtml.  The Division of Investment Management has published a "FAQ" (frequently asked questions) on the custody rule, which is available at http://www.sec.gov/divisions/investment/custody_faq.htm.

112    Notice need not be give if the client opens the account himself.

113    One method of forming a reasonable belief that the custodian is delivering the account statements directly to the client is for the adviser to receive duplicate statements.  Release No. 2176, *supra* note 111.

114    The timing of exams must be irregular from year to year. *See* In the Matter of Kaufman, Bernstein*, et al.,* Investment Advisers Act Release No. 2194 (Nov. 20, 2003) (independent auditor began examination the same date each year).  The accountant conducting the examination must file a certificate on Form ADV-E within 30 days of completing the exam.  Rule 206(4)-2(a)(3)(ii)(B).

115    The audited financial statements must be prepared according to, or reconciled to, U.S. generally accepted accounting principles (GAP), and must be distributed to investors within 120 days.  The Division of Investment Management has provided limited relief from the requirement that financial

statements be prepared in accordance with GAP for certain advisers to hedge funds that were required to register under Rule 203(b)(3)-2 (See discussion above).  Deloitte & Touche LLP, SEC Staff No-Action Letter (Aug. 28, 2006).  The Commission adopted amendments that extended the 120-day deadline to 180 days for a "fund of funds," defined as a limited partnership (or limited liability company, or another type of pooled investment vehicle) that invests 10 percent or more of its total assets in other pooled investment vehicles that are not, and are not advised by, a related person, of the limited partnership, its general partner, or its adviser.  Funds of funds typically cannot complete their own audit until they receive the audited financials of the underlying funds in which they invest.  This amendment was vacated by a Court of Appeals in *Goldstein v. SEC.*  The SEC staff has provided a no-action letter restoring the extension for funds of funds.  *See* ABA Letter 2006, *supra note* 41.

[116]    Rule 206(4)-2(c).

[117]    Crocker Investment Management Corp., SEC Staff No-Action Letter (Apr. 4, 1978).

[118]    Rule 206(4)-6.  *See supra* note 92.

[119]    Rule 206(4)-3.

[120]    For discussion of an adviser's obligation to supervise cash solicitors acting on its behalf, *see* Requirements Governing Payments of Cash Referral Fees by Investment Advisers, Investment Advisers Act Release No. 615 (Feb. 2, 1978) (proposing release); Requirements Governing Payments of Cash Referral Fees by Investment Advisers, Investment Advisers Act Release No. 688 (July 12, 1979) (adopting release).

[121]    Section 203(e)(6).  The SEC has stated that the "delicate fiduciary relationship" between an investment adviser and a client imposes an obligation on an adviser to review and to monitor its activities the activities of its employees.  Shearson Lehman Brothers, Inc. and Stein Roe & Farnham, Exchange Act Release No. 23640 (Sept. 24, 1966).  Both registered and unregistered advisers have an obligation to supervise persons acting on their behalf.  In the Matter of Wilfred Mickel and Robert A. Littell, Investment Advisers Act Release No. 2203 (Dec. 15, 2003), *see also* In the Matter of Western Asset Management Co. and Legg Mason Fund Adviser, Inc., Investment Advisers Act Release No. 1980 (Sept. 28, 2001) (adviser has a duty to supervise a sub-adviser).

[122]    Section 203(e)(6).

[123]    Rule 206(4)-7.

[124]    Each adviser identifies conflicts and other compliance factors creating risk exposure for the firm and its clients in light of its particular operations, and then designs policies and procedures to address those risks.  The SEC has provided advisers with guidance about the elements to be addressed by these compliance programs.  *See* Investment Advisers Act Release No. 2204 (Dec. 17, 2003), available at http://www.sec.gov/rules/final/finalarchive/finalarchive2003.shtml.

[125]    Rule 204A-1.

[126]    Rule 204A-1(e)(1) defines "access person".  Generally, an access person is a supervised person who has access to nonpublic information regarding clients' securities purchase or sale of securities.

[127]    Section 204A.  *See* In the Matter of Gabelli & Co. Inc., Investment Advisers Act Release No. 1457 (Dec. 8, 1994).

[128]    Investment Advisers Act Release No. 2256 (July 2, 2004), available at http://www.sec.gov/rules/final/finalarchive/finalarchive2004.shtml, ("We … remind advisers that they must maintain and enforce policies and procedures to prevent the misuse of materials nonpublic information, which we believe includes misuse of material nonpublic information about the adviser's securities recommendations, and client securities holdings and transaction.").

[129]    Rule 204-3.  Advisers are not required to deliver a brochure to investment company clients or to clients for whom they provide only impersonal services for less than $200.  An adviser entering into a contract for impersonal advisory services for more than $200 need only offer to deliver a brochure.

[130]    The SEC has proposed substantial revisions to the content of the brochure.  Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000), available at http://www.sec.gov/rules/proposed/proposedarchive/proposed2000.shtml.

[131]    Title V is not codified as part of the Advisers Act.  It is codified at 15 U.S.C. 6801-6827.

[132]    *See* rule 248.3(g)(1).  The SEC's implementing rules can be found at 17 CFR Part 248 (Regulation S-P)**.**  The rules apply to SEC-registered advisers.  Rule 248.1(b).  Unregistered advisers, including state-registered advisers, are subject to rules issued by the Federal Trade Commission.  Regulation S-P was adopted under the Securities Exchange Act, the Investment Company Act, and the Investment Advisers Act; therefore the Commission has the remedies available under those statutes as applicable in enforcing the privacy rules.  The SEC staff has posted responses to questions about Regulation S-P at www.sec.gov/divisions/investment/iard/faqregsp.shtml.

[133]    Rules 248.4(a), 248.5(a).

[134]    Rule 248.10

[135]    Rules 248.14, 248.15.

[136]    Rule 248.13.

[137]    Rule 248.30(a); 248.30(b).

[138]    Rule 248.3(t)(1).

[139]    Rule 248.3(u)(1).

[140]    Rule 248.3(t)(2).

[141]    Section 13(f) of the Exchange Act; rule 13f-1(a) under the Exchange Act.  *See* In the Matter of Cabot Money Management Inc., Investment Advisers Act Release No. 1577 (Aug. 15, 1996) (adviser failed to File Form 13F).

[142]    "Section 13(f) securities" also include certain equity options and warrants, shares of closed-end investment companies, and some convertible securities.  Shares of open-end investment companies are not "Section 13(f) securities." Rule 13f-1(c).  The Commission publishes an official list of Section 13(f) securities, which is available at http://www.sec.gov/divisions/investment/13flists.htm.

[143]    The Division of Investment Management has published a "FAQ" regarding Form 13F, which is available at http://www.sec.gov/divisions/investment/13ffaq.htm.

43

144     *Id at* FAQ #4.

145     Section 205(a)(1).   The SEC staff has taken the position that Section 205(a)(1)'s prohibition of investment advisory contracts that contain performance fees extends to investment advisory contracts that provide for "contingent fees."  Contingent Advisory Compensation Arrangements, Investment Advisers Act Release No. 721 (May 16, 1980).   A contingent fee is "an advisory fee [that] will be waived or refunded, in whole or in part, if a client's account does not meet a specified level of performance" or that is contingent on the investment performance of the funds of advisory clients.

146     Section 205(b)(1).

147     Section 205(b)(2).  Rules 205-1 and 205-2 define the terms in the text.  The SEC has published a release discussing factors that investment companies considering entering into a fulcrum fee should consider.  Investment Advisers Act Release No. 113 (Apr. 18, 1972).

148     *But see* Royce Value Trust, SEC Staff No-Action Letter (Dec. 22, 1986) (the SEC staff stated it would not object if an advisory agreement contained a performance fee that decreased at a greater rate than it increased and provided for no compensation if the net asset value per share declined)*.* The Commission recently instituted several enforcement cases against advisers who entered into advisory contracts with investment companies that charge performance fees that did not comply with Section 205(b).  In each case, the adviser charged the fund more that it could charge under Section 205(b).  In the Matter of Gartmore Mutual Fund Capital Trust, Investment Advisers Act Release No. 2548 (Sept. 7, 2006); In the Matter of Putnam Investment Management, LLLC, Investment Advisers Act Release No. 2547 (Sept. 7, 2006); In the Matter of Numeric Investors LLC, Investment Advisers Act Release No. 2546. (Sept. 7, 2006); In the Matter of Kensington Investment Group, Inc., Investment Advisers Act Release No. 2545 (Sept. 7, 2006).

149     Section 205(b)(5).

150     Section 205(b)(4).   These funds, which include many hedge funds, rely on the exception from the definition of "investment company" provided by section 3(c)(7) of the Investment Company Act.

151     Rule 205-3.

152     Rule 205-3(d)(1).

153     Section 205(a)(2).

154     Section 202(a)(1).

155     Rule 202(a)(1)-1.  While rule 202(a)(1)-1 was adopted primarily to deal with intra-corporate reorganizations and reorganizations resulting from changes in domicile, the Division explained in a recent Staff No-Action Letter that the rule is not so limited.  Zurich Insurance Company, Scudder Kemper Investments, SEC Staff No-Action Letter (Aug. 31, 1998).  Zurich involved a complex corporate transaction, the substance of which the Division did not address.  Instead, the Division stated that the adviser must itself evaluate whether a particular transaction involves a change of actual control or management.

156     Section 205(a)(3).

157     Section 215(a).

158     Opinion of the General Counsel, Investment Advisers Act Release No. 58 (Apr. 10, 1951).

159     *See, e.g.,* National Deferred Compensation, SEC Staff No-Action Letter (Aug. 31, 1987) ("an adviser may not fulfill its fiduciary obligations if it imposes a fee structure penalizing a client for deciding to terminate the adviser's service or if it imposes an additional fee on a client for choosing to change his investment").

160     National Regulatory Services, SEC Staff No-Action Letter (Dec. 2, 1992).   The staff does not see this view altered by the decision *Transamerica v. Lewis*, 444 U.S. 11 (1979), that clients do not have a private right of action under Section 206 of the Act, because they continue to have rights to sue for equitable damages under Section 215 of the Act.

161     BISYS Fund Services, Inc., SEC Staff No-Action Letter (Sept. 2, 1999).

162     Rule 204-2.

163     Rule 204-2(a)(16).  *See* Investment Advisers Act Release No. 1135 (Aug. 17, 1988) (adopting paragraph (a)(16)); Salomon Brothers Asset Management Inc and Salomon Brothers Asset Management Asia Pacific Limited, SEC Staff No-Action Letter (July 23, 1999) (explaining records needed to substantiate performance).

164     Rule 204(b).

165     Rule 204-2(a)(12)-(13).

166     Rule 204(e)(3).  The first two years, the records must be kept in the offices of the adviser.

167     Rule 204-2(g).  An adviser storing records in electronic storage media must establish and maintain procedures:  (i) to preserve the records and safeguard them from loss, alteration or destruction; (ii) limit access to authorized personnel; and (iii) reasonably assure that any reproduction of paper records onto electronic media is accurate.

168     Rule 204-2(j).

169     Registration Under the Advisers Act of Certain Hedge Fund Advisers, Investment Advisers Act Release No. 2266 (July 20, 2004) at §II.C.(3)(c).

170     The SEC staff has provided guidance in a series of no-action letters regarding the recordkeeping obligations of registered advisers that are located offshore. Under that analysis, the registered adviser must, in order to rely on the no-action relief, comply with the Act's recordkeeping rules, other than (1) rules 204-2(a)(3) and (7) with respect to transactions involving offshore clients that do not relate to advisory services performed by the registered adviser on behalf of United States clients or related securities transactions; and (2) rules 204-2(a)(8), (9), (10), (11), (14), (15) and (16) and 204-2(b) with respect to transactions involving, or representations or disclosures made to, offshore clients. *See*, *e.g.,*Royal Bank of Canada, SEC Staff No-Action Letter, (June 3, 1998).

171     *See* Section 204 ("<u>All</u> records (as so defined) of such investment advisers are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations." (emphasis added)).

172     Section 210(b) of the Act generally prohibits the SEC or the SEC staff from disclosing publicly either the existence of an examination or investigation conducted under the Act, or the results of or any facts ascertained during an examination or investigation.

[173]    *See* Lori A. Richards, "Current Examination and Enforcement Issues: 15th Annual Conference on the Securities Industry," (Oct. 29, 2003), available at http://www.sec.gov/news/ speech.shtml#staff05.