# Exhibit A

128 S.Ct. 2531                                                                                      Page 1
128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly
Fed. S 411
**128 S.Ct. 2531**

**H**Sprint Communications Co., L.P. v. APCC
Services, Inc.
U.S.Dist.Col.,2008.

Supreme Court of the United States
SPRINT COMMUNICATIONS CO., L. P., et al.,
Petitioners,
v.
APCC SERVICES, INC., et al.
**No. 07-552.**

Argued April 21, 2008.
Decided June 23, 2008.

**Background:** Assignees of payphone operators
brought separate Communications Act suits against
long-distance carriers, seeking to recover dial-around
compensation for coinless payphone calls required by
Federal Communications Commission (FCC)
regulation. The United States District Court for the
District of Columbia, 281 F.Supp.2d 41 and 281
F.Supp.2d 52,Huvelle, J., denied carriers' motions to
dismiss. On interlocutory appeal, the United States
Court of Appeals for the District of Columbia Circuit,
418 F.3d 1238, consolidated actions and reversed. The
United States Supreme Court granted certiorari and,
550 U.S. ----, 127 S.Ct. 2094, 167 L.Ed.2d 811,
vacated and remanded. On remand, the Court of
Appeals, 489 F.3d 1249, affirmed denial of motions to
dismiss. Certiorari was granted.

**Holdings:** The United States Supreme Court, Justice
Breyer, held that:
(1) assignees had Article III standing to bring claims
arising from payphone operators' injuries, and
(2) prudential standing considerations did not weigh
against Article III standing.

Affirmed.

Chief Justice Roberts filed dissenting opinion joined
by Justices Scalia, Thomas, and Alito.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑**103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
       170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

**Federal Civil Procedure 170A** 🔑**103.3**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
       170Ak103.3 k. Causation;
Redressability. Most Cited Cases
In order to have Article III standing, plaintiff must
adequately establish: (1) injury in fact, i.e. concrete
and particularized invasion of legally protected
interest; (2) causation, i.e. fairly traceable connection
between alleged injury in fact and alleged conduct of
defendant; and (3) redressability, i.e. that it is likely
and not merely speculative that plaintiff's injury will
be remedied by relief plaintiff seeks in bringing suit.
U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[2] Assignments 38** 🔑**119**

38 Assignments
   38VI Actions
     38k118 By Assignee
      38k119 k. In General. Most Cited Cases
Assignee of legal claim for money has standing to sue
in federal court, even when assignee has promised to
give all litigation proceeds back to assignor. U.S.C.A.
Const. Art. 3, § 2, cl. 1.

**[3] Telecommunications 372** 🔑**916(2)**

372 Telecommunications
   372III Telephones
     372III(F) Telephone Service
      372k912 Civil Liabilities and Actions
       372k916 Actions
        372k916(2) k. Persons Entitled to
Sue. Most Cited Cases
Assignees of payphone operators had Article III

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

standing to bring Communications Act suits against long-distance carriers seeking to recover dial-around compensation for coinless payphone calls required under Federal Communications Commission (FCC) regulation, even though assignees, who received fees from operators, had agreed to remit all proceeds of suits to operators; assignments were complete transfers of operators' claims, so that no injury to assignees was required, and redressability criterion focused on redressability of injury alleged, not on assignee's ultimate intent for proceeds. U.S.C.A. Const. Art. 3, § 2, cl. 1; Communications Act of 1934, § 226, 47 U.S.C.A. § 226; 47 C.F.R. § 64.1300.

**[4] Telecommunications 372 ⟨⟩916(2)**

372 Telecommunications
     372III Telephones
          372III(F) Telephone Service
               372k912 Civil Liabilities and Actions
                    372k916 Actions
                         372k916(2) k. Persons Entitled to Sue. Most Cited Cases
Prudential standing considerations did not weigh against Article III standing for assignees of payphone operators in their Communications Act suits against long-distance carriers seeking to recover dial-around compensation for coinless payphone calls; assignees were asserting first-party interests, having acquired all rights, title and interest in operators' claims, operators' choice to proceed by assignment rather than class action did not by itself warrant finding of no standing, and district court could address any practical problems such as operators' non-compliance with discovery requests. U.S.C.A. Const. Art. 3, § 2, cl. 1; Communications Act of 1934, § 226, 47 U.S.C.A. § 226; 47 C.F.R. § 64.1300.

***2532** *Syllabus*[FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

A payphone customer making a long-distance call with an access code or 1-800 number issued by a long-distance carrier pays the carrier (which completes the call). The carrier then compensates the

payphone operator (which connects the call to the carrier in the first place). The payphone operator can sue the long-distance carrier for any compensation that the carrier fails to pay for these "dial-around" calls. Many payphone operators assign their dial-around claims to billing and collection firms (aggregators) so that, in effect, these aggregators can bring suit on their behalf. A group of aggregators (respondents here) were assigned legal title to the claims of approximately 1,400 payphone operators. The aggregators separately agreed to remit all proceeds to those operators, who would then pay the aggregators for their services. After entering into these agreements, the aggregators filed federal-court lawsuits seeking compensation from petitioner long-distance carriers. The District Court refused to dismiss the claims, finding that the aggregators had standing, and the D.C. Circuit ultimately affirmed.

*Held:* An assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor. Pp. 2535 - 2546.

(a) History and precedent show that, for centuries, courts have found ways to allow assignees to bring suit; where assignment is at issue, courts-both before and after the founding-have always permitted the party with legal title alone to bring suit; and there is a strong tradition specifically of suits by assignees for collection. And while precedents of this Court, *Waite v. Santa Cruz,* 184 U.S. 302, 22 S.Ct. 327, 46 L.Ed. 552, *Spiller v. Atchison, T. & S.F.R. Co.,* 253 U.S. 117, 40 S.Ct. 466, 64 L.Ed. 810, and *Titus v. Wallick,* 306 U.S. 282, 59 S.Ct. 557, 83 L.Ed. 653, do not conclusively resolve the standing question here, they offer powerful support for the proposition that suits by assignees for collection have long been seen as "amenable" to resolution by the judicial process, *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210. Pp. 2535 - 2542.

(b) Petitioners offer no convincing reason to depart from the historical tradition of suits by assignees, including assignees for collection. In any event, the aggregators satisfy the Article III standing requirements articulated in this Court's more modern decisions. Petitioners argue that the aggregators have not themselves suffered an injury and that assignments for collection do not transfer the payphone operators'

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

injuries. But the operators assigned their claims lock, stock, and barrel, and precedent makes clear that an assignee can sue based on his assignor's injuries. *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836. In arguing that the aggregators cannot satisfy the redressability requirement because they **\*2533** will remit their recovery to the payphone operators, petitioners misconstrue the nature of the redressability inquiry, which focuses on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation-not on what the plaintiff ultimately intends to do with the money recovered. See, *e.g.,id.,* at 771, 120 S.Ct. 1858. Petitioners' claim that the assignments constitute nothing more than a contract for legal services is overstated. There is an important distinction between simply hiring a lawyer and assigning a claim to a lawyer. The latter confers a property right (which creditors might attach); the former does not. Finally, as a practical matter, it would be particularly unwise to abandon history and precedent in resolving the question here, for any such ruling could be overcome by, *e.g.,* rewriting the agreement to give the aggregator a tiny portion of the assigned claim itself, perhaps only a dollar or two. Pp. 2541 - 2544.

(c) Petitioners' reasons for denying prudential standing-that the aggregators are seeking redress for third parties; that the litigation represents an effort by the aggregators and payphone operators to circumvent Federal Rule of Civil Procedure 23's class-action requirements; and that practical problems could arise because the aggregators are suing, *e.g.,* payphone operators may not comply with discovery requests or honor judgments-are unpersuasive. And because there are no allegations that the assignments were made in bad faith and because the assignments were made for ordinary business purposes, any other prudential questions need not be considered here. Pp. 2543 - 2546.

489 F.3d 1249, affirmed.

BREYER, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, THOMAS, and ALITO, JJ., joined.

Carter G. Phillips, Washington, DC, for petitioners.

Roy T. Englert, Jr., Washington, DC, for respondents. Thomas C. Goldstein, Patricia A. Millett, Akin Gump Strauss Hauer & Feld, LLP, Washington, D.C., David P. Murray, Randy J. Branitsky, Willkie Farr & Gallagher LLP, Washington, D.C., for Petitioner Sprint Carter G. Phillips, Counsel of Record, David W. Carpenter, Sidley Austin LLP, Washington, D.C., Wayne Watts, AT&T Inc., Senior Executive Vice President & General Counsel, San Antonio, TX, for Petitioner AT&T.

Roy T. Englert, Jr., Counsel of Record, Donald J. Russell, Damon W. Taaffe, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C., Michael W. Ward, Ward & Ward, P.C., Rolling Meadows, IL, for Respondents.For U.S. Supreme Court briefs, see:2008 WL 466094 (Pet.Brief)2008 WL 685065 (Resp.Brief)2008 WL 1721901 (Reply.Brief)

Justice BREYER delivered the opinion of the Court.

The question before us is whether an assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor. Because history and precedent make clear that such an assignee has long been permitted to bring suit, we conclude that the assignee does have standing.

## **\*2534** I

When a payphone customer makes a long-distance call with an access code or 1-800 number issued by a long-distance communications carrier, the customer pays the carrier (which completes that call), but not the payphone operator (which connects that call to the carrier in the first place). In these circumstances, the long-distance carrier is required to compensate the payphone operator for the customer's call. See 47 U.S.C. § 226; 47 CFR § 64.1300 (2007). The payphone operator can sue the long-distance carrier in court for any compensation that the carrier fails to pay for these "dial-around" calls. And many have done so. See *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.,* 550 U.S. ----, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007) (finding that the Communications Act of 1934 authorizes such suits).

Because litigation is expensive, because the evidentiary demands of a single suit are often great, and because the resulting monetary recovery is often small, many payphone operators assign their

dial-around claims to billing and collection firms called "aggregators" so that, in effect, these aggregators can bring suit on their behalf. See Brief for Respondents 3. Typically, an individual aggregator collects claims from different payphone operators; the aggregator promises to remit to the relevant payphone operator (*i.e.,* the assignor of the claim) any dial-around compensation that is recovered; the aggregator then pursues the claims in court or through settlement negotiations; and the aggregator is paid a fee for this service.

The present litigation involves a group of aggregators who have taken claim assignments from approximately 1,400 payphone operators. Each payphone operator signed an Assignment and Power of Attorney Agreement (Agreement) in which the payphone operator "assigns, transfers and sets over to [the aggregator] for purposes of collection all rights, title and interest of the [payphone operator] in the [payphone operator's] claims, demands or causes of action for 'Dial-Around Compensation' ... due the [payphone operator] for periods since October 1, 1997." App. to Pet. for Cert. 114a. The Agreement also "appoints" the aggregator as the payphone operator's "true and lawful attorney-in-fact." *Ibid.* The Agreement provides that the aggregator will litigate in the [payphone operator's] interest." *Id.,* at 115a. And the Agreement further stipulates that the assignment of the claims "may not be revoked without the written consent of the [aggregator]." *Ibid.* The aggregator and payphone operator then separately agreed that the aggregator would remit all proceeds to the payphone operator and that the payphone operator would pay the aggregator for its services (typically via a quarterly charge).

After signing the agreements, the aggregators (respondents here) filed lawsuits in federal court seeking dial-around compensation from Sprint, AT & T, and other long-distance carriers (petitioners here). AT & T moved to dismiss the claims, arguing that the aggregators lack standing to sue under Article III of the Constitution. The District Court initially agreed to dismiss, *APCC Servs., Inc. v. AT & T Corp.,* 254 F.Supp.2d 135, 140-141 (DC 2003), but changed its mind in light of a "long line of cases and legal treatises that recognize a well-established principle that assignees for collection purposes are entitled to bring suit where [as here] the assignments transfer absolute title to the claims." *APCC Servs., Inc. v. AT & T*

*Corp.,* 281 F.Supp.2d 41, 45 (DC 2003). After consolidating similar cases, a divided panel of the Court of Appeals for the District of Columbia Circuit agreed that **\*2535** the aggregators have standing to sue, but held that the relevant statutes do not create a private right of action. *APCC Servs., Inc. v. Sprint Communications Co.,* 418 F.3d 1238 (2005)(*per curiam*). This Court granted the aggregators' petition for certiorari on the latter statutory question, vacated the judgment, and remanded the case for reconsideration in light of *Global Crossing, supra. APCC Services, Inc. v. Sprint Communications Co.,* 550 U.S. ----, 127 S.Ct. 2094, 167 L.Ed.2d 811 (2007). On remand, the Court of Appeals affirmed the orders of the District Court allowing the litigation to go forward. 489 F.3d 1249, 1250 (2007)(*per curiam*). The long-distance carriers then asked us to consider the standing question. We granted certiorari, and we now affirm.

II

[1] We begin with the most basic doctrinal principles: Article III, § 2, of the Constitution restricts the federal "judicial Power" to the resolution of "Cases" and "Controversies." That case-or-controversy requirement is satisfied only where a plaintiff has standing. See, *e.g., DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). And in order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (*i.e.,* a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (*i.e.,* a "'fairly ... trace[able]'" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is "'likely'" and not "merely 'speculative'" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit). *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (calling these the "irreducible constitutional minimum" requirements).

In *some* sense, the aggregators clearly meet these requirements. They base their suit upon a concrete and particularized "injury in fact," namely, the carriers' failure to pay dial-around compensation. The carriers "caused" that injury. And the litigation will "redress" that injury-if the suits are successful, the long-distance carriers will pay what they owe. The long-distance carriers argue, however, that the aggregators lack

standing because it was the payphone operators (who are not plaintiffs), not the aggregators (who are plaintiffs), who were "injured in fact" and that it is the payphone operators, not the aggregators, whose injuries a legal victory will truly "redress": The aggregators, after all, will remit all litigation proceeds to the payphone operators. Brief for Petitioners 18. Thus, the question before us is whether, under these circumstances, an assignee has standing to pursue the assignor's claims for money owed.

We have often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider. See, *e.g.,Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("We have always taken [the case-or-controversy requirement] to mean cases and controversies of the sort *traditionally* amenable to, and resolved by, the judicial process" (emphasis added)); *GTE Sylvania, Inc. v. Consumers Union of United States, Inc.,* 445 U.S. 375, 382, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980) ("The purpose of the case-or-controversy requirement is to limit the business of federal courts to questions presented in an adversary context and in a form *historically viewed* as capable of resolution through the judicial process" (emphasis added and internal quotation marks omitted)); cf. *Coleman v. Miller,* 307 U.S. 433, 460, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (opinion of Frankfurter, J.) (in crafting Article III, **\*2536** "the framers ... gave merely the outlines of what were to them the familiar operations of the English judicial system and its manifestations on this side of the ocean before the Union"). Consequently, we here have carefully examined how courts have historically treated suits by assignors and assignees. And we have discovered that history and precedent are clear on the question before us: Assignees of a claim, including assignees for collection, have long been permitted to bring suit. A clear historical answer at least demands reasons for change. We can find no such reasons here, and accordingly we conclude that the aggregators have standing.

### A

We must begin with a minor concession. Prior to the 17th century, English law would not have authorized a suit like this one. But that is because, with only limited exceptions, English courts refused to recognize assignments at all. See, *e.g.,Lampet's Case,* 10 Co.

Rep. 46b, 48a, 77 Eng. Rep. 994, 997 (K.B.1612) (stating that "no possibility, right, title, nor thing in action, shall be granted or assigned to strangers" (footnote omitted)); *Penson & Highbed's Case,* 4 Leo. 99, 74 Eng. Rep. 756 (K.B.1590) (refusing to recognize the right of an assignee of a right in contract); see also 9 J. Murray, Corbin on Contracts § 47.3, p. 134 (rev. ed.2007) (noting that the King was excepted from the basic rule and could, as a result, always receive assignments).

Courts then strictly adhered to the rule that a "chose in action"-an interest in property not immediately reducible to possession (which, over time, came to include a financial interest such as a debt, a legal claim for money, or a contractual right)-simply "could not be transferred to another person by the strict rules of the ancient common law." See 2 W. Blackstone, Commentaries *442. To permit transfer, the courts feared, would lead to the "multiplying of contentions and suits," *Lampet's Case, supra,* at 48a, 77 Eng. Rep., at 997, and would also promote "maintenance," *i.e.,* officious intermeddling with litigation, see Holdsworth, History of the Treatment of *Choses* in Action by the Common Law, 33 Harv. L.Rev. 997, 1006-1009 (1920).

As the 17th century began, however, strict anti-assignment rules seemed inconsistent with growing commercial needs. And as English commerce and trade expanded, courts began to liberalize the rules that prevented assignments of choses in action. See 9 Corbin, *supra,* § 47.3, at 134 (suggesting that the "pragmatic necessities of trade" induced "evolution of the common law"); Holdsworth, *supra,* at 1021-1022 (the "common law" was "induced" to change because of "considerations of mercantile convenience or necessity"); J. Ames, Lectures on Legal History 214 (1913) (noting that the "objection of maintenance" yielded to "the modern commercial spirit"). By the beginning of the 18th century, courts routinely recognized assignments of equitable (but not legal) interests in a chose in action: Courts of equity permitted suits by an assignee who had equitable (but not legal) title. And courts of law effectively allowed suits either by the assignee (who had equitable, but not legal title) or the assignor (who had legal, but not equitable title).

To be more specific, courts of equity would simply permit an assignee with a beneficial interest in a chose

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

in action to sue in his own name. They might, however, require the assignee to bring in the assignor as a party to the action so as to bind him to whatever judgment was reached. See, *e.g., Warmstrey v. Tanfield,* 1 Ch. Rep. 29, 21 Eng. Rep. 498 (1628-1629); *Fashion v. Atwood,* 2 Ch. Cas. 36, 22 Eng. Rep. 835 (1688); *Peters v. Soame,***2537** 2 Vern. 428, 428-429, 23 Eng. Rep. 874 (Ch. 1701); *Squib v. Wyn,* 1 P. Wms. 378, 381, 24 Eng. Rep. 432, 433 (Ch. 1717); *Lord Carteret v. Paschal,* 3 P. Wms. 197, 199, 24 Eng. Rep. 1028, 1029 (Ch. 1733); *Row v. Dawson,* 1 Ves. sen. 331, 332-333, 27 Eng. Rep. 1064, 1064-1065 (Ch. 1749). See also M. Smith, Law of Assignment: The Creation and Transfer of Choses in Action 131 (2007) (by the beginning of the 18th century, "it became settled that equity would recognize the validity of the assignment of both debts and of other things regarded by the common law as choses in action").

Courts of law, meanwhile, would permit the assignee with an equitable interest to bring suit, but nonetheless required the assignee to obtain a "power of attorney" from the holder of the legal title, namely, the assignor, and further required the assignee to bring suit *in the name of that assignor.* See, *e.g.,* Cook, Alienability of Choses in Action, 29 Harv. L.Rev. 816, 822 (1916) ( "[C]ommon law lawyers were able, through the device of the 'power of attorney' ... to enable the assignee to obtain relief in common law proceedings by suing in the name of the assignor"); 29 R. Lord, Williston on Contracts § 74.2, pp. 214-215 (4th ed.2003). Compare, *e.g., Barrow v. Gray,* Cro. Eliz. 551, 78 Eng. Rep. 797 (Q.B.1653), and *South & Marsh's Case,* 3 Leo. 234, 74 Eng. Rep. 654 (Exch.1686) (limiting the use of a power of attorney to cases in which the assignor owed the assignee a debt), with Holdsworth, *supra,* at 1021 (noting that English courts abandoned that limitation by the end of the 18th century). At the same time, courts of law would permit an assignor to sue *even when he had transferred away his beneficial interest.* And they permitted the assignor to sue in such circumstances precisely because the assignor retained legal title. See, *e.g., Winch v. Keeley,* 1 T.R. 619, 99 Eng. Rep. 1284 (K.B.1787) (allowing the bankrupt assignor of a chose in action to sue a debtor for the benefit of the assignee because the assignor possessed legal, though not equitable, title).

The upshot is that by the time Blackstone published volume II of his Commentaries in 1766, he could

dismiss the "ancient common law" prohibition on assigning choses in action as a "nicety ... now disregarded." 2 Blackstone, *supra,* at *442.

B

Legal practice in the United States largely mirrored that in England. In the latter half of the 18th century and throughout the 19th century, American courts regularly "exercised their powers in favor of the assignee," both at law and in equity. 9 Corbin on Contracts § 47.3, at 137. See, *e.g.,McCullum v. Coxe,* 1 Dall. 139, 1 L.Ed. 72 (Pa.1785) (protecting assignee of a debt against a collusive settlement by the assignor); *Dennie v. Chapman,* 1 Root 113, 115 (Conn.Super.1789) (assignee of a nonnegotiable note can bring suit "in the name of the original promisee or his administrator"); *Andrews v. Beecker,* 1 Johns. Cas. 411, 411-412, n. (N.Y.Sup.1800) ("Courts of law ... are, in justice, bound to protect the rights of the assignees, as much as a court of equity, though they may still require the action to be brought in the name of the assignor"); *Riddle & Co. v. Mandeville,* 5 Cranch 322, 3 L.Ed. 114 (1809) (assignees of promissory notes entitled to bring suit in equity). Indeed, § 11 of the Judiciary Act of 1789 specifically authorized federal courts to take "cognizance of any suit to recover the contents of any promissory note or other chose in action in favour of an assignee" so long as federal jurisdiction would lie if the assignor himself had brought suit. 1 Stat. 79.

**\*2538** Thus, in 1816, Justice Story, writing for a unanimous Court, summarized the practice in American courts as follows: "Courts of law, following in this respect the rules of equity, now take notice of assignments of choses in action, and exert themselves to afford them every support and protection." *Welch v. Mandeville,* 1 Wheat. 233, 236, 4 L.Ed. 79. He added that courts of equity have "disregarded the rigid strictness of the common law, and protected the rights of the assignee of choses in action," and noted that courts of common law "now consider an assignment of a chose in action as substantially valid, only preserving, in certain cases, the form of an action commenced in the name of the assignor." *Id.,* at 237, n.

It bears noting, however, that at the time of the founding (and in some States well before then) the law did permit the assignment of legal title to at least some

choses in action. In such cases, the assignee could bring suit on the assigned claim in his own name, in a court of law. See, *e.g.,* 3 Va. Stat. at Large 378, Ch. XXXIV (W. Hening ed. 1823) (reprinted 1969) (Act of Oct. 1705) (permitting any person to "assign or transfer any bond or bill for debt over to any other person" and providing that "the assignee or assignees, his and their executors and administrators by virtue of such assignment shall and may have lawful power to commence and prosecute any suit at law in his or their own name or names"); Act of May 28, 1715, Ch. XXVIII, Gen. Laws of Penn. 60 (J. Dunlop 2d ed. 1849) (permitting the assignment of "bonds, specialties, and notes" and authorizing "the person or persons, to whom the said bonds, specialties or notes, are ... assigned" to "commence and prosecute his, her, or their actions at law"); Patent Act of 1793, ch. 11, § 4, 1 Stat. 322 ("[I]t shall be lawful for any inventor, his executor or administrator to assign the title and interest in the said invention, at anytime, and the assignee ... shall thereafter stand in the place of the original inventor, both as to right and responsibility").

C

[2] By the 19th century, courts began to consider the specific question presented here: whether an assignee of a legal claim for money could sue when that assignee had promised to give all litigation proceeds back to the assignor. During that century American law at the state level became less formalistic through the merger of law and equity, through statutes more generously permitting an assignor to pass legal title to an assignee, and through the adoption of rules that permitted any "real party in interest" to bring suit. See 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1541, pp. 320-321 (2d ed.1990) (hereinafter Wright & Miller); see also 9 Corbin, *supra,* § 47.3, at 137. The courts recognized that pre-existing law permitted an assignor to bring suit on a claim even though the assignor retained nothing more than naked legal title. Since the law increasingly permitted the transfer of legal title to an assignee, courts agreed that assignor and assignee should be treated alike in this respect. And rather than abolish the assignor's well-established right to sue on the basis of naked legal title alone, many courts instead *extended the same right to an assignee.* See, *e.g.,* Clark & Hutchins, The Real Party in Interest, 34 Yale L.J. 259, 264-265 (1925) (noting that the changes in the law permitted both the assignee with "naked legal

title" and the assignee with an equitable interest in a claim to bring suit).

Thus, during the 19th century, most state courts entertained suits virtually identical to the litigation before us: suits by individuals who were assignees for collection**2539** only, *i.e.,* assignees who brought suit to collect money owed to their assignors but who promised to turn over to those assignors the proceeds secured through litigation. See, *e.g.,* *Webb & Hepp v. Morgan, McClung & Co.,* 14 Mo. 428, 431 (1851) (holding that the assignees of a promissory note for collection only can bring suit, even though they lack a beneficial interest in the note, because the assignment "creates in them such legal interest, that they thereby become the persons to sue"); *Meeker v. Claghorn,* 44 N.Y. 349, 350, 353 (1871) (allowing suit by the assignee of a cause of action even though the assignors " 'expected to receive the amount recovered in the action,' " because the assignee, as "legal holder of the claim", was "the real party in interest"); *Searing v. Berry,* 58 Iowa 20, 23, 24, 11 N.W. 708, 709 (1882) (where legal title to a judgment was assigned "merely for the purpose of enabling plaintiff to enforce the collection" and the assignor in fact retained the beneficial interest, the plaintiff-assignee could "prosecute this suit to enforce the collection of the judgment"); *Grant v. Heverin,* 77 Cal. 263, 265, 19 P. 493 (1888) (holding that the assignee of a bond could bring suit, even though he lacked a beneficial interest in the bond, and adopting the rule that an assignee with legal title to an assigned claim can bring suit even where the assignee must "account to the assignor" for "a part of the proceeds" or "is to account for the whole proceeds" (internal quotation marks omitted)); *McDaniel v. Pressler,* 3 Wash. 636, 638, 637, 29 P. 209, 210 (1892) (holding that the assignee of promissory notes was the real party in interest, even though the assignment was "for the purpose of collection" and the assignee had "no interest other than that of the legal holder of said notes"); *Wines v. Rio Grande W.R. Co.,* 9 Utah 228, 235, 33 P. 1042, 1044, 1045 (1893) (holding that an assignee could bring suit based on causes of action assigned to him "simply to enable him to sue" and who "would turn over to the assignors all that was recovered in the action, after deducting [the assignors'] proportion of the expenses of the suit"); *Gomer v. Stockdale,* 5 Colo.App. 489, 492, 39 P. 355, 357, 356 (1895) (permitting suit by a party who was assigned legal title to contractual rights, where the assignor retained the beneficial interest, noting that the doctrine that

128 S.Ct. 2531                                                                                                            Page 8
128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly
Fed. S 411
**128 S.Ct. 2531**

"prevails in Colorado" is that the assignee may bring suit in his own name "although there may be annexed to the transfer the condition that when the sum is collected the whole or some part of it must be paid over to the assignor"). See also Appendix, *infra* (collecting cases from numerous other States approving of suits by assignees for collection).

Of course, the dissent rightly notes, *some* States during this period of time refused to recognize assignee-for-collection suits, or otherwise equivocated on the matter. See *post*, at 2555 - 2556. But so *many* States allowed these suits that by 1876, the distinguished procedure and equity scholar John Norton Pomeroy declared it "settled by a *great preponderance* of authority, although there is some conflict" that an assignee is "entitled to sue in his own name" whenever the assignment vests "legal title" in the assignee, and notwithstanding "any contemporaneous, collateral agreement by virtue of which he is to receive a part only of the proceeds ... or even is to thus account [to the assignor] for the *whole* proceeds." Remedies and Remedial Rights § 132, p. 159 (internal quotation marks omitted and emphasis added). Other contemporary scholars reached the same basic conclusion. See, *e.g.*, P. Bliss, A Treatise upon the Law of Pleading § 51, p. 69 (2d ed. 1887) (stating that *"[m]ost of the courts* have held that where negotiable paper has been indorsed, **\*2540** or other choses in action have been assigned, it does not concern the defendant for what purpose the transfer has been made") and giving examples of States permitting assignees to bring suit even where they lacked a beneficial interest in the assigned claims (emphasis added). See also Clark & Hutchins, *supra*, at 264 ("*many, probably most, American jurisdictions*" have held that "an assignee who has no beneficial interest, like an assignee for collection only, may prosecute an action in his own name" (emphasis added)). Even Michael Ferguson's California Law Review Comment-which the dissent cites as support for its argument about "the divergent practice" among the courts, *post*, at 2556-recognizes that "*[a] majority of courts* has held that an assignee for collection only is a real party in interest" entitled to bring suit. See Comment, The Real Party in Interest Rule Revitalized: Recognizing Defendant's Interest in the Determination of Proper Parties Plaintiff, 55 Cal. L.Rev. 1452, 1475 (1967) (emphasis added); see also *id.*, at 1476, n. 118 (noting that even "[t]he few courts that have wavered on the question have always ended up in the camp of the *majority*" (emphasis added)).

During this period, a number of federal courts similarly indicated approval of suits by assignees for collection only. See, *e.g.*, *Bradford v. Jenks*, 3 F. Cas. 1132, 1134 (No. 1,769) (CC Ill. 1840) (stating that the plaintiff, the receiver of a bank, could bring suit in federal court to collect on a note owed to that bank if he sued as the bank's *assignee*, not its receiver, but ultimately holding that the plaintiff could not sue as an assignee because there was no diversity jurisdiction); *Orr v. Lacy*, 18 F. Cas. 834 (No. 10,589) (CC Mich. 1847) (affirming judgment for the plaintiff, the endorsee of a bill of exchange, on the ground that, as endorsee, he had the "legal right" to bring suit notwithstanding the fact that the proceeds of the litigation would be turned over to the endorser); *Murdock v. The Emma Graham*, 17 F. Cas. 1012, 1013 (No. 9,940) (DC SD Ohio 1878) (permitting the assignee of a claim for injury to a "float or barge" to bring suit when, "under the assignment," the assignor's *creditors* would benefit from the litigation); *The Rupert City*, 213 F. 263, 266-267 (W.D.Wash.1914) (assignees of claims for collection only could bring suit in maritime law because "an assignment for collection ... vest[s] such an interest in [an] assignee as to entitle him to sue").

Even this Court long ago indicated that assignees for collection only can properly bring suit. For example, in *Waite v. Santa Cruz*, 184 U.S. 302, 22 S.Ct. 327, 46 L.Ed. 552 (1902), the plaintiff sued to collect on a number of municipal bonds and coupons whose "legal title" had been vested in him but which were transferred to him "for collection only." *Id.*, at 324, 22 S.Ct. 327. The Court, in a unanimous decision, ultimately held that the federal courts could not hear his suit because the amount-in-controversy requirement of diversity jurisdiction would not have been satisfied if the bondholders and coupon holders had sued individually. See *id.*, at 328-329, 22 S.Ct. 327. However, before reaching this holding, the Court expressly stated that the suit *could* properly be brought in federal court "if the only objection to the jurisdiction of the Circuit Court is that the plaintiff was invested with the legal title to the bonds and coupons simply for purposes of collection." *Id.*, at 325, 22 S.Ct. 327.

Next, in *Spiller v. Atchison, T. & S.F.R. Co.*, 253 U.S. 117, 40 S.Ct. 466, 64 L.Ed. 810 (1920), a large number of cattle shippers assigned to Spiller (the

128 S.Ct. 2531                                                                                      Page 9
128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly
Fed. S 411
**128 S.Ct. 2531**

secretary of a Cattle Raiser's Association) their individual reparation claims against railroads they said had charged them excessive rates. **\*2541** The Federal Court of Appeals held that Spiller could not bring suit because, in effect, he was an assignee for collection only and would be passing back to the cattle shippers any money he recovered from the litigation. In a unanimous decision, this Court reversed. The Court wrote that the cattle shippers' "assignments were absolute in form" and "plainly" "vest[ed] the legal title in Spiller." *Id.,* at 134, 40 S.Ct. 466. The Court conceded that the assignments did not pass "beneficial or equitable title" to Spiller. *Ibid.* But the Court then said that "this was not necessary to support the right of the assignee to claim an award of reparation and enable him to recover it by action at law brought in his own name but for the benefit of the equitable owners of the claims." *Ibid.* The Court thereby held that Spiller's legal title alone was sufficient to allow him to bring suit in federal court on the aggregated claims of his assignors.

Similarly, in *Titus v. Wallick,* 306 U.S. 282, 59 S.Ct. 557, 83 L.Ed. 653 (1939), this Court unanimously held that (under New York law) a plaintiff, an assignee for collection, had "dominion over the claim for purposes of suit" because the assignment purported to " 'sell, assign, transfer and set over' the chose in action" to the assignee. *Id.,* at 289, 59 S.Ct. 557. More importantly for present purposes, the Court said that the assignment's "legal effect was not curtailed by the recital that the assignment was for purposes of suit and that its proceeds were to be turned over or accounted for to another." *Ibid.*

To be clear, we do not suggest that the Court's decisions in *Waite,Spiller,* and *Titus* conclusively resolve the standing question before us. We cite them because they offer additional and powerful support for the proposition that suits by assignees for collection have long been seen as "amenable" to resolution by the judicial process. *Steel Co.,* 523 U.S., at 102, 118 S.Ct. 1003.

Finally, we note that there is also considerable, more recent authority showing that an assignee for collection may properly sue on the assigned claim in federal court. See, *e.g.,*6A Wright & Miller § 1545, at 346-348 (noting that an assignee with legal title is considered to be a real party in interest and that as a result "federal courts have held that an assignee for

purposes of collection who holds legal title to the debt according to the governing substantive law is the real party in interest even though the assignee must account to the assignor for whatever is recovered in the action"); 6 Am.Jur.2d, Assignments § 184, pp. 262-263 (1999) ("An assignee for collection or security only is within the meaning of the real party in interest statutes and entitled to sue in his or her own name on an assigned account or chose in action, although he or she must account to the assignor for the proceeds of the action, even when the assignment is without consideration" (footnote omitted)). See also *Rosenblum v. Dingfelder,* 111 F.2d 406, 407 (C.A.2 1940); *Staggers v. Otto Gerdau Co.,* 359 F.2d 292, 294 (C.A.2 1966); *Dixie Portland Flour Mills, Inc. v. Dixie Feed & Seed Co.,* 382 F.2d 830, 833 (C.A.6 1967); *Klamath-Lake Pharmaceutical Assn. v. Klamath Medical Serv. Bur.,* 701 F.2d 1276, 1282 (C.A.9 1983).

D

The history and precedents that we have summarized make clear that courts have long found ways to allow assignees to bring suit; that where assignment is at issue, courts-both before and after the founding-have always permitted the party with legal title alone to bring suit; and that there is a strong tradition specifically of suits by assignees for collection. We find this history and precedent "well nigh **\*2542** conclusive" in respect to the issue before us: Lawsuits by assignees, including assignees for collection only, are "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 777-778, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (internal quotation marks omitted).

III

[3] Petitioners have not offered any convincing reason why we should depart from the historical tradition of suits by assignees, including assignees for collection. In any event, we find that the assignees before us satisfy the Article III standing requirements articulated in more modern decisions of this Court.

Petitioners argue, for example, that the aggregators have not themselves suffered any injury in fact and that the assignments for collection "do not suffice to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411

**128 S.Ct. 2531**

transfer the payphone operators' injuries." Brief for Petitioners 18. It is, of course, true that the aggregators did not originally suffer any injury caused by the long-distance carriers; the payphone operators did. But the payphone operators assigned their claims to the aggregators lock, stock, and barrel. See *APCC Servs.,* 418 F.3d, at 1243 (there is "no reason to believe the assignment is anything less than a complete transfer to the aggregator" of the injury and resulting claim); see also App. to Pet. for Cert. 114a (Agreement provides that each payphone operator "assigns, transfers and sets over" to the aggregator "all rights, title and interest" in dial-around compensation claims). And within the past decade we have expressly held that an assignee can sue based on his assignor's injuries. In *Vermont Agency, supra,* we considered whether a *qui tam* relator possesses Article III standing to bring suit under the False Claims Act, which authorizes a private party to bring suit to remedy an injury (fraud) that the United States, not the private party, suffered. We held that such a relator does possess standing. And we said that is because the Act "effect[s] a partial assignment of the Government's damages claim" and that assignment of the "United States' injury in fact suffices to confer standing on [the relator]." *Id.,* at 773, 774, 120 S.Ct. 1858. Indeed, in *Vermont Agency* we stated quite unequivocally that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.,* at 773, 120 S.Ct. 1858.

Petitioners next argue that the aggregators cannot satisfy the redressability requirement of standing because, if successful in this litigation, the aggregators will simply remit the litigation proceeds to the payphone operators. But petitioners misconstrue the nature of our redressability inquiry. That inquiry focuses, as it should, on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation-not on what the plaintiff ultimately intends to do with the money he recovers. See, *e.g.,id.,* at 771, 120 S.Ct. 1858 (to demonstrate redressability, the plaintiff must show a "substantial likelihood that the requested relief will remedy *the alleged injury in fact*" (internal quotation marks omitted and emphasis added)); *Lujan,* 504 U.S., at 561, 112 S.Ct. 2130 ("[I]t must be likely ... that the *injury* will be redressed by a favorable decision" (internal quotation marks omitted and emphasis added)). Here, a legal victory would unquestionably redress the *injuries* for which the aggregators bring suit. The aggregators' injuries relate to the failure to receive the required dial-around

compensation. And if the aggregators prevail in this litigation, the long-distance carriers would write a check to the aggregators for the amount of dial-around compensation **\*2543** owed. What does it matter what the aggregators do with the money afterward? The injuries would be redressed whether the aggregators remit the litigation proceeds to the payphone operators, donate them to charity, or use them to build new corporate headquarters. Moreover, the statements our prior cases made about the need to show redress of the *injury* are consistent with what numerous authorities have long held in the assignment context, namely, that an assignee for collection may properly bring suit to redress the injury originally suffered by his assignor. Petitioners might disagree with those authorities. But petitioners have not provided us with a good reason to reconsider them.

The dissent argues that our redressability analysis "could not be more wrong," because "[w]e have never approved federal-court jurisdiction over a claim where the entire relief requested will run to a party not before the court. Never." *Post,* at 2551 (opinion of ROBERTS, C. J.). But federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth. The dissent's view of redressability, if taken seriously, would work a sea change in the law. Moreover, to the extent that trustees, guardians ad litem, and the like have some sort of "obligation" to the parties whose interests they vindicate through litigation, see *post,* at 2552 - 2553, n. 2, the same is true in respect to the aggregators here. The aggregators have a *contractual* obligation to litigate "in the [payphone operator's] interest." App. to Pet. for Cert. 115a. (And if the aggregators somehow violate that contractual obligation, say, by agreeing to settle the claims against the long-distance providers in exchange for a kickback from those providers, each payphone operator would be able to bring suit for breach of contract.)

Petitioners also make a further conceptual argument. They point to cases in which this Court has said that a party must possess a "personal stake" in a case in order to have standing under Article III. See *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663

128 S.Ct. 2531                                                                                                   Page 11
128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly
Fed. S 411
**128 S.Ct. 2531**

(1962). And petitioners add that, because the aggregators will not actually benefit from a victory in this case, they lack a "personal stake" in the litigation's outcome. The problem with this argument is that the general "personal stake" requirement and the more specific standing requirements (injury in fact, redressability, and causation) are flip sides of the same coin. They are simply different descriptions of the same judicial effort to assure, in every case or controversy, "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Ibid.* See also *Massachusetts v. EPA,* 549 U.S. ----, ----, 127 S.Ct. 1438, 1453, 167 L.Ed.2d 248 (2007) ("At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness" (internal quotation marks omitted)). Courts, during the past two centuries, appear to have found that "concrete adverseness" where an assignee for collection brings a lawsuit. And petitioners have provided us with no grounds for reaching a contrary conclusion.

Petitioners make a purely functional argument, as well. Read as a whole, they say, the assignments in this litigation constitute nothing more than a contract for legal services. We think this argument is overstated. There is an important distinction**\*2544** between simply hiring a lawyer and assigning a claim to a lawyer (on the lawyer's promise to remit litigation proceeds). The latter confers a property right (which creditors might attach); the former does not.

Finally, we note, as a practical matter, that it would be particularly unwise for us to abandon history and precedent in resolving the question before us. Were we to agree with petitioners that the aggregators lack standing, our holding could easily be overcome. For example, the Agreement could be rewritten to give the aggregator a tiny portion of the assigned claim itself, perhaps only a dollar or two. Or the payphone operators might assign all of their claims to a "Dial-Around Compensation Trust" and then pay a trustee (perhaps the aggregator) to bring suit on behalf of the trust. Accordingly, the far more sensible course is to abide by the history and tradition of assignee suits and find that the aggregators possess Article III standing.

IV

[4] Petitioners argue that, even if the aggregators have standing under Article III, we should nonetheless deny them standing for a number of prudential reasons. See *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (prudential standing doctrine "embodies judicially self-imposed limits on the exercise of federal jurisdiction" (internal quotation marks omitted)).

First, petitioners invoke certain prudential limitations that we have imposed in prior cases where a plaintiff has sought to assert the legal claims of third parties. See, *e.g.,Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (expressing a "reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties"); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("In the ordinary case, a party is denied standing to assert the rights of third persons"); *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (a plaintiff ordinarily " 'cannot rest his claim to relief on the legal rights or interests of third parties' ").

These third-party cases, however, are not on point. They concern plaintiffs who seek to assert not their own legal rights, but the legal rights of others. See, *e.g.,Warth,supra,* at 499, 95 S.Ct. 2197 (plaintiff "generally must assert his own *legal rights* and interests, and cannot rest his claim to relief on the *legal rights* or interests of third parties" (emphasis added)); see also *Kowalski v. Tesmer,* 543 U.S. 125, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (lawyers lack standing to assert the constitutional rights of defendants deprived of appointed counsel on appeal); *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (permitting a criminal defendant to assert rights of juror discriminated against because of race); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (permitting beer vendors to assert rights of prospective male customers aged 18 to 21 who, unlike females of the same ages, were barred from purchasing beer). Here, the aggregators are suing based on *injuries* originally suffered by third parties. But the payphone operators assigned to the aggregators all "rights, title and interest" in claims based on those injuries. Thus, in the litigation before us, the aggregators assert what are, due to that transfer,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

*legal rights of their own*. The aggregators, in other words, are asserting first-party, not third-party, legal rights. Moreover, we add that none of the third-party cases cited by petitioners**\*2545** involve assignments or purport to overturn the longstanding doctrine permitting an assignee to bring suit on an assigned claim.

Second, petitioners suggest that the litigation here simply represents an effort by the aggregators and the payphone operators to circumvent Federal Rule of Civil Procedure 23's class-action requirements. But we do not understand how "circumvention" of Rule 23 could constitute a basis for denying standing here. For one thing, class actions are permissive, not mandatory. More importantly, class actions constitute but one of several methods for bringing about aggregation of claims, *i.e.,* they are but one of several methods by which multiple similarly situated parties get similar claims resolved at one time and in one federal forum. See Rule 20(a) (permitting joinder of multiple plaintiffs); Rule 42 (permitting consolidation of related cases filed in the same district court); 28 U.S.C. § 1407 (authorizing consolidation of pretrial proceedings for related cases filed in multiple federal districts); § 1404 (making it possible for related cases pending in different federal courts to be transferred and consolidated in one district court); D. Herr, Annotated Manual for Complex Litigation § 20.12, p. 279 (4th ed.2007) (noting that "[r]elated cases pending in different federal courts may be consolidated in a single district" by transfer under 28 U.S.C. § 1404(a)); J. Tidmarsh & R. Transgrud, Complex Litigation and the Adversary System 473-524 (1998) (section on "Transfer Devices that Aggregate Cases in a Single Venue"). Because the federal system permits aggregation by other means, we do not think that the payphone operators should be denied standing simply because they chose one aggregation method over another.

Petitioners also point to various practical problems that could arise because the aggregators, rather than the payphone operators, are suing. In particular, they say that the payphone operators may not comply with discovery requests served on them, that the payphone operators may not honor judgments reached in this case, and that petitioners may not be able to bring, in this litigation, counterclaims against the payphone operators. See Brief for Petitioners 46-48. Even assuming all that is so, courts have long permitted

assignee lawsuits notwithstanding the fact that such problems could arise. Regardless, courts are not helpless in the face of such problems. For example, a district court can, if appropriate, compel a party to collect and to produce whatever discovery-related information is necessary. See Fed. Rules Civ. Proc. 26(b)(1), 30-31, 33-36. That court might grant a motion to join the payphone operators to the case as "required" parties. See Rule 19. Or the court might allow the carriers to file a third-party complaint against the payphone operators. See Rule 14(a). And the carriers could always ask the Federal Communications Commission to find administrative solutions to any remaining practical problems. Cf. 47 U.S.C. § 276(b)(1)(A) (authorizing the FCC to "prescribe regulations" that "ensure that all payphone service providers are fairly compensated for each and every completed [dial-around] call"). We do not say that the litigation before us calls for the use of any such procedural device. We mention them only to explain the lack of any obvious need for the remedy that the carriers here propose, namely, denial of standing.

Finally, we note that in this litigation, there has been no allegation that the assignments were made in bad faith. We note, as well, that the assignments were made for ordinary business purposes. Were this not so, additional prudential questions might perhaps arise. But these **\*2546** questions are not before us, and we need not consider them here.

V

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

APPENDIX

Examples of cases in which state courts entertained or otherwise indicated approval of suits by assignees for collection only. References to "Pomeroy's rule" are references to the statement of law set forth in J. Pomeroy, Remedies and Remedial Rights § 132, p. 159 (1876).

1. *Webb & Hepp v. Morgan, McClung & Co.,* 14 Mo. 428, 431 (1851) (holding that the assignees of a promissory note for collection only can bring suit,

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411

**128 S.Ct. 2531**

even though they lack a beneficial interest in the note, because the assignment "creates in them such legal interest, that they thereby become the persons to sue");

2. *Castner v. Austin Sumner & Co.,* 2 Minn. 44, 47-48 (1858) (holding that the assignees of promissory notes were proper plaintiffs, regardless of the arrangement they and their assignor had made in respect to the proceeds of the litigation, because the defendants "can only raise the objection of a defect of parties to the suit, when it appears that some other person or party than the Plaintiffs have such a *legal* interest in the note that a recovery by the Plaintiffs would not preclude it from being enforced, and they be thereby subjected to the risk of another suit for the same subject-matter" (emphasis added));

3. *Cottle v. Cole,* 20 Iowa 481, 485-486 (1866) (holding that the assignee could sue, notwithstanding the possibility that the assignor was the party "beneficially interested in the action," because "[t]he course of decision in this State establishes this rule, viz.: that the party holding the *legal title* of a note or instrument may sue on it though he be an agent or trustee, and liable to account to another for the proceeds of the recovery");

4. *Allen v. Brown,* 44 N.Y. 228, 231, 234 (1870) (opinion of Hunt, Comm'r) (holding that the assignee with legal title to a cause of action was "legally the real party in interest" "[e]ven if he be liable to another as a debtor upon his contract for the collection he may thus make");

5. *Meeker v. Claghorn,* 44 N.Y. 349, 350, 353 (1871) (opinion of Earl, Comm'r) (allowing suit by the assignee of a cause of action even though the assignors " 'expected to receive the amount recovered in the action,' " because the assignee, as "legal holder of the claim," was "the real party in interest");

6. *Hays v. Hathorn,* 74 N.Y. 486, 490 (1878) (holding that so long as an assignee has legal title to the assigned commercial paper, the assignee may bring suit even if the assignment was "merely for the purpose of collection" and he acts merely as "equitable trustee" for the assignor, *i.e.,* the assignor maintains the beneficial interest in the paper);

7. *Searing v. Berry,* 58 Iowa 20, 23, 24, 11 N.W. 708, 709 (1882) (where legal title to a judgment was

assigned "merely for the purpose of enabling plaintiff to enforce the collection" and the assignor in fact retained the beneficial interest, the plaintiff-assignee could "prosecute this suit to enforce the collection of the judgment");

8. *Haysler v. Dawson,* 28 Mo.App. 531, 536 (1888) (holding, in light of the "recognized practice in this state," that the assignee could bring suit to recover on certain accounts even where the assignment of the accounts had been made "with the agreement that they were to [be][he]ld *solely* for the purpose of [the litigation]," **\*2547** *i.e.,* the assignor maintained the beneficial interest in the accounts (emphasis added));

9. *Grant v. Heverin,* 77 Cal. 263, 265, 264, 19 P. 493 (1888) (holding that the assignee of a bond could bring suit, even though he lacked a beneficial interest in the bond, and endorsing Pomeroy's rule as "a clear and correct explication of the law");

10. *Young v. Hudson,* 99 Mo. 102, 106, 12 S.W. 632, 633 (1889) (holding that an assignee could sue to collect on an account for merchandise sold, even though the money would be remitted to the assignor, because "[a]n assignee of a chose in action arising out of contract, may sue upon it in his own name, though the title was passed to him only for the purpose of collection");

11. *Jackson v. Hamm,* 14 Colo. 58, 61, 23 P. 88, 88-89 (1890) (holding that the assignee of a judgment was "the real party in interest" and was "entitled to sue in his own name," even though the beneficial interest in the judgment was held by someone else);

12. *Saulsbury v. Corwin,* 40 Mo.App. 373, 376 (1890) (permitting suit by an assignee of a note who "had no interest in the note" on the theory that "[o]ne who holds negotiable paper for collection merely may sue on it in his own name");

13. *Anderson v. Reardon,* 46 Minn. 185, 186, 48 N.W. 777 (1891) (where plaintiff had been assigned a claim on the "understanding" that he would remit the proceeds to the assignor less the "amount due him for services already rendered, and to be thereafter rendered" to the assignor, the plaintiff could bring suit, even though he had "already collected on the demand enough to pay his own claim for services up to that time," because "[i]t is no concern of the defendant

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

whether the assignee of a claim receives the money on it in his own right or as trustee of the assignor");

14. *McDaniel v. Pressler,* 3 Wash. 636, 638, 637, 29 P. 209, 210 (1892) (holding that the assignee of promissory notes was the real party in interest, even the assignment was "for the purpose of collection" and the assignee had "no interest other than that of the legal holder of said notes");

15. *Minnesota Thresher Mfg. Co. v. Heipler,* 49 Minn. 395, 396, 52 N.W. 33 (1892) (upholding the plaintiff-assignee's judgment where that assignee "held the legal title to the demand" and notwithstanding the fact that "there was an agreement between the [assignor] and the plaintiff that the latter took the [assignment] only for collection");

16. *Wines v. Rio Grande W.R. Co.,* 9 Utah 228, 235, 33 P. 1042, 1044, 1045 (1893) (adopting Pomeroy's rule and holding that an assignee could bring suit based on causes of action assigned to him "simply to enable him to sue" and who "would turn over to the assignors all that was recovered in the action, after deducting their proportion of the expenses of the suit");

17. *Greig v. Riordan,* 99 Cal. 316, 323, 33 P. 913, 916 (1893) (holding that the plaintiff-assignee could sue on claims assigned by multiple parties "for collection," stating that "[i]t is [a] matter of common knowledge that for the purpose of saving expense commercial associations and others resort to this method" and repeating the rule that "[i]n such cases the assignee becomes the legal holder of a chose in action, which is sufficient to entitle him to recover");

18. *Gomer v. Stockdale,* 5 Colo.App. 489, 492, 39 P. 355, 357, 356 (1895) (permitting suit by a party who was assigned legal title to contractual rights, where the assignor retained the beneficial interest, noting**\*2548** that the doctrine that "prevails in Colorado" is that the assignee may bring suit in his own name "although there may be annexed to the transfer the condition that when the sum is collected the whole or some part of it must be paid over to the assignor");

19. *Cox's Executors v. Crockett & Co.,* 92 Va. 50, 58, 57, 22 S.E. 840, 843 (1895) (finding that suit by assignor following an adverse judgment against assignee was barred by res judicata but endorsing Pomeroy's rule that an assignee could bring suit as the

"real party in interest" even where the assignee must "account to the assignor, or other person, for the residue, or even is to thus account for the whole proceeds" of the litigation);

20. *Sroufe v. Soto Bros. & Co.,* 5 Ariz. 10, 11, 12, 43 P. 221 (1896) (holding that state law permits "a party to maintain an action on an account which has been assigned to him for the purpose of collection, only" because such parties are "holders of the legal title of said accounts");

21. *Ingham v. Weed,* 5 Cal. Unreported Cases, 645, 649, 48 P. 318, 320 (1897) (holding that the assignees of promissory notes could bring suit where the assignors retained part of the beneficial interest in the outcome, and expressly noting that the assignees could bring suit even if the entire interest in the notes had been assigned to them as "agents for collection" because, citing Pomeroy and prior California cases "to the same effect," an assignee can bring suit where he has "legal title" to a claim, notwithstanding "any contemporaneous collateral agreement" by which he is to account to the assignor for part or even "the whole proceeds");

22. *Citizens' Bank v. Corkings,* 9 S.D. 614, 615, 616, 70 N.W. 1059, 1060,rev'd on other grounds, 10 S.D. 98, 72 N.W. 99 (1897) (holding that where the assignee "took a formal written assignment absolute in terms, but with the understanding that he would take the claim, collect what he could, and turn over to the company the proceeds thereof less the expenses of collection," the assignee could sue because the "rule is that a written or verbal assignment, absolute in terms, and vesting in the assignee the apparent legal title to a chose in action, is unaffected by a collateral contemporaneous agreement respecting the proceeds");

23. *Chase v. Dodge,* 111 Wis. 70, 73, 86 N.W. 548, 549 (1901) (adopting New York's rule that an assignee is the real party in interest so long as he "holds the legal title" to an assigned claim, regardless of the existence of "any private or implied understanding" between the assignor and assignee concerning the beneficial interest (internal quotation marks omitted));

24. *Roth v. Continental Wire Co.,* 94 Mo.App. 236, 262-264, 68 S.W. 594, 602 (1902) (noting that Missouri has adopted Pomeroy's rule and holding that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

the trial court did not err in excluding evidence that plaintiff was assigned the cause of action for collection only);

25. *Manley v. Park,* 68 Kan. 400, 402, 75 P. 557, 558 (1904) (overruling prior state cases and holding that where the assignment of a bond or note vests legal title in the assignee, the assignee can bring suit even where the assignee promises to remit to the assignor "a part or *all* of the proceeds" (emphasis added));

26. *Eagle Mining & Improvement Co. v. Lund,* 14 N.M. 417, 420-422, 94 P. 949, 950 (1908) (adopting the rule that the assignee of a note can bring suit even where the assignor, not the assignee, maintains the beneficial interest in the note);

27. *Harrison v. Pearcy & Coleman,* 174 Ky. 485, 488, 487, 192 S.W. 513, 514-**\*2549** 515 (1917) (holding that the assignee could bring suit to collect on a note, even though he was "an assignee for the purpose of collection only" and had "no financial interest in the note").

28. *James v. Lederer-Strauss & Co*., 32 Wyo. 377, 233 P. 137, 139 (1925) ( "By the clear weight of authority a person to whom a chose in action has been assigned for the purpose of collection may maintain an action thereon ... and as such is authorized by statute in this state to maintain an action in his own name").

Chief Justice ROBERTS, with whom Justice SCALIA, Justice THOMAS, and Justice ALITO join, dissenting.

The majority concludes that a private litigant may sue in federal court despite having to "pass back ... all proceeds of the litigation," Brief for Respondents 9, thus depriving that party of any stake in the outcome of the litigation. The majority reaches this conclusion, in flat contravention of our cases interpreting the case-or-controversy requirement of Article III, by reference to a historical tradition that is, at best, equivocal. That history does not contradict what common sense should tell us: There is a legal difference between something and nothing. Respondents have nothing to gain from their lawsuit. Under settled principles of standing, that fact requires dismissal of their complaint.[FN1]

> FN1. Because respondents have failed to demonstrate that they have Article III

standing to bring their claims, I do not reach the question whether prudential considerations would also bar their suit.

I

Article III of the Constitution confines the judicial power of the federal courts to actual "Cases" and "Controversies." § 2. As we have recently reaffirmed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (quoting *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); internal quotation marks omitted). Unlike the political branches, directly elected by the people, the courts derive their authority under Article III, including the power of judicial review, from "the necessity ... of carrying out the judicial function of deciding cases." *Cuno, supra,* at 340, 126 S.Ct. 1854. That is why Article III courts "may exercise power only ... 'as a necessity,' " that is, only when they are sure they have an actual case before them. *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting *Chicago & Grand Trunk R. Co. v. Wellman,* 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892)). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Cuno, supra,* at 341, 126 S.Ct. 1854.

Given the importance of assuring a court's jurisdiction before deciding the merits of a case, "[w]e have always insisted on strict compliance with th[e] jurisdictional standing requirement." *Raines, supra,* at 819, 117 S.Ct. 2312. And until today, it has always been clear that a party lacking a direct, personal stake in the litigation could not invoke the power of the federal courts. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (plaintiff must demonstrate a "concrete private interest in the outcome of [the] suit"); *Lance v. Coffman,* 549 U.S. ----, ----, 127 S.Ct. 1194, 1196, 167 L.Ed.2d 29 (2007) (plaintiff must seek **\*2550** relief that "directly and tangibly benefits *him* " (quoting *Lujan, supra,* at 574, 112 S.Ct. 2130; emphasis added; internal quotation marks omitted)); *Larson v. Valente,* 456 U.S. 228, 244, n. 15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (Article III requires a litigant to show that a

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

favorable decision "will relieve a discrete injury to *himself*" (emphasis added)); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*" (emphasis added)).

In recent years, we have elaborated the standing requirements of Article III in terms of a three-part test-whether the plaintiff can demonstrate an injury in fact that is fairly traceable to the challenged actions of the defendant and likely to be redressed by a favorable judicial decision. See *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 102-103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). But regardless of how the test is articulated, "the point has always been the same: whether a plaintiff '*personally* would benefit in a tangible way from the court's intervention.' " *Id.,* at 103, n. 5, 118 S.Ct. 1003 (quoting *Warth, supra,* at 508, 95 S.Ct. 2197; emphasis added). An assignee who has acquired the bare legal right to prosecute a claim but no right to the substantive recovery cannot show that he has a personal stake in the litigation.

The Court's decision today is unprecedented. *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), does not support it. *Vermont Agency,* in recognizing that a *qui tam* relator as assignee of the United States had standing to sue, did not dispense with the essential requirement of Article III standing that the plaintiff have a "concrete private interest in the outcome of [the] suit." *Id.,* at 772, 120 S.Ct. 1858 (quoting *Lujan, supra,* at 573, 112 S.Ct. 2130; internal quotation marks omitted). In *Vermont Agency,* the *qui tam* relator's bounty was sufficient to establish standing because it represented a "partial assignment of the Government's damages claim," encompassing both a legal right to assert the claim *and* a stake in the recovery. 529 U.S., at 773, 120 S.Ct. 1858. Thus, it was clear that the False Claims Act gave the "relator himself an interest *in the lawsuit*," in addition to "the right to retain a fee out of the recovery." *Id.,* at 772, 120 S.Ct. 1858.

Here, respondents are authorized to bring suit on behalf of the payphone operators, but they have no claim to the recovery. Indeed, their take is not tied to the recovery in any way. Respondents receive their compensation based on the number of payphones and telephone lines operated by their clients, see App. 198,

not based on the measure of damages ultimately awarded by a court or paid by petitioners as part of a settlement. Respondents received the assignments only as a result of their willingness to assume the obligation of remitting any recovery to the assignors, the payphone operators. That is, after all, the entire point of the arrangement. The payphone operators assigned their claims to respondents "for purposes of collection," App. to Pet. for Cert. 114a; respondents never had any share in the amount collected. The absence of any right to the substantive recovery means that respondents cannot benefit from the judgment they seek and thus lack Article III standing. "When you got nothing, you got nothing to lose." Bob Dylan, Like A Rolling Stone, on Highway 61 Revisited (Columbia Records 1965).

To be sure, respondents doubtless have more than just a passing interest in the litigation. As collection agencies, respondents**2551** must demonstrate that they are willing to make good on their threat to pursue their clients' claims in litigation. Even so, "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." *Vermont Agency, supra,* at 773, 120 S.Ct. 1858. The benefit respondents would receive-the general business goodwill that would result from a successful verdict, the ability to collect dial-around compensation for their clients more effectively-is nothing more than a byproduct of the current litigation. Such an interest cannot support their standing to sue in federal court. Cf. *Steel Co., supra,* at 107, 118 S.Ct. 1003 (the costs of investigating and prosecuting a substantive claim do not give rise to standing to assert the claim); *Diamond v. Charles,* 476 U.S. 54, 70, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (an interest in recovering attorney's fees does not confer standing to litigate the underlying claim).

The undeniable consequence of today's decision is that a plaintiff need no longer demonstrate a personal stake in the outcome of the litigation. Instead, the majority has replaced the personal stake requirement with a completely impersonal one. The right to sue is now the exact opposite of a personal claim-it is a marketable commodity. By severing the right to recover from the right to prosecute a claim, the Court empowers *anyone* to bring suit on any claim, whether it be the first assignee, the second, the third, or so on. But, as we have said in another context, standing is not "commutative." *Cuno,* 547 U.S., at 352, 126 S.Ct.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

1854. Legal claims, at least those brought in federal court, are not fungible commodities.

The source of the Court's mistake is easy to identify. The Court goes awry when it asserts that the standing inquiry focuses on whether the *injury* is likely to be redressed, not whether the *complaining party's* injury is likely to be redressed. See *ante,* at 2542 - 2543. That could not be more wrong. We have never approved federal-court jurisdiction over a claim where the entire relief requested will run to a party not before the court. Never. The Court commits this mistake by treating the elements of standing as separate strands rather than as interlocking and related elements meant to ensure a personal stake. Our cases do not condone this approach.

The Court expressly rejected such an argument in *Vermont Agency,* where the relator argued that he was "suing to remedy an injury in fact suffered by the United States." 529 U.S., at 771, 120 S.Ct. 1858. We dismissed the argument out of hand, noting that "[t]he Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party.*" *Id.,* at 771-772, 120 S.Ct. 1858 (quoting *Warth,* 422 U.S., at 499, 95 S.Ct. 2197; emphasis in *Vermont Agency* ; internal quotation marks omitted). Although the Court's analysis in that section of the opinion concerned the right of the relator to assert the United States' *injury,* the Court treated it as axiomatic that any "redress" must also redound to the benefit of the relator.

In *Steel Co.,* the Court similarly rejected a basis for standing that turned on relief sought-the imposition of civil penalties-that was "payable to the United States Treasury," but not to the plaintiff. 523 U.S., at 106, 118 S.Ct. 1003. We observed that the plaintiff sought "not remediation of its *own* injury," but merely the "vindication of the rule of law." *Ibid.* (emphasis added). Importantly, the Court recognized that "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very **\*2552** essence of the redressability requirement." *Id.,* at 107, 118 S.Ct. 1003. Again, the Court's emphasis on the *party's* injury makes clear that the basis for rejecting standing in *Steel Co.* was the fact that the remedy sought would not benefit the party before the Court.

The majority's view of the Article III redressability

requirement is also incompatible with what we said in *Raines,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849. In that case, we held that individual Members of Congress lacked standing to contest the constitutionality of the Line Item Veto Act. We observed that the Congressmen "do not claim that they have been deprived of something to which they *personally* are entitled." *Id.,* at 821, 117 S.Ct. 2312. Rather, the Members sought to enforce a right that ran to their office, not to their person. "If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds ... as trustee for his constituents, not as a prerogative of personal power." *Ibid.* We therefore held that the individual Members did "not have a sufficient 'personal stake' in th[e] dispute" to maintain their challenge. *Id.,* at 830, 117 S.Ct. 2312. See also *Warth, supra,* at 506, 95 S.Ct. 2197 (denying standing where "the record is devoid of any indication" that the requested "relief would benefit petitioners"); *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 39, 42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (denying standing to plaintiffs who did not "stand to profit in some *personal* interest" because it was "purely speculative" whether the relief sought "would result in *these respondents'* receiving the hospital services they desire" (emphasis added)).

The majority finds that respondents have a sufficient stake in this litigation because the substantive recovery will initially go to them, and "[w]hat does it matter what the aggregators do with the money afterward?" *Ante,* at 2543. The majority's assertion implies, incorrectly, that respondents have, or ever had, a choice of what to do with the recovery. It may be true that a plaintiff's *independent* decision to pledge his recovery to another, as in respondents' hypothetical of an "*original* owner of a claim who signs a collateral agreement with a charity obligating herself to donate every penny she recovers in [the] litigation," Brief for Respondents 21, would not divest the plaintiff of Article III standing. But respondents never had the right to direct the disposition of the recovery; they have only the right to sue. The hypothetical plaintiff who chooses to pledge her recovery to charity, by contrast, will secure a personal benefit from the recovery. Unlike respondents' claims, the hypothetical plaintiff's pre-existing claim is not tied in any way to her separate agreement to direct her recovery to charity. She has more than the right to sue;

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly
Fed. S 411
**128 S.Ct. 2531**

she has the right to exercise her independent authority to direct the proceeds as she sees fit. In that situation, the Article III requirement that a plaintiff demonstrate a personal stake in the outcome of the litigation is satisfied.[FN2]

> FN2. The majority believes that the examples of trustees, guardians ad litem, receivers, and executors show that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit." *Ante,* at 2543. None of these examples is pertinent to the question here. "A guardian ad litem or next friend ... is a nominal party only; the ward is the real party in interest ... ."6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1548, pp. 373-374 (2d ed.1990). A receiver "is considered to be an officer of the court, and therefore not an agent of the parties, whose appointment is incident to other proceedings in which some form of primary relief is sought." 12 *id.,* § 2981, at 9-10 (2d ed.1997) (footnote omitted). Trustees hold legal title to the assets in the trust estate and have an independent fiduciary obligation to sue to preserve those assets. The trustee's discharge of its legal obligation is an independent, personal benefit that supports the trustee's standing to sue in federal court. The majority's response that assignees for collection only have a "*contractual obligation to litigate,*" *ante,* at 2543, is unavailing, because the contractual obligation to sue and remit the proceeds of any recovery was a condition of the assignment of the claim in the first place. The majority's reasoning is perfectly circular: A suit pursuant to a contract to remit proceeds satisfies Article III because there is a contract to remit proceeds.

> In any event, the majority cannot dispute the point that suits by trustees, guardians ad litem, executors, and the like make up a settled, continuous practice "of the sort traditionally amenable to, and resolved by, the judicial process." *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As shown below, the same cannot be said

for suits by assignees for collection only. See *infra,* at 2539 - 2541.

The Court believes that these standing principles, embodying a "core component **\*2553** derived directly from the Constitution,"*Allen,* 468 U.S., at 751, 104 S.Ct. 3315, that is of "particular importance in ensuring that the Federal Judiciary respects the proper-and properly limited-role of the courts in a democratic society," and that is "crucial in maintaining the tripartite allocation of power set forth in the Constitution,"*Cuno,* 547 U.S., at 341, 126 S.Ct. 1854 (internal quotation marks omitted), should yield "as a practical matter" to the prospect that a contrary "holding could easily be overcome," *ante,* at 2544. The Court chooses to elevate expediency above the strictures imposed by the Constitution. That is a tradeoff the Constitution does not allow. Cf. *Raines, supra,* at 820, 117 S.Ct. 2312 ("[W]e must put aside the natural urge to proceed directly to the merits of this important dispute and to 'settle' it for the sake of convenience and efficiency"). Perhaps it is true that a "dollar or two," *ante,* at 2544, would give respondents a sufficient stake in the litigation. Article III is worth a dollar. And in any case, the ease with which respondents can comply with the requirements of Article III is not a reason to abandon our precedents; it is a reason to adhere to them.

II

Given all this, it is understandable that the majority opts to minimize its reliance on modern standing principles and to retreat to a broad, generalized reading of the historical tradition of assignments. But that history does not support the majority's conclusion.

The first problem lies in identifying the relevant tradition. Much of the majority's historical analysis focuses on the generic (and undisputed) point that common law and equity courts eventually permitted assignees to sue on their assigned claims. See *ante,* at 2535 - 2539. I would treat that point as settled as much by *stare decisis,* see *Vermont Agency,* 529 U.S., at 773, 120 S.Ct. 1858, as by the historic practice of the King's Bench and Chancery. But the general history of assignments says nothing about the particular aspect of suits brought on assigned claims that is relevant to this case: whether an assignee who has acquired the legal right to sue, but no right to any substantive recovery, can maintain an action in court. On that

precise question, the historical sources are either nonexistent or equivocal.

### A

None of the English common-law sources on which the majority relies establishes that assignments *of this sort* would **\*2554** be permitted either at law or in equity. As the majority's discussion makes clear, both systems permitted suits brought on assignments-either in equity by an assignee having a beneficial interest in the litigation, or at law by an assignee who had a power of attorney and sued in the name of the assignor. See *ante*, at 2536 - 2537. But at all times, suits based on assignments remained subject to the prohibition on champerty and maintenance. See 7 W. Holdsworth, History of English Law 535-536 (1926).[FN3] By the 18th century, an assignment no longer constituted maintenance *per se,* see *id.,* at 536, but it appears to have been an open question whether an assignment of the "[b]are [r]igh[t] to [l]itigate" would fail as "[s]avouring" of champerty and maintenance, see M. Smith, Law of Assignment: The Creation and Transfer of Choses in Action 318, 321 (2007). In order to sustain an assignment of the right to sue, the assignment had to include the transfer of a property interest to which the right of action was incident or subsidiary. *Id.,* at 321-322; see also *Prosser v. Edmonds,* 1 Y. & C. Exch. 481, 160 Eng. Rep. 196 (1835); *Dickinson v. Burrell,* 35 Beav. 257, 55 Eng. Rep. 894 (1866); 2 J. Story, Commentaries on Equity Jurisprudence § 1040*h,* pp. 234-235 (8th ed. 1861); R. Megarry & P. Baker, Snell's Principles of Equity 82 (25th ed.1960).

> FN3. Blackstone defined maintenance as the "officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it .... This is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression." 4 W. Blackstone, Commentaries \*134-\*135. Champerty "is a species of maintenance, ... being a bargain with a plaintiff or defendant *campum partire,* to divide the land or other matter sued for between them, if they prevail at law; whereupon the champertor is to carry on the party's suit at his own expense." *Id.,* at \*135.

American courts as well understood the common-law rule to require a transfer of interest to the assignee-over and above the "naked right to bring a suit"-that gave the assignee a "valuable right of property." *Traer v. Clews,* 115 U.S. 528, 541, 6 S.Ct. 155, 29 L.Ed. 467 (1885). A New York court, surveying the English sources, concluded that "an assignment to the plaintiff of the assignor's right to maintain and prosecute an action for the specific performance of defendants' agreement, amounts to nothing more than an assertion that the assignor has undertaken to assign to the plaintiff a bare right to litigate for the former's benefit exclusively." *Williams v. Boyle,* 1 Misc. 364, 367, 20 N.Y.S. 720, 722 (Ct. Common Pleas 1892). To secure standing in a court of equity, the court held, "it must appear that the assignee's successful prosecution of the action is susceptible of *personal* enjoyment *by him...* ."*Ibid.* (emphasis added).

So while there is no doubt that at common law, courts of law and equity sought ways of protecting the rights of assignees, they did not do so to the exclusion of the age-long objection to maintenance, which could be found when the assignee lacked a sufficient interest in the subject matter of the litigation. During the common-law period at least, it remained an open question whether an assignee for collection, who by agreement took nothing from the suit, had a sufficient interest in the assigned debt to support his right to sue.

To be sure, the assignments at issue here purport to give respondents "all rights, title and interest" in the payphone operators' claims for dial-around compensation. App. to Pet. for Cert. 114a. But when severed from the right to retain any of the substantive recovery, it is not clear that common-law courts of law or equity would have treated the assigned right to **\*2555** litigate as incidental or subsidiary to the interest represented by the claim itself. Cf. 7 Holdsworth, *supra,* at 538 ("[I]t was not till certain classes of rights ... became more freely assignable in equity, that it became necessary to distinguish between the cases in which assignment was permitted and cases in which it was not; and it is for this reason that we find very little clear authority on these questions till quite modern times").[FN4]

> FN4. The fact that a bankrupt assignor could sue at law to recover debts for the benefit of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531                                                                    Page 20
128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly
Fed. S 411
**128 S.Ct. 2531**

an assignee creditor, see *ante,* at 2537 (citing *Winch v. Keeley,* 1 T.R. 619, 99 Eng. Rep. 1284 (K.B.1787)), says nothing about the issue in this case. It is of course true that one has standing to sue when the result of a favorable judgment will be the discharge of a debt or other legal obligation. The only legal obligation respondents seek to discharge is the obligation to remit the proceeds of the litigation to the payphone operators. But as explained above, a party lacking the independent right to direct the disposition of the proceeds cannot demonstrate the personal stake required to invoke the authority of an Article III court. See *supra,* at 2536 - 2537.

I do not take the majority's point to be that the common-law tradition supplies the answer to this question. As the majority concedes, it was not until the 19th century that "courts began to consider the specific question presented here." *Ante,* at 2538. But even granting this starting point, the Court's recitation of the 19th-century tradition fails to account for the deep divergence in practice regarding the right of assignees with no stake in the substantive recovery to maintain an action in court.

The majority concedes that "*some* States during this period of time refused to recognize assignee-for-collection suits,"*ante,* at 2539, but that refusal was substantially more widespread than the majority acknowledges. See *Robbins v. Deverill,* 20 Wis. 142 (1865); *Bostwick v. Bryant,* 113 Ind. 448, 16 N.E. 378 (1888); *Moses v. Ingram,* 99 Ala. 483, 12 So. 374 (1893); *Brown v. Ginn,* 66 Ohio St. 316, 64 N.E. 123 (1902); *Coombs v. Harford,* 99 Me. 426, 59 A. 529 (1904); *Martin v. Mask,* 158 N.C. 436, 74 S.E. 343 (1912). These courts concluded that assignees having no legal or beneficial interest to vindicate could not sue on the assigned claims.

Several more States, including some enlisted by the majority, only eventually recognized the right of assignees for collection to sue after taking inconsistent positions on the issue. In fact, the rule regarding assignees for collection only was so unsettled that the Kansas Supreme Court reversed itself twice in the span of 19 years. Compare *Krapp v. Eldridge,* 33 Kan. 106, 5 P. 372 (1885) (assignees for collection only may sue as the real party in interest), with *Stewart v. Price,* 64 Kan. 191, 67 P. 553 (1902) (assignees for

collection only may not sue), with *Manley v. Park,* 68 Kan. 400, 75 P. 557 (1904) (assignees for collection only may sue again). During this period, many other courts reversed course on the flinty problem posed by assignees for collection only. See *Hoagland v. Van Etten,* 23 Neb. 462, 36 N.W. 755 (1888), overruled by*Archer v. Musick,* 147 Neb. 1018, 25 N.W.2d 908 (1947); *State ex rel. Freebourn v. Merchants' Credit Serv., Inc.,* 104 Mont. 76, 66 P.2d 337 (1937), overruled by*Rae v. Cameron,* 112 Mont. 159, 114 P.2d 1060 (1941).

The majority's survey of 19th-century judicial practice thus ignores a substantial contrary tradition during this period. That tradition makes clear that state courts *did not* regularly "entertai[n] suits virtually identical to the litigation before us." *Ante,* at 2538. In reality, all that the majority's cases show is that the question whether assignees for collection could **\*2556** maintain an action in court was hotly contested-a live issue that spawned much litigation and diverse published decisions. The confusion was much remarked on by courts of this period, even those that ultimately sided with the Court's understanding of the prevailing practice. See, *e.g.,Gomer v. Stockdale,* 5 Colo.App. 489, 492, 39 P. 355, 356 (1895) ("There is much controversy in the various states respecting that almost universal code provision, that a suit must be prosecuted in the name of the real party in interest"); *Compton v. Atwell,* 207 F.2d 139, 140-141 (C.A.D.C.1953) ( "[W]hether an assignee for collection only is the real party in interest ... has produced a variance of judicial opinion" and "has so divided other courts").

Commentators have also called attention to the divergent practice. As the majority notes, John Norton Pomeroy observed that "there is some conflict" on the question whether an assignee for collection obligated to "account for the whole proceeds ... is entitled to sue in his own name." Remedies and Remedial Rights § 132, p. 159 (1876) (internal quotation marks omitted). See also M. Ferguson, Comment, The Real Party in Interest Rule Revitalized: Recognizing Defendant's Interest in the Determination of Proper Parties Plaintiff, 55 Cal. L.Rev. 1452, 1475 (1967) ("Nowhere do the courts manifest more confusion than in deciding whether an assignee for collection only is a real party in interest"); Note, 51 Mich. L.Rev. 587, 588 (1953) (observing that "[t]here is, however, little agreement among the courts as to the meaning

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

and purpose of [real party in interest] provisions" and noting that they have been construed "to prevent the owner of the bare legal title to a chose in action from suing"). Indeed, notable legal commentators of the period argued against permitting suits by assignees for collection. See, *e.g.,* 1 J. Kerr, Law of Pleading and Practice § 586, pp. 791-792 (1919) ("[T]he party in whom the legal interest is vested is not always the real party in interest. The 'real party in interest' is the party who would be benefited or injured by the judgment in the cause .... The rule should be restricted to parties whose interests are in issue, and are to be affected by the decree").

This unsettled and conflicting state of affairs is understandable given the transformation in the understanding of the common-law prohibition on suits by assignees with no beneficial interest. The immediate cause for this transformation was the merger of law and equity, and the creation of real party in interest provisions intended to reconcile the two forms of actions. *Allen v. Brown,* 44 N.Y. 228, 231 (1870) (noting that New York code provision allowing assignees to sue as the real party in interest "abolishe[d] the distinction between actions at law and suits in equity"); see *ante,* at 2538 - 2539. The fusion of law and equity forced courts to confront the novel question of what to do with assignees for collection only, who could not sue at law in their own name, and who could not recover on a bill in equity for the lack of any beneficial interest to enforce. Were such assignees, under the new system, real parties in interest who could bring suit? It is not surprising that courts took conflicting positions on this question, a question for which the historical tradition did not provide an answer. Given this, it is difficult to characterize a practice as showing what sort of cases and controversies were "*traditionally* amenable to ... the judicial process,"*Steel Co.,* 523 U.S., at 102, 118 S.Ct. 1003 (emphasis added), when the practice was a self-conscious *break* in tradition.

In *Vermont Agency,* by contrast, the Court relied on a long and unbroken tradition of informer statutes that reached back to the 14th century and prevailed up to the **\*2557** "period immediately before and after the framing of the Constitution." 529 U.S., at 776, 120 S.Ct. 1858. The Court noted that the American Colonies "pass[ed] several informer statutes expressly authorizing *qui tam* suits," and that the First Congress itself "enacted a considerable number of informer

statutes." *Ibid.* This tradition provided relevant evidence of what the Framers in 1787 would have understood the terms "case" and "controversy" to mean. See *Coleman v. Miller,* 307 U.S. 433, 460, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (opinion of Frankfurter, J.) (the Article III"[j]udicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies' ").[FN5]

> FN5. The statutes from the American Colonies add nothing to the majority's historical argument. See *ante,* at 2538 - 2539. Exceptions (some created by statute) to the general rule against assignments at law arose early in the common-law period, including exceptions for executors and administrators of estates, assignees in bankruptcy, negotiable instruments, and assignments involving the sovereign. See 29 R. Lord, Williston on Contracts § 74.2, pp. 214-215 (4th ed.2003). What none of these exceptions provides for, however, are suits brought by assignees for collection only-*i.e.,* assignees who have no share in the substantive recovery. Such assignees, as the majority acknowledges, did not attract the attention of courts until the 19th century. See *ante,* at 2538 - 2539.

There is certainly no comparable tradition here. The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of Article III. Although we have sometimes looked to cases postdating the founding era as evidence of common-law traditions, we have never done so when the courts self-consciously confronted novel questions arising from a break in the received tradition, or where the practice of later courts was so divergent. A belated and equivocal tradition cannot fill in for the fundamental requirements of Article III where, as here, those requirements are so plainly lacking.

### B

Nor do our own cases establish that we "long ago indicated that assignees for collection only can properly bring suit." *Ante,* at 2540. (If the majority truly believed that, one would expect the cases to be

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

placed front and center in the Court's analysis, rather than as an afterthought.) None addressed the requirements of Article III, and so none constitutes binding precedent. See *Steel Co., supra,* at 91, 118 S.Ct. 1003 ("[D]rive-by jurisdictional rulings of this sort ... have no precedential effect"); *Lewis v. Casey,* 518 U.S. 343, 352, n. 2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[W]e have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect").

In *Waite v. Santa Cruz,* 184 U.S. 302, 22 S.Ct. 327, 46 L.Ed. 552 (1902), we addressed the then-existing statutory provision that barred jurisdiction over suits "improperly or collusively made or joined ... for the purpose of creating a case cognizable or removable under this act." *Id.,* at 325, 22 S.Ct. 327. We held that a plaintiff who took legal title of multiple bonds "for purposes of collection" could not satisfy the statute when the bonds individually did not meet the amount in controversy requirement. *Ibid.* The Court did not say that the "suit *could* properly be brought in federal court,"*ante,* at 2540, if the only objection were the limitation placed on the plaintiff's assignment; instead, the Court remarked that such a limited assignment would not violate the *statutory* prohibition on suits that are "improperly or collusively made or joined,"*Waite, supra,* at 325, 22 S.Ct. 327.

**\*2558** In *Spiller v. Atchison, T. & S.F.R. Co.,* 253 U.S. 117, 40 S.Ct. 466, 64 L.Ed. 810 (1920), the plaintiff, secretary of the Cattle Raisers' Association, sued to enforce an order of reparations issued by the Interstate Commerce Commission, which found that the defendant railroads had charged excessive shipping rates to the members of the association. The question before the Court was the validity of the lower court's ruling that the assignments to the plaintiff-which reserved a beneficial interest in the assignors, the individual members of the association-did not vest legal title in the secretary "so as [to] authorize the commission to make the award of damages in his name." *Id.,* at 134, 40 S.Ct. 466. We concluded that the agency was authorized to issue the reparations order in the name of the plaintiff because the assignments were "absolute in form." *Ibid.* We then concluded that "beneficial or equitable title" was not necessary for the plaintiff "to claim an award of reparation" and enforce that award in his own name in court. *Ibid.* In other words, the Court addressed merely the question whether it was appropriate for a federal

agency (not bound by the constraints of Article III) to enter an award in the plaintiff's name. In no way did the Court endorse the right of an assignee for collection to sue as an initial matter in federal court.

Nor did the Court address Article III standing requirements in *Titus v. Wallick,* 306 U.S. 282, 59 S.Ct. 557, 83 L.Ed. 653 (1939). There, we found that an assignment "for purposes of suit," where the assignee had an obligation to account for the proceeds (in part) to another, did not render the assignment invalid under New York *state law*. *Id.,* at 289, 59 S.Ct. 557. Thus, we held that the Ohio courts had failed to give full faith and credit to an earlier, valid New York court judgment. *Id.,* at 292, 59 S.Ct. 557. If we had been presented with the Article III question, we would likely have found it significant that the plaintiff-assignee stood to take the balance of any recovery after the proceeds were used to discharge the debts of the assignor (plaintiff's brother) and the plaintiff's wife. *Id.,* at 286, 59 S.Ct. 557. But in any event, the Court's conclusion that the assignment was valid under New York law, where the restrictions of Article III do not operate, does not support the view that suits by assignees for collection are permissible in federal courts.

### C

When we have looked to history to confirm our own Article III jurisdiction, we have relied on a firmly entrenched historical tradition that served to confirm the application of modern standing principles. See *Vermont Agency,* 529 U.S., at 774-778, 120 S.Ct. 1858. The Court's decision today illustrates the converse approach. It relies on an equivocal and contradictory tradition to override the clear application of the case-or-controversy requirement that would otherwise bar respondents' suit.

But perhaps we should heed the counsels of hope rather than despair. The majority, after all, purports to comply with our Article III precedents, see *ante,* at 2541 - 2543, so those precedents at least live to give meaning to "the judiciary's proper role in our system of government" another day. *Raines,* 521 U.S., at 818, 117 S.Ct. 2312. What is more, the majority expressly and repeatedly grounds its finding of standing on its conclusion that "history and precedent are clear" that these types of suits "have long been permitted," *ante,* at 2535 - 2536, and that there is "a

128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411
**128 S.Ct. 2531**

strong tradition" of such suits "during the past two centuries," *ante,* at 2541 - 2542, 2543. This conclusion is, for the reasons we have set forth, achingly wrong-but at **\*2559** least the articulated test is clear and daunting.

Finally, there is the majority's point that all this fuss could have been avoided for a dollar, see *ante,* at 2543 - 2544-a price, by this point, that most readers would probably be happy to contribute. The price will be higher in future standing cases. And when it is-when standing really matters-it would be surprising if the Court were to look to a case in which it did not.

I would vacate the decision of the Court of Appeals and remand for further proceedings.

U.S.Dist.Col.,2008.
Sprint Communications Co., L.P. v. APCC Services, Inc.
128 S.Ct. 2531, 76 USLW 4542, 08 Cal. Daily Op. Serv. 7702, 2008 Daily Journal D.A.R. 9308, 21 Fla. L. Weekly Fed. S 411

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.